**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————
                                                    )
HÅKAN LANS and                                      )
UNIBOARD AKTIEBOLAG,                                )
                                                    )
            Plaintiffs,                             )
                                                    )
      v.                                            )        Civil Action No. 02-2165  (RBW)
                                                    )
ADDUCI MASTRIANI &                                  )
SCHAUMBERG L.L.P., <u>et</u> <u>al.</u> ,           )
                                                    )
            Defendants.                             )
———————————————————————)

**MEMORANDUM OPINION**

Dr. Håkan Lans and Uniboard Aktiebolag ("Uniboard"), the plaintiffs in this civil suit,

seek to recover "actual and treble" compensatory and punitive damages from the defendants in

an amount to be determined at a trial, as well as injunctive relief in the form of the imposition of

a constructive trust, Third Amended Complaint (the "Compl.") at 56-57, due to (1) multiple

alleged breaches by the defendants of their duty of care and fiduciary duty in regard to legal

representation provided to the plaintiffs in various matters, <u>see</u> <u>id.</u> ¶¶ 11-12 (listing four discrete

breaches of the duty of care by the defendants and nineteen discrete breaches of their fiduciary

duty by the defendants); (2) perjury committed as "part of a pattern of conduct designed

corruptly to influence a judge of a United States [District] Court[] and obstruct or impede the due

administration of justice," <u>id.</u> ¶ 6; (3) conversion of "funds received in trust for [the p]laintiffs,"

<u>id.</u> ¶ 8; and (4) "racketeering activity . . . designed . . . to avoid the consequences of [the

d]efendants' negligence," <u>id.</u> ¶ 9.  The plaintiffs contend that these misdeeds resulted in the loss

of the plaintiffs' proprietary interests in a patent allegedly worth "more than $100 million."  <u>Id.</u>

¶ 13.  Currently before the Court are separate dispositive motions: a motion to dismiss for lack of personal jurisdiction and forum non conveniens filed by defendants Delphi & Co. ("Delphi"), Peter Utterström, and Talbot Lindström (collectively the "Delphi Defendants"), and a motion for partial judgment on the pleadings filed by defendants Adduci, Mastriani & Schaumberg, L.L.P. ("AMS"), Louis Mastriani, Tom Schaumberg, and V. James Adduci (collectively the "AMS Defendants").  Upon carefully considering the plaintiffs' Third Amended Complaint, the defendants' motions, and all memoranda and exhibits submitted with these filings,[1] the Court concludes for the reasons that follow that it must deny the Delphi Defendants' motion and grant in part the AMS Defendants' motion.

## I. Background[2]

Although the facts giving rise to this litigation are relatively straightforward, the procedural history of this case is a long and tortured one.  In the mid-1970s, Dr. Lans, "one of the most well[-]regarded scientists in Sweden," Compl. ¶ 15, "began working on the development of a color graphics system for computers and data processing and display systems," id. ¶ 24.  This work resulted in the invention of "a system and apparatus for managing the picture memory of a digital color graphics imaging system," id. (internal quotation marks omitted),

---

[1] In addition to the plaintiffs' Third Amended Complaint, the Delphi Defendants' motion to dismiss, and the AMS Defendants' motion for partial judgment on the pleadings (the "AMS Defs.' Mot."), the Court considered the following documents in reaching its decision: (1) the Memorandum of Law in Support of Motion to Dismiss Claims Against the Delphi Defendants for Lack of Personal Jurisdiction and on the Ground of Forum Non Conveniens (the "Delphi Defs.' Mem."); (2) the Plaintiffs' Memorandum of Points and Authorities in Opposition to the Delphi Defendants' Motion to Dismiss the Plaintiffs' Third Amended Complaint (the "Pls.' Delphi Opp'n"); (3) the Reply Memorandum in Support of Motion to Dismiss Claims Against the Delphi Defendants for Lack of Personal Jurisdiction and on the Ground of Forum Non Conveniens (the "Delphi Defs.' Reply"); (4) the Memorandum of Points and Authorities in Support of the AMS Defendants' Motion for Judgment on the Pleadings (the "AMS Defs.' Mem."); (5) the Memorandum of Law in Opposition to the AMS Defendants' Motion for Judgment on the Pleadings (the "Pls.' AMS Opp'n"); and (6) the AMS Defendants' Reply to Plaintiffs' Opposition to Motion for Judgment on the Pleadings (the "AMS Defs.' Reply").

[2] All of the facts discussed herein are either alleged in the plaintiffs' Third Amended Complaint or are matters of public record.

which Dr. Lans patented in the United States, Germany, Denmark, Finland, Italy, Japan, and Norway, id. ¶¶ 24-25.  This patent, U.S. Patent No. 4,303,986 (the "'986 Patent"), was registered in the United States on December 1, 1981, and expired on January 9, 1999.  Id. ¶ 26.

"Since at least 1985, Dr. Lans has been the [m]anaging [d]irector and sole shareholder of Uniboard," a "Swedish corporation with its principal place of business" in Salsjöbaden, Sweden. Id. ¶ 16.  "On October 19, 1989, . . . Dr. Lans assigned [his] rights in the '986 Patent to Uniboard."  Id. ¶ 30.  That same day, "Uniboard entered into a non-exclusive agreement to license the '986 Patent to IBM."  Id.  Dr. Lans also "signed a document . . . that clarified his retention of the ownership of the '986 Patent while transferring the licensing rights under the '986 Patent to Uniboard."  Id. ¶ 31.

Six years later, Peter Utterström, the managing partner of Swedish law firm Delphi, id. ¶¶ 21-22, "approached Dr. Lans about enforcing the '986 Patent and convinced Dr. Lans to meet with him and Lindstr[ö]m," id. ¶ 32, a District of Columbia attorney affiliated with Delphi as "of counsel," id. ¶ 23, to discuss the project, id. ¶ 32.  Lindström, in turn, contacted AMS, id. ¶ 33, "a District of Columbia law firm . . . claim[ing] to have extensive experience in patent matters," id. ¶ 17, "after which Lindstr[ö]m and Utterstr[ö]m of Delphi and Mastriani and Schaumberg[, principals] of AMS[,] began to correspond about the possibility of pursuing patent infringers of the '986 Patent," id. ¶¶ 18-19, 33.  "As part of their review of the '986 Patent in 1995, Delphi, Lindstr[ö]m[,] and Utterstr[ö]m determined that IBM had entered into a non-exclusive license agreement to use the '986 Patent," a fact they shared with AMS.  Id. ¶ 34.

Mastriani wrote Dr. Lans directly in March of 1996, urging Dr. Lans to "pursu[e] infringers of the '986 Patent," and suggesting that "litigation could be brought in the name of a company to which Dr. Lans could assign the '986 Patent."  Id. ¶ 35.  "On May 9, 1996, Mastriani

faxed Lindstr[ö]m a request that he set up a meeting with Dr. Lans on May 17, 1996[,] in Stockholm," and "faxed a proposal to Dr. Lans requesting that Delphi and AMS represent him in connection with pursuing infringers of the '986 Patent." Id. ¶ 36.  Twelve days after this May 17 meeting with Dr. Lans, Shaumberg, Utterström, and Lindström, id. ¶ 38, "Mastriani sent a proposal to Dr. Lans for notifying and suing infringers of the '986 Patent," id. ¶ 39.  In that proposal, "Mastriani acknowledged that the '986 Patent would expire in December [of] 1998," although the actual expiration date was January 9, 1999. Id.

On or about August 9, 1996, Dr. Lans entered into a fee agreement with AMS and Delphi (the "Fee Agreement"). Id. ¶ 45.  "Under the [terms of] the Fee Agreement, Dr. Lans was to receive 67% of all recoveries from infringers of the '986 Patent, and the attorneys were to receive 33%, to be divided as they chose." Id. ¶ 41.  "The Fee Agreement gave AMS and Delphi the right of access to all licensing and litigation concerning the '986 Patent . . . anywhere in the world," id. ¶ 42, and also vested AMS and Delphi with "complete discretion in the conduct of negotiations concerning licensing strategy," id. ¶ 43.  Further, the Fee Agreement vested AMS with "exclusive discretion in the conduct of litigation." Id. ¶ 44.

"From September [of] 1996 through March [of] 1997, AMS sent approximately 100 letters giving notice of the '986 Patent to potential infringers . . . ." Id. ¶ 49.  All of these notices were sent in Dr. Lans's name. Id.  Mastriani, Adduci (a principal of AMS), and Schaumberg also met with Utterström and Lindström in July of 1997 at AMS's office in Washington, D.C., to discuss, inter alia, whether suits for infringement of the '986 Patent "should be brought in Dr. Lans'[s] name or in the name of . . . Uniboard." Id. ¶¶ 20, 60.  Ultimately, the defendants "decided that the lawsuit[s] should be filed in Dr. Lans'[s] name only." Id. ¶ 60.

On October 24, 1997, AMS filed separate patent infringement suits in this Court—all in

the name of Dr. Lans—against Digital Equipment Corporation ("Digital Equipment"), Gateway

2000, Inc. ("Gateway"), Hewlett-Packard Company ("Hewlett-Packard"), Packard Bell NEC,

Inc. ("Packard Bell"), Dell Computer Corporation ("Dell"), Compaq Computer Corporation

("Compaq"), Acer America Corporation ("Acer"), and AST Research, Inc. (collectively the

"Computer Companies"). See generally Lans v. Digital Equip. Corp., Civil Action No. 97-2493

(JGP) (D.D.C.); Lans v. Gateway 2000, Inc., Civil Action No. 97-2523 (RBW) (D.D.C.); Lans v.

Hewlett-Packard Co., Civil Action No. 97-2524 (JGP) (D.D.C.); Lans v. Packard Bell NEC, Inc.,

Civil Action No. 97-2525 (JGP) (D.D.C.); Lans v. Dell Computer Corp., Civil Action No. 97-

2526 (RBW) (D.D.C.); Lans v. Compaq Computer Corp., Civil Action No. 97-2527 (JGP)

(D.D.C.); Lans v. Acer Am. Corp., Civil Action No. 97-2528 (JGP) (D.D.C.); Lans v. AST

Research, Inc., Civil Action No. 97-2529 (JGP) (D.D.C.).[3] These civil actions (collectively the

"Lans Civil Actions") were assigned to Judge Penn of this Court until his passing in October of

2007.

　　　　As part of the discovery process in the Lans Civil Actions, "Gateway asked IBM for a

copy of the document under which Uniboard claimed the right to assign rights in the '986 Patent

to IBM." Compl. ¶ 90. After receiving a copy of this document, Gateway filed a motion to

dismiss Dr. Lans's complaint or, in the alternative, for summary judgment "based upon a lack of

standing and attached the assignment from [Dr.] Lans to Uniboard in support of its motion." Id.

¶ 91. Thereafter, the other Computer Companies filed motions to dismiss for the same reason.

See id. ¶ 96. AMS responded on Dr. Lans's behalf by filing both oppositions to these motions

and motions for leave to file amended complaints substituting Uniboard as the plaintiff in each of

---

[3] AMS also filed patent infringement actions in Dr. Lans's name against Olsy North America, Inc. and Siemens
Nixdorf Information Systems, Inc., but the complaints in those cases were dismissed pursuant to settlement
agreements entered into by the parties. See generally Lans v. Olsy N. Am., Inc., Civil Action No. 97-2530 (JGP)
(D.D.C.); Lans v. Siemens Nixdorf Info. Sys., Inc., Civil Action No. 98-50 (JGP) (D.D.C.).

the <u>Lans</u> Civil Actions.

On November 23, 1999, Judge Penn issued a memorandum opinion granting Gateway's motion for summary judgment and denying Dr. Lans's motion seeking leave to file an amended complaint. <u>Lans v. Gateway 2000, Inc.</u>, 84 F. Supp. 2d 112, 123 (D.D.C. 1999) ("<u>Lans I</u>").[4] Judge Penn described the factual background of the case before him as follows:

> Prior to filing his motion for leave to amend by substituting plaintiffs, [Dr.] Lans had denied that the '986 [P]atent had ever been assigned. [Dr.] Lans's original complaint made no mention of Uniboard or any assignment. During discovery, [Dr.] Lans appeared to resist disclosing any information that would cast doubt on his status as patentee. For example, in response to an interrogatory filed in a related case, [Dr.] Lans declared that there has been no assignment of the '986 [P]atent. Furthermore, that same interrogatory response indicates that [Dr.] Lans was the party licensing the patent to IBM, when in fact Uniboard was the licensor in the transaction.
>
> Apparently, even when confronted with [the] defendant's repeated discovery requests surrounding any assignment, [Dr.] Lans neglected to inform even his attorneys that an assignment had taken place. Finally, after being confronted by [the] defendant with a copy of the assignment, [Dr.] Lans recalled that he had signed the document approximately ten years ago in the context of granting a license to IBM under the ['986 Patent]. As such, [Dr.] Lans now understands that the patent is owned by his wholly-owned company, Uniboard.

<u>Id.</u> at 114 (internal quotation marks, citations, and footnotes omitted).

Based on these factual findings, Judge Penn concluded that Dr. Lans's motion for leave to file an amended complaint was without merit because the Court lacked subject-matter jurisdiction to permit Dr. Lans, who did not own the '986 Patent, to file an amended complaint, <u>id.</u> at 115-17, and because Dr. Lans's failure to name Uniboard as the plaintiff in the case was not the type of "honest and understandable mistake" necessary to permit substitution of a

---

[4] Judge Penn also denied as moot Gateway's motion to dismiss, and dismissed the complaint with prejudice. <u>Lans v. Gateway 2000, Inc.</u>, Civil Action No. 97-2523, Order (D.D.C. Nov. 23, 1999).

plaintiff under Federal Rule of Civil Procedure 17(a), id. at 117-22.  Judge Penn explained this

latter conclusion at length:

> [Dr.] Lans argues simultaneously that he both forgot that he had
> made the assignment and that he thought the assignment was
> invalid—the Court finds this dual position untenable.  [Dr.] Lans
> was in control of all the information regarding the assignment
> since it was executed.  As previously noted, [Dr.] Lans was able to
> inform his attorneys of the license to IBM, but then appears to
> have conveniently forgotten the assignment to Uniboard, which
> was a vital aspect of that transaction.  Prior to the declaration in
> support of his motion to amend, [Dr.] Lans never expressed any
> doubts as to the assignment's validity.  In any event, it was entirely
> within [Dr.] Lans's ability to verify the validity of the assignment,
> establish ownership of the patent, and sue in the name of the
> proper plaintiff.   When [Dr.] Lans's attorneys inquired as to
> whether he had made any assignments of the patent, [Dr.] Lans
> should have told them about the assignment to IBM and his belief
> that the assignment was invalid.  If he had done that, counsel might
> have proceeded differently[] and avoided this present situation.
> The Court cannot escape the conclusion that [Dr.] Lans chose to
> conceal all information about the assignment, possibly even from
> his attorneys, until confronted with irrefutable evidence that the
> assignment had occurred.

Id. at 122.  Judge Penn went on to grant Gateway's motion for summary judgment and dismiss

Lans v. Gateway 2000, Inc., Civil Action No. 97-2523, because it was "clear that [Dr.] Lans, in

his individual capacity, lack[ed] the requisite standing to bring this claim against [the]

defendant."  Id. at 123.  He subsequently issued memoranda opinions in the other Lans Civil

Actions incorporating his decision in Lans I.

Despite this setback, AMS continued to represent Dr. Lans in all of the Lans Civil

Actions.[5]  And, on December 22, 1999, AMS filed a notice of appeal in the United States Court

---

[5]   Dr. Lans alleges that "there is no record that the AMS Defendants ever sent [him] a copy of [Judge Penn's]
opinion dismissing the [civil action against Gateway]."  Compl. ¶ 96.  Circuitous statements of this nature do not
qualify as the kind of "plain statement of the claim" envisioned by Federal Rule of Civil Procedure 8(a)(2).  If Dr.
Lans believes in good faith that the AMS Defendants never sent him a copy of Judge Penn's Lans I decision, he
should say so without equivocation, rather than making an insinuation to that effect.

of Appeals for the Federal Circuit on behalf of Dr. Lans challenging Judge Penn's orders of

dismissal.  See Lans v. Gateway 2000, Inc., 110 F. Supp. 2d 1, 3 (D.D.C. 2000) ("Lans II").  A

little over a month later, on January 24, 2000, AMS filed motions for reconsideration of those

same orders with Judge Penn pursuant to Federal Rule of Civil Procedure 60(b)(2), alleging that

newly discovered evidence had been located by Dr. Lans.  Id.  Judge Penn denied those motions

in memoranda opinions and orders issued on April 13, 2000, see, e.g., id. at 4-10 (holding that

the "evidence" produced by Dr. Lans did not qualify as newly discovered evidence within the

meaning of Rule 60(b)(2)), which Dr. Lans, through AMS, appealed.

AMS also initiated a separate patent infringement suit on behalf of Uniboard against all

of the Computer Companies.  See generally Uniboard Aktiebolag v. Acer Am. Corp., Civil

Action No. 99-3153 (RBW) (D.D.C.).  The Computer Companies promptly moved to either

dismiss Uniboard's complaint or, in the alternative, for summary judgment on the ground that

Uniboard failed to notify infringers of its patent or their infringement in the manner prescribed

by 35 U.S.C. § 287(a) until it filed its complaint in November of 1999.[6]  Uniboard Aktiebolag v.

Acer Am. Corp., 118 F. Supp. 2d 19, 22 (D.D.C. 2000).  As the '986 Patent had expired on

January 9, 1999, the Computer Companies argued that the notice they received came eleven

months too late to give rise to any measurable period of damages.  Id.

In a memorandum opinion issued on August 31, 2000, Judge Penn, who presided over the

---

[6]  35 U.S.C. § 287(a) provides, in relevant part:

> Patentees . . . may give notice to the public that the same is patented, either by
> fixing thereon the word "patent" or . . . by fixing to it . . . a label containing a
> like notice.  In the event of failure so to mark, no damages shall be recovered by
> the patentee in any action for infringement, except on proof that the infringer
> was notified of the infringement and continued to infringe thereafter, in which
> event damages may be recovered only for infringement occurring after such
> notice.  Filing of an action for infringement shall constitute such notice.

35 U.S.C. § 287(a) (2006).

<u>Uniboard</u> case as well,[7] concluded that "[a]ny knowledge the [Computer Companies] might have had of the[ir] infringements [of the '986 Patent] before Uniboard gave them actual notice [was] irrelevant" as a matter of law.  <u>Id.</u> at 24.  He further reasoned that his prior holding in <u>Lans I</u> compelled him to hold that "[a]ny notice provided by [Dr.] Lans in his personal capacity [was] not attributable to Uniboard," <u>id.</u> at 25, and therefore agreed with the Computer Companies that Uniboard did not provide notice to the defendants of their alleged infringement of the '986 Patent in the manner required by § 287(a) until after the '986 Patent had expired, <u>id.</u> at 25-27.  Accordingly, he granted the Computer Companies' motions and dismissed Uniboard's complaint with prejudice.  <u>Id.</u> at 27.  Acting once again on behalf of Dr. Lans, AMS timely appealed this determination to the Federal Circuit.  <u>Lans v. Digital Equip. Corp.</u>, 252 F.3d 1320, 1326 (Fed. Cir. 2001).

The Federal Circuit resolved all three of the appeals filed by AMS on behalf of the plaintiffs in a decision issued on June 4, 2001.  The Federal Circuit "first address[ed] [Judge Penn's] dismissal of Uniboard's complaint," concluding that Judge Penn had "correctly ruled that Uniboard ha[d] not stated a claim on which relief may be granted," <u>id.</u> at 1326, 1328, because "notice from someone closely associated with the patentee does not satisfy § 287(a)," <u>id.</u> at 1327, "Uniboard's licensees did not mark their products," and "Uniboard did not inform the Computer Companies of infringement before expiration of the '986  [P]atent," <u>id.</u> at 1328.  The circuit court further concluded that in light of the "unusual circumstances" presented by the case, <u>id.</u>, Judge Penn "remained well within [his] broad discretion in denying [Dr.] Lans's motion for leave to amend his complaint," <u>id.</u> at 1329.  Finally, the circuit court held that Judge Penn "did not abuse [his] discretion in denying [Dr.] Lans relief from judgment under Rule 60(b)(2)."  <u>Id.</u>

---

[7]  <u>Uniboard</u> was originally assigned to a different member of the Court, but was transferred to Judge Penn due to its relation to the <u>Lans</u> Civil Actions.  <u>See</u> LCvR 40.5(a), (c).

While Dr. Lans's appeals were still pending before the Federal Circuit, the Computer

Companies filed motions for attorneys' fees against Dr. Lans and Uniboard in their respective

cases.  Lans v. Gateway 2000, Inc., Civil Action No. 97-2523 (JGP), Civil Action No. 97-2526

(JGP), Civil Action No. 97-2528 (JGP), Civil Action No. 97-2529 (JGP), Civil Action No. 99-

3153 (JGP), slip op. at 1-2 (D.D.C. Sept. 6, 2001) ("Lans III").[8]  They sought attorneys' fees

against Dr. Lans and Uniboard directly pursuant to 35 U.S.C. § 285, a patent law provision

providing for attorneys' fees to a prevailing party where there are "exceptional circumstances,"

id. at 6-7, and against AMS pursuant to 28 U.S.C. § 1927, which provides that "[a]ny

attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be

required by the court to satisfy personally the excess costs, expenses, and attorneys' fees

reasonably incurred because of such conduct," id. at 7 (quoting 28 U.S.C. § 1927).  Acer also

filed a separate motion for costs pursuant to 28 U.S.C. §§ 1919, 1920, Federal Rules of Civil

Procedure 11 and 54(d), Local Civil Rule 54.1, and based on the Court's inherent authority.  Id.

at 14.

Judge Penn resolved these motions in a consolidated memorandum opinion issued on

September 6, 2001.  With respect to Dr. Lans, Judge Penn concluded that he "ha[d] no

alternative but to conclude" that there were "exceptional circumstances" within the meaning of

35 U.S.C. § 285 "[c]onsidering the history of this case[] and the conclusions [that he reached] in

Lans I."  Lans III, slip op. at 11.  He further concluded that it was appropriate to award attorneys'

fees with respect to Uniboard under § 285 because its separate suit against the Computer

---

[8]  Digital Equipment, Hewlett-Packard, and Packard Bell subsequently withdrew their motions pursuant to
settlement agreements entered into by the parties.  See Stipulation, Lans v. Digital Equip. Corp., Civil Action No.
97-2493 (D.D.C. Aug. 2, 2001) (Docket Entry ("Dkt.") 112); Stipulation, Lans v. Hewlett-Packard Co., Civil Action
No. 97-2524 (D.D.C. July 23, 2001) (Dkt. 101); Stipulation, Lans v. Packard Bell NEC, Inc., Civil Action No. 97-
2525 (D.D.C. July 24, 2001) (Dkt. 86).

Companies was frivolous.  Id. at 16-18.

Judge Penn also found fault with AMS's conduct in the Lans Civil Actions and the

Uniboard litigation:

> First, the Court is concerned that [AMS] failed to properly
> investigate ownership of the patent prior to filing the Lans cases.
> Second, the Court is concerned that [AMS] did not adequately
> investigate the issue of a potential assignment when the issue was
> raised by the defendants.  Third, while the Court recognizes that
> there were discovery disputes under consideration after the
> assignment became known, it took an order from this Court to
> force [Dr.] Lans and his counsel to make a clear statement as to the
> ownership of the patent.  Fourth, [AMS] filed a motion for
> reconsideration based on new evidence demonstrating that [Dr.]
> Lans owned the patent at the same time it was maintaining a suit
> on Uniboard's behalf.  Surely representation of both [Dr.] Lans and
> Uniboard, when both were claiming ownership of the '986
> [P]atent, should have raised ethical considerations for the firm.
>
> . . .
>
> [AMS] presented this Court with two, mutually exclusive[]
> theories as to the true ownership of the '986  [P]atent. . . . Given
> the Court's previous holding that only the actual owner could sue
> for infringement, [AMS] knew that maintaining both of these
> theories of ownership was untenable.  The Court agrees with [the
> Computer Companies] that once [AMS] put forth the new evidence
> in the Lans cases, it was under an obligation to withdraw the
> Uniboard case.   By maintaining both the Lans motions for
> reconsideration and the Uniboard case, [AMS] put [the Computer
> Companies] in the situation of having to defend duplicative
> litigation.

Id. at 13-14, 19 (internal citation omitted).

Nevertheless, Judge Penn was "unable to conclude that [AMS]'s conduct was vexatious

and unreasonable" within the meaning of 28 U.S.C. § 1927, and therefore refused to impose fees

against AMS based on its conduct in the Lans Civil Actions.  Id. at 14.  He reached the same

result with respect to AMS's conduct in the Uniboard case, noting that AMS had filed a motion

to stay the proceedings in the Uniboard case pending the resolution of Dr. Lans's motions for

reconsideration in the Lans Civil Action and that "the theory of attributing [Dr.] Lans's notice to

Uniboard was [not] so unreasonable as to justify an award of attorneys['] fees." Id. at 20.

Finally, Judge Penn denied Acer's request for all but $377.40 in costs accrued over the course of

its litigation with Dr. Lans and Uniboard. Id. at 14-16.

It was only after this ruling by Judge Penn that Dr. Lans parted ways with AMS, and

even then, it was AMS, not Dr. Lans, who decided to end the relationship. Specifically, "[o]n

September 20, 2001, Mastriani wrote Dr. Lans and told him that he and AMS would refuse to

represent [him] in any . . . appeal from [Judge Penn's] September 6, 2001, [o]rder . . . , or in any

petition for a writ of certiorari to the United States Supreme Court." Compl. ¶ 122. Shortly

thereafter, the plaintiffs obtained new counsel and moved for reconsideration of Judge Penn's

Lans III decision insofar as that decision imposed the payment of attorneys' fees on Dr. Lans and

Uniboard but not AMS, claiming that "they were not properly represented on the motion for

attorneys['] fees that were the subject of the September 6, 2001[,] order." Lans v. Gateway,

2000, Inc., Civil Action No. 97-2523 (JGP), Civil Action No. 97-2526 (JGP), Civil Action No.

99-3153 (JGP), slip op. at 1 (D.D.C. June 23, 2005) ("Lans IV").[9] This motion prompted AMS

to move to intervene in the Lans Civil Actions and the Uniboard case, id., which, in turn, led the

plaintiffs to file an application to refer Mastriani to the Office of the United States Attorney for

the District of Columbia for alleged perjury, Lans v. Gateway 2000, Inc., Civil Action No. 97-

---

[9]  Dr. Lans also moved for sanctions against Mastriani pursuant to Federal Rule of Civil Procedure 11 and filed an
application to refer Mastriani to the United States Attorney for alleged perjury.  Motion of Hakan Lans for Sanctions
under Federal Rule of Civil Procedure 11, Gateway, Civil Action No. 97-2523 (JGP), Civil Action No. 97-2526
(JGP), Civil Action No. 99-3153 (JGP) (June 5, 2002); Application for Referral to the United States Attorney,
Gateway, Civil Action No. 97-2523 (JGP), Civil Action No. 97-2526 (JGP), Civil Action No. 99-3153 (JGP) (June
25, 2004).  These motions were denied by Judge Penn in orders entered on July 5, 2005, and July 8, 2005,
respectively.  Lans v. Gateway 2000, Inc., Civil Action No. 97-2523 (JGP), Civil Action No. 97-2526 (JGP), Civil
Action No. 99-3153 (JGP), Memorandum ("Mem.") Order (D.D.C. July 5, 2005); Lans v. Gateway 2000, Inc., Civil
Action No. 97-2523 (JGP), Civil Action No. 97-2526 (JGP), Civil Action No. 99-3153 (JGP), Mem. Order (D.D.C.
July 8, 2005) ("Lans V").

2523 (JGP), Civil Action No. 97-2526 (JGP), Civil Action No. 99-3153 (JGP), Memorandum

("Mem.") Order at 1-2 (D.D.C. July 8, 2005) ("Lans V").

The plaintiffs filed their complaint initiating this civil lawsuit on November 5, 2002,

naming only the AMS Defendants as defendants.  They amended their complaint twice

thereafter, adding the Delphi Defendants, the 4,303,986 Partners (the "'986 Partners"), "a

partnership . . . that entered into a fee[-]splitting agreement concerning proceeds of the '986

Patent [l]itigation with the AMS Defendants and the Delphi Defendants," Second Amended

Complaint and Jury Demand ¶ 25, and James Scott, one of the members of the '986 Partners, id.

¶ 26, as defendants.  The AMS and Delphi Defendants filed motions to dismiss in response to the

second amended complaint in March and August of 2003, respectively, Dkt. 22, 40, while the

plaintiffs stipulated to the dismissal of their claims against the '986 Partners and Scott on

December 30, 2003, Dkt. 55.  Thereafter, the case remained inactive for the better part of a year

until Judge Penn entered an order on October 13, 2004, staying the case until he could resolve

the plaintiffs' motions for reconsideration in the Lans Civil Actions and the Uniboard case.  Dkt.

56.

Judge Penn issued a consolidated memorandum opinion resolving those motions on June

23, 2005.  Citing Dr. "Lans'[s] credibility" as "[t]he main issue" before him, he ultimately

rejected Dr. Lans's assertions "that AMS knew about the assignment of the [']986 Patent to

Uniboard" and that "his previous arguments to the Court were not authorized by him."  Lans IV,

slip op. at 6.  While Judge Penn was "suspicio[us]" as to "whether AMS acted within the

appropriate standard of care in determining the ownership of the patent claim," he did not find

that issue to be "determinative as to whether [Dr.] Lans told AMS about the assignment."  Id. at

8.  He found more persuasive an admission by Dr. Lans at an evidentiary hearing on the

plaintiffs' motion for reconsideration that "he did not tell AMS that he had signed an agreement transferring his ownership rights," as well as the fact that Dr. Lans "would not have authorized AMS to send infringement letters naming himself as the owner of the ['986 P]atent" if he thought that "the suits should have been filed in the name of Uniboard."  Id.  Further, Judge Penn "[found] it unlikely that AMS would have intentionally filed [the complaints in the Lans Civil Actions] in the wrong name," id. at 9, and was "troubled by the fact that [Dr.] Lans continued to claim that he was the registered owner of the patent even after the transfer to Uniboard was revealed," id. at 8.

Judge Penn also rejected the plaintiffs' allegation that "AMS made the decision to file [the complaint in the Uniboard case] in the name of Uniboard without consulting [Dr.] Lans." Id. at 9.  Based on a "letter executed by [Dr.] Lans on December 20, 1999," in which Dr. "Lans authorized AMS to file an infringement action against the [C]omputer [C]ompanies with Uniboard as the named plaintiff," he concluded that it was "clear that [Dr.] Lans was in control of the litigation and that the representations made to the Court on Uniboard's behalf were made with his consent and approval."  Id.  Finally, Judge Penn declined to address certain "additional claims" raised by the plaintiffs in their motions for reconsideration, reasoning that it would be more appropriate to adjudicate the claims in the plaintiffs' lawsuit against the AMS and Delphi Defendants.  Id. at 10 n.10.  These claims included AMS's alleged "failure to tell [Dr.] Lans about the [']986 Partnership, failure to exercise the proper standard of care, failure to conduct proper research, failure to properly explain American patent law, [and] failure to advise [Dr.] Lans or Uniboard to seek separate counsel on the [Computer Companies'] motions for attorneys['] fees."  Id.

Shortly thereafter, Judge Penn entered an order denying the plaintiffs' application to refer

Mastriani to the Office of the United States Attorney for the District of Columbia.  Framing the

issue before him as a question of whether Mastriani perjured himself in an affidavit attached to

AMS's opposition to the plaintiffs' motion for reconsideration that was denied in <u>Lans IV</u>, <u>Lans</u>

<u>V</u>, Mem. Order at 1-2, Judge Penn found that the plaintiffs did not "proffer[] evidence in their

application that unequivocally prove[d] that the statements in Mastriani's affidavit [were] false,"

as required to justify a referral to the United States Attorney, <u>id.</u> at 2.  He therefore denied the

motion.  <u>Id.</u>

Having held on two occasions that the AMS Defendants should not be held liable for the

attorneys' fees incurred by the Computer Companies, Judge Penn took up the issue yet again in a

consolidated memorandum opinion resolving a renewed attempt by Gateway and Dell to hold

AMS jointly liable for the attorneys' fees imposed on Dr. Lans and Uniboard.  <u>See generally</u>

<u>Lans v. Gateway 2000, Inc.</u>, Civil Action No. 97-2523 (JGP), Civil Action No. 97-2526 (JGP),

Civil Action No. 99-3153 (JGP), slip op. (D.D.C. Aug. 10, 2005) ("<u>Lans VI</u>").  Gateway and

Dell asserted that AMS must have known about the assignment of the '986 Patent to Uniboard

based on "AMS'[s] representation of Uniboard in a dispute that arose in January [of] 1997

regarding the scope of the licensing agreement between Uniboard and IBM" that ended in a

settlement in which IBM paid $1 million to license the '986 Patent, <u>id.</u> at 5-6, which, Gateway

and Dell argued, IBM never would have done "if Uniboard did not have an ownership interest in

the patent," <u>id.</u> at 6.  They further argued that, at a minimum, "there were various red flags

throughout AMS'[s] representation of [Dr.] Lans," such as a February 19, 1997, fax from Dr.

Lans to Mastriani in which Dr. Lans referenced the assignment to Uniboard, <u>id.</u>, an e-mail from

Dr. Lans to AMS in January of 1999 in which Dr. Lans suggested changing a draft interrogatory

response (the same response that would later be cited by Judge Penn in his <u>Lans I</u> decision as

evidence of Dr. Lans's misconduct) to state that Uniboard was the owner of the '986 Patent, and "two licensing agreements that purported to give both [Dr.] Lans and Uniboard ownership of the [']986 [P]atent at the same time," id. at 7.

Once again, Judge Penn refused to hold AMS accountable for the Computer Companies' attorneys' fees. While he agreed that "AMS'[s] failure to uncover the 1986 assignment of the [']986 [P]atent may have been negligent," he found "no indication that AMS engaged in vexatious and unreasonable conduct sufficient to warrant sanctions under [§] 1927," and concluded that AMS could not be sanctioned under the Court's inherent authority because "there [was] no evidence of bad faith" on the part of AMS. Id. at 9. He therefore denied the motion. Id. at 10.

Following his Lans IV decision denying the plaintiffs' motions for reconsideration, on July 12, 2005, Judge Penn vacated his order staying the current case. On October 5, 2005, the plaintiffs filed their Third Amended Complaint. This complaint incorporates and further develops many of the allegations made by Dr. Lans, Uniboard, and the Computer Companies throughout their many submissions regarding the issue of attorneys' fees in the Lans Civil Actions and the Uniboard case.

For example, the plaintiffs once again allege that AMS was put on notice of the assignment of the '986 Patent when Dr. Lans sent a copy of the IBM licensing agreement to AMS in response to an inquiry from Mastriani in March of 1996, but supplement this assertion with the new allegation that the Delphi Defendants knew about IBM's non-exclusive license agreement "[a]s early as December 7, 1995." Compl. ¶ 50. They repeat the allegation made by Gateway and Dell in their renewed motion to hold AMS jointly liable for attorneys' fees based on Dr. Lans having "reminded the AMS Defendants of Uniboard's interest in the '986 Patent" in

16

a fax sent in February of 1997, id. ¶ 53, but go beyond those allegations by asserting that Mastriani and Utterström recognized Uniboard's interest in the '986 Patent on several occasions in April of 1997, including in a declaration filed by Mastriani in a separate declaratory action unrelated to the Lans Civil Actions, id. ¶¶ 54, 57.  Indeed, they now allege that "[o]n April 7, 1997, Schaumberg sought permission from Dr. Lans for the AMS Defendants to act on behalf of Uniboard concerning the issue of the breadth of the IBM licenses."  Id. ¶ 55.

The plaintiffs also allege, as Gateway and Dell did earlier, that Mastriani drafted the interrogatory answer cited by Judge Penn in Lans I as evidence of Dr. Lans falsely claiming title to the '986 Patent, Compl. ¶ 88, and that Dr. Lans suggested changing the answer to no avail, id. ¶¶ 88-89.  But the plaintiffs go further in their Third Amended Complaint, alleging that Dr. Lans "reminded Mastriani of their discussions about the Uniboard assignment in early 1997" when Mastriani asked him about the assignment of the '986 Patent after Gateway filed its initial motion to dismiss, id. ¶ 91, and that Mastriani "never sent Dr. Lans" a copy of Mastriani's declaration disclaiming knowledge of the assignment of the '986 Patent that was referenced by Judge Penn in Lans I, id. ¶ 92.  Moreover, according to the plaintiffs, "[t]he AMS Defendants failed to inform the Court of their knowledge of the IBM/Uniboard [a]greement and also failed to tell the Court of their representation of Uniboard in negotiations with IBM about the scope of the IBM license agreement, despite their obligation to do so."  Id. ¶ 94.

Finally, the plaintiffs renew their allegation, rejected by Judge Penn in Lans IV, that the "[AMS] Defendants did not tell [them] that they were filing [the Uniboard] lawsuit."  Id. ¶ 103.  According to the plaintiffs, it was "three weeks after the AMS Defendants filed the Uniboard lawsuit," on December 17, 1999, that "Mastriani sent Dr. Lans a document asking him to agree that AMS represented Uniboard for the purpose of litigation."  Id. ¶ 104.  The plaintiffs further

allege that "[w]hen the AMS Defendants finally did inform [them] of the <u>Uniboard</u> lawsuit, [the AMS] Defendants did not tell [the p]laintiffs that there was any problem under American law in Uniboard's filing of the lawsuit." <u>Id.</u> ¶ 103.

The plaintiffs also reference instances of alleged negligence in their Third Amended Complaint that were not discussed by Judge Penn in his various memoranda opinions. For example, they allege that AMS negligently represented Dr. Lans in a declaratory judgment action concerning the '986 Patent filed by Micron Electronics, Inc. ("Micron") and Diamond Multimedia Systems, Inc. ("Diamond") in the United States District Court for the District of Idaho. <u>Id.</u> ¶ 80. Specifically, the AMS Defendants allegedly acknowledged in an internal memorandum that they had no interest in granting a license to Diamond and that Dr. Lans had a policy of offering licenses only to computer systems manufacturers (such as Micron) and not to computer component suppliers (such as Diamond), <u>id.</u> ¶ 82, yet "prepared settlement, license, and non-assertion agreements that gave [both] Micron and Diamond and all of their customers a broad world-wide[,] fully paid[-]up license and release under the '986 Patent and all of its foreign counterparts," <u>id.</u> ¶ 83. And according to the plaintiffs, the effect of this settlement agreement "was to give a release and immunity from suit to all companies that purchased otherwise infringing components from Micron-Diamond." <u>Id.</u> ¶ 84.

This was not the only allegedly disadvantageous settlement negotiated by AMS. As told by the plaintiffs, "Schaumberg faxed a proposed settlement agreement with Gateway to Dr. Lans" a few days before Judge Penn granted the Computer Companies' motion for attorneys' fees, which, "if executed, would have given Gateway rights to all of Dr. Lans['s] current and future inventions, whether related to the '986 Patent or not." <u>Id.</u> ¶ 121. When "Dr. Lans changed the language of the agreement so that only patents relating to his color graphics

technology would be licensed, . . . Schaumberg told him that the language could not be changed and had to be accepted that day." Id. More importantly, none of the defendants ever informed Dr. Lans "that [the AMS Defendants] had a conflict of interest in advising him about settlement." Id. Ultimately, Dr. Lans declined to sign the agreement as drafted, "insist[ing] that any settlement be confined to the '986 Patent's technology." Id.

The plaintiffs' Third Amended Complaint is replete with allegations of similarly unethical conduct by the AMS Defendants. For example, after Judge Penn dismissed the complaints in the Lans Civil Actions and the Computer Companies moved for attorneys' fees, the AMS Defendants allegedly "never raised the advi[c]e of counsel defense []or informed Dr. Lans that it should be raised." Id. ¶ 111. And after the Federal Circuit affirmed the rulings in Lans I, Lans II, and Uniboard, Mastriani allegedly "sent an e[-]mail to Dr. Lans stating that AMS would file a petition for certiorari with the United States Supreme Court only if Dr. Lans paid AMS an additional up[-]front fee of $250,000." Id. ¶ 120. Moreover, after refusing to represent Dr. Lans in any further actions following the imposition of attorneys' fees against Dr. Lans and Uniboard pursuant to Judge Penn's Lans III decision, id. ¶ 122, Mastriani purportedly "sent a memo to Dr. Lans and the Delphi Defendants stating that AMS would represent Dr. Lans on appeals for the grant of attorneys['] fees to Gateway and Dell . . . if Dr. Lans paid another $279,000" to AMS, id. ¶ 123.

As for the Delphi Defendants, they allegedly "had actual knowledge of the falsity of the AMS Defendants' repeated statements that Dr. Lans had concealed the Uniboard assignment from his lawyers," id. ¶ 112, "never advised [the p]laintiffs or the Court of the AMS Defendants' false testimony" in response to Gateway's initial motion to dismiss, id ¶ 113, and "never advised [the p]laintiffs or the Court that [AMS] decided to file the Uniboard complaint without

[the p]laintiffs' consent," id. ¶ 114.  Thus, they allegedly "jointly perpetuated the Court's false belief that Dr. Lans had withheld from his lawyers both the fact of the assignment to Uniboard and the details of the IBM license," id. ¶ 113, as well as "the Court's false belief that Uniboard was responsible for filing its complaint," id. ¶ 114.  Because "[t]he Delphi Defendants had an obligation to act on behalf [of the p]laintiffs to assure that [the p]laintiffs continued to receive representation under the terms of the Fee Agreement, but failed to do so," id. ¶ 125, their alleged inactivity made them, in the plaintiffs' view, "complicit[] with the AMS Defendants in . . . abandoning and harming [the plaintiffs]," id. ¶ 112.

Also, the plaintiffs now allege that all of the defendants have converted licensing proceeds from the '986 Patent.  Allegedly, "Dr. Lans entered into an [e]scrow [a]greement with the AMS Defendants and the Delphi Defendants" on September 23, 1997 (the "Escrow Agreement"), which "provided that Dr. Lans and the AMS Defendants and the Delphi Defendants would loan the ['986 Patent licensing fee] project their respective shares of the sum [of $390,000]."  Id. ¶ 126.  This amount was to be repaid to Dr. Lans and the defendants "with priority before any other payments" arising from the recovered licensing fees would be made. Id.

"The Escrow Agreement also required the AMS Defendants to make continuous progress reports on the use of funds for actions in Germany and Italy."  Id.  However, according to the plaintiffs, "[t]he AMS Defendants did not make continuous progress reports to Dr. Lans and did not repay the amount loaned by Dr. Lans under the Escrow Agreement."  Id. ¶ 127.  Moreover, "[f]rom March 19, 1997, through March 2, 2001, the AMS Defendants and the Delphi Defendants received a total of $20.93 million in licensing fees and interest from other infringers of the '986 Patent," yet only turned over $12.33 million to the plaintiffs when "the Fee

Agreement required the AMS Defendants and the Delphi Defendants to pay [the p]laintiffs 67%"

of the recovered licensing fees, "or $14.02 million." Id. ¶ 130.  The plaintiffs allege that they

have made repeated requests for payment of the money owed them under the Fee Agreement, id.

¶ 132, as well as an explanation for the disposition of the funds held in trust by their attorneys,

"but the AMS Defendants have repeatedly refused to do so," id. ¶ 133.  Meanwhile, the Delphi

Defendants allegedly "have done nothing to require the AMS Defendants to pay [the p]laintiffs,"

id. ¶ 132, and, "as signators of the Fee Agreement" are therefore "jointly responsible for the

conversion of [the p]laintiffs' funds," id. ¶ 134.

Finally, the plaintiffs allege that the AMS Defendants have repeatedly refused to respond

to requests made by the plaintiffs concerning the escrow account established pursuant to the

Escrow Agreement as well as requests regarding litigation undertaken by AMS on Dr. Lans's

behalf.  They identify eighteen separate queries made regarding the escrow account to which the

AMS Defendants have not responded.  Id. ¶¶ 135-36.  Further, they allege that AMS "failed to

provide information" regarding litigation "to pursue the German counterpart of the '986 Patent in

the German courts" by German counsel under AMS's supervision, id. ¶ 137, as well as

information regarding litigation "to pursue the Italian counterpart of the '986 Patent in the Italian

courts" by Italian counsel under the supervision of both AMS and Delphi, id. ¶ 139.  AMS has

also allegedly refused to turn over documents requested by the plaintiffs concerning "the [n]on-

[a]ssertion [a]greement between [Dr.] Lans and Diamond . . . negotiated by AMS," id. ¶ 138, as

well as all of the "notice of infringement letters" sent on Dr. Lans's behalf in September of 1996,

id. ¶ 139.

Based on these factual allegations, the plaintiffs seek relief under a variety of legal

theories: the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 (2000)

("RICO") with respect to both plaintiffs (Count I),[10] id. ¶¶ 143-50, breach of contract with respect to Dr. Lans (Count II), id. ¶¶ 151-154, and separately with respect to Uniboard (Count IV), id. ¶¶ 159-62, breach of the implied covenant of good faith and fair dealing with respect to Dr. Lans (Count III), id. ¶¶ 155-58, and separately with respect to Uniboard (Count V), id. ¶¶ 163-66, breach of fiduciary duty with respect to both plaintiffs (Count VI), id. ¶¶ 167-72, malpractice with respect to both plaintiffs (Count VII), id. ¶¶ 173-78, fraud with respect to Dr. Lans (Count VIII), id. ¶¶ 179-89, fraudulent concealment with respect to Dr. Lans (Count IX), id. ¶¶ 190-98, and separately with respect to Uniboard (Count X), id. ¶¶ 199-207, conversion with respect to Dr. Lans (Count XI), id. ¶¶ 208-16, and intentional infliction of emotional distress with respect to Dr. Lans (Count XIV), id. ¶¶ 222-24.  The plaintiffs also seek an accounting on behalf of Dr. Lans "for all funds received in connection with the '986 Patent [l]itigation" (Count XII).  Id. ¶ 218.  Finally, the plaintiffs seek a determination that any funds held by the defendants "in connection with the '986 Patent [l]itigation" along with "the interest and proceeds obtained on the use of the funds they wrongfully received" be held "in constructive trust" for the benefit of Dr. Lans (Count XIII).  Id. ¶ 221.

The AMS Defendants answered the plaintiffs' complaint on October 21, 2005.  Ten days later, they filed a motion for judgment on the pleadings with respect to all of the claims against them, while the Delphi Defendants renewed their motion to dismiss the plaintiffs' claims against them for lack of personal jurisdiction and on the ground of forum non conveniens.  Thereafter, the parties proceeded to conduct discovery notwithstanding their pending motions to dismiss,

---

[10]  The plaintiffs refer to this count of their Third Amended Complaint as the "first cause of action," and refer to subsequent counts of the Third Amended Complaint in the identical manner.  They also mislabel what should in chronological order correctly be the eleventh count of their Third Amended Complaint as the "twelfth cause of action" and likewise mislabel by one the remaining counts of the Third Amended Complaint.  For the sake of clarity, the Court has correctly relabeled the counts and will refer to them as correctly relabeled in this memorandum opinion.

which, in turn, gave rise to a series of discovery-related motions.  Several of these motions were stayed pursuant to a minute order entered by Judge Penn on July 25, 2006.

The case was transferred to the undersigned member of the Court on October 2, 2007. Thereafter, the Court, noting the long passage of time since the filing of the defendants' dispositive motions, denied all of the pending motions in the case without prejudice and directed the defendants to renew their dispositive motions on or before February 25, 2008.  Both sets of defendants renewed their motions on that date; however, the AMS Defendants now seek to dismiss only Counts I through X of the plaintiffs' Third Amended Complaint.  AMS Defs.' Mot. at 1.[11]

In support of their renewed motion to dismiss, the Delphi Defendants assert that because they have not had minimum contacts with the District of Columbia and because it would be unreasonable to assert jurisdiction over them, the Court lacks personal jurisdiction over them as a constitutional matter.  Delphi Defs.' Mem. at 2, 8-20.  They further assert that "Sweden offers the more convenient forum for the resolution of [the p]laintiffs' claims against the Delphi Defendants," id. at 20, based on the adequacy of Sweden as an alternative forum, id. at 20-21, and the balancing of private and public interests delineated most extensively by the Supreme Court in Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981), id. at 22-27.  The plaintiffs dispute the Delphi Defendants' assertion that they lacked minimum contacts in the District of Columbia, Pls.' Delphi Opp'n at 7-13, arguing that the contacts at issue in this litigation were purposely directed at the District of Columbia, id. at 14-15, that the plaintiffs' claims arise out of these

---

[11]  Previously, the AMS Defendants argued that upon dismissal of Counts I through X of the plaintiffs' Third Amended Complaint, the Court should dismiss the remaining counts in the complaint for lack of subject-matter jurisdiction.  They take the opposite position in their renewed motion.  See AMS Defs.' Mem. at 7 n.2 (acknowledging that "two recent decisions by the [Federal Circuit] . . . conclusively establish that irrespective of the Court's decision on the [AMS Defendants' motion], federal subject[-]matter jurisdiction is maintained for the remainder of [the p]laintiffs' claims").

contacts, id. at 15, and that it is reasonable to assert personal jurisdiction over the Delphi

Defendants, id. at 16-19.  Alternatively, they opine in a footnote that they should be permitted to

take jurisdictional discovery of the Delphi Defendants if the Court is inclined to dismiss their

complaint for lack of personal jurisdiction, id. at 2 n.1.  With respect to the Delphi Defendants'

forum non conveniens argument, the plaintiffs contend that the Delphi Defendants have

"failed . . . to show that Sweden is an adequate alternative forum," id. at 20, and that the factors

referenced by the Supreme Court in Piper favor adjudication of their claims in the District of

Columbia, id. at 21-25.  The Delphi Defendants contest all of these assertions in their reply

memorandum, Delphi Defs.' Reply at 1-20, and argue that the plaintiffs are not entitled to

jurisdictional discovery based on the District of Columbia Circuit's ruling in El-Fadl v. Central

Bank of Jordan, 75 F.3d 668 (D.C. Cir. 1996), id. at 20.

      The AMS Defendants assert a variety of arguments in support of their separate motion for

partial judgment on the pleadings.  As a threshold matter, they argue that all of the claims at

issue in their motions—Counts I through X of the plaintiffs' Third Amended Complaint—are

barred by the doctrines of claim preclusion (also known as res judicata) and issue preclusion

(also known as collateral estoppel).  AMS Defs.' Mem. at 16-30.  Alternatively, they argue that

the plaintiffs do not allege facts in their Third Amended Complaint sufficient to state causes of

action for violations of RICO (Count I), id. at 5-12, fraud (Count VIII), id. at 14-15, or

fraudulent concealment (Counts IX-X), id. at 15-16.  Finally, they argue that "the District of

Columbia does not recognize an independent cause of action for a purported breach of an

implied covenant of good faith and fair dealing with regard to an attorney's representation of a

client" (Counts III & V).  Id. at 12.

      The plaintiffs dispute most, but not all, of these arguments.  They contend that the criteria

for application of the doctrines of claim and issue preclusion have not been satisfied in this case, Pls.' AMS Opp'n at 2, 6-13, that to the extent these arguments turn upon the notion that the plaintiffs were contributorily negligent, they must be rejected because the AMS Defendants "cannot cite a single case finding a duty from a client to his or her attorney, let alone prove what that duty entails," id. at 24, and that, with respect to the plaintiffs' fraud and fraudulent concealment claims, "[i]ssue preclusion . . . does not apply to this case because . . . Dr. Lans and Uniboard have not been able to take discovery from [the AMS Defendants]," id. at 27.  They also argue at length that they have alleged facts sufficient to state a valid RICO claim.  Id. at 14-24. Finally, the plaintiffs assert that "[t]he District of Columbia recognizes causes of action for breach of contract, breach of fiduciary duty, and breach of [the] implied covenant of good faith and fair dealing," id. at 25-26, and further argue that these claims are based on different facts than the plaintiffs' malpractice claim, id. at 26-27.  They do not respond to the AMS Defendants' arguments concerning the sufficiency of their allegations in support of their fraud and fraudulent concealment claims.  See id. at 27-29 (arguing only that the plaintiffs' fraud and fraudulent concealment claims are not barred by the doctrine of issue preclusion).

In their reply memorandum, the AMS defendants repeat and further develop the arguments raised in their initial memorandum of law in support of their motion.  See AMS Defs.' Reply at 2-8 (arguing that the plaintiffs do not allege facts sufficient to give rise to a RICO claim), id. at 8-14 (arguing that many of the plaintiffs' claims must be dismissed under the doctrines of claim and issue preclusion); id. at 18 (arguing "that the District of Columbia does not recognize an independent cause of action for a breach of the implied covenant of good faith and fair dealing").  They also take issue with the plaintiffs' assertion that a client cannot be held to be contributorily negligent in regard to a legal malpractice claim.  See id. at 14-18 ("It is

clear . . . that the majority of jurisdictions that have considered this issue have either directly or implicitly held that the defense of contributory negligence is available in an action for legal malpractice."). Finally, the AMS Defendants note that the plaintiffs failed to respond to all of their arguments regarding the plaintiffs' fraud and fraudulent concealment claims, which the AMS Defendants construe as "a concession of [the unopposed] argument[s'] validity." Id. at 19.

## II. Standards of Review

As noted previously, the Delphi Defendants seek the dismissal of all claims against them pursuant to Federal Rule of Civil Procedure 12(b)(2) and the doctrine of forum non conveniens, while the AMS Defendants seek partial judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Each putative basis for dismissal asserted by the parties is governed by different standards of review. Those standards of review are discussed below.

A.      Motion to Dismiss for Lack of Personal Jurisdiction under Rule 12(b)(2)

When personal jurisdiction is challenged under Federal Rule of Civil Procedure 12(b)(2), the "[p]laintiff bears the burden of establishing personal jurisdiction over each individual defendant." Atlantigas Corp. v. Nisource, Inc., 290 F. Supp. 2d 34, 42 (D.D.C. 2003). In the absence of an evidentiary hearing, the plaintiff need only make a prima facie showing that the Court has personal jurisdiction. See Mwani v. Bin Laden, 417 F.3d 1, 6 (D.C. Cir. 2005); Walton v. Bureau of Prisons, 533 F. Supp. 2d 107, 112 (D.D.C. 2008). In order to meet this burden, the "[p]laintiff must allege specific facts on which personal jurisdiction can be based; [the plaintiff] cannot rely on conclusory allegations." Moore v. Motz, 437 F. Supp. 2d 88, 91 (D.D.C. 2006) (internal citations omitted). Furthermore, the "plaintiff cannot aggregate factual allegations concerning multiple defendants in order to demonstrate personal jurisdiction over any individual defendant." Atlantigas, 290 F. Supp. 2d at 42. The Court "may receive and weigh

26

affidavits and other relevant matter to assist it in determining the jurisdictional facts." United States v. Philip Morris Inc., 116 F. Supp. 2d 116, 120 n.4 (D.D.C. 2000) (internal quotation marks and citation omitted); see also Capital Bank Int'l, Ltd. v. Citigroup, Inc., 276 F. Supp. 2d 72, 74 (D.D.C. 2003). However, the Court must resolve all "factual discrepancies appearing in the record . . . in favor of the plaintiff," Crane v. N.Y. Zoological Soc'y, 894 F.2d 454, 456 (D.C. Cir. 1990), and the plaintiff's factual assertions "are presumed to be true unless directly contradicted by affidavit . . . or other evidence," Rong v. Liaoning Provincial Gov't, 362 F. Supp. 2d 83, 90 (D.D.C. 2005) (internal quotation marks and citation omitted).

B.      Motion to Dismiss on the Ground of Forum Non Conveniens

There is a strong presumption in favor of a plaintiff's choice of forum. Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947). However, the trial court may, in the exercise of discretion, dismiss a case on the grounds of forum non conveniens. Piper Aircraft Co. v. Reyno, 454 U.S. 235, 241 (1981). "[D]ismissal will ordinarily be appropriate where trial in the plaintiff's chosen forum imposes a heavy burden on the defendant or the court, and where the plaintiff is unable to offer any specific reasons of convenience supporting his choice." Id. at 249 (construing Gulf Oil, 330 U.S. 501). Furthermore, "the strong presumption against disturbing [the] plaintiff['s] initial forum choice . . . is weakened . . . when the forum is not [the] plaintiff's home forum and most of the relevant events occurred elsewhere." Demery v. Montgomery County, Md., 602 F. Supp. 2d 206, 210 (D.D.C. 2009) (quoting Hunter v. Johanns, 517 F. Supp. 2d 340, 344 (D.D.C. 2007)); see also Atlantic Tele-Network, Inc. v. Inter-American Dev. Bank, 251 F. Supp. 2d 126, 136 (D.D.C. 2003) ("[T]he usual presumption [in favor of the plaintiff's choice of forum] may . . . be overcome when private and public interest factors clearly point toward[] trial in an

alternative forum." (citing <u>Piper Aircraft</u>, 454 U.S. at 241)).[12]

When a court is presented with a motion to dismiss based on forum non conveniens, the threshold issue for the court is whether there exists an adequate alternative forum.   <u>Piper Aircraft</u>, 454 U.S. at 254 n.22; <u>El Fadl v. Cent. Bank of Jordan</u>, 75 F.3d 668, 676-77 (D.C. Cir. 1996).  If an adequate alternative forum exists, the court then must "weigh the relative conveniences to the parties against the presumption [in favor] of the plaintiff's forum selection." <u>El Fadl</u>, 75 F.3d at 676-77.  This requires the court to balance the relevant "private interest factors" and "public interest factors" and determine whether "the balance of convenience tilts strongly in favor of trial in the foreign forum."  <u>R. Maganlal & Co. v. M.G. Chem. Co.</u>, 942 F.2d 164, 167 (2d Cir. 1991).  "[T]he defendant bears the burden of persuasion as to all [the] elements of the forum non conveniens analysis."  <u>Lacey v. Cessna Aircraft Co.</u>, 932 F.2d 170, 180 (3d Cir. 1991); <u>see</u> <u>El Fadl</u>, 75 F.3d at 676-77 (defendant bears the burden of proving adequate alternative forum).  If the court decides that the balance of convenience favors the foreign forum, the court must still ensure that the "plaintiffs can reinstate their suit in the alternative forum without undue inconvenience or prejudice."  <u>Pain v. United Techs. Corp.</u>, 637 F.2d 775, 784-85 (D.C. Cir. 1980).  Because the presumption in favor of the plaintiff's choice of forum can only be overcome when the public and private interest factors "clearly point towards trial in the alternative forum," <u>Piper Aircraft</u>, 454 U.S. at 255, dismissal for forum non conveniens is the exception, rather than the rule.  <u>Raytheon Eng'rs & Constructors, Inc. v. H L H & Assocs. Inc.</u>, No. 97-20187, 1998 WL 224531, at *4 (5th Cir. Apr. 17, 1998) ("The burden on a defendant moving to dismiss in favor of a foreign court . . . is a strong one.  The cases . . . make it clear that

---

[12]  Although the weight given to a plaintiff's choice of forum is less when the plaintiff is a foreign resident, <u>Piper Aircraft</u>, 454 U.S. at 256, "this does not mean, and the <u>Piper Aircraft</u> Court did not say in that case, that [a] plaintiff's choice is not at least presumptively valid," <u>Laker Airways Ltd. v. Pan Am. World Airways</u>, 568 F. Supp. 811, 813 n.8 (D.D.C. 1983).

dismissal is to be the exception, not the rule, and that there must be a strong showing that the alternative forum would be significantly more convenient." (quoting 15 Charles Alan Wright et al., Federal Practice and Procedure § 3828, at 291-92 (2d ed.1986))); see Gulf Oil, 330 U.S. at 504-09.

C.   Motion for Judgment on the Pleadings under Rule 12(c)

In evaluating a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), courts employ the same standard that governs a Rule 12(b)(6) motion to dismiss. Jung v. Ass'n of Am. Med. Colls., 339 F. Supp. 2d 26, 35-36 (D.D.C. 2004).  And in deciding either motion, "the Court may not rely on facts outside the pleadings and must construe the complaint in the light most favorable to the non-moving party." Id. at 36.  The Court may also consider "any documents either attached to or incorporated in the complaint[,] and matters of which [the Court] may take judicial notice." EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997) (footnote omitted).  Although the Court must accept the plaintiffs' factual allegations as true, any conclusory allegations are not entitled to an assumption of truth, and even those allegations pleaded with factual support need only be accepted to the extent that "they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, ___ U.S. ___, ___, 129 S. Ct. 1937, 1950 (2009).  The Court may thus only grant judgment on the pleadings if it appears, even accepting as true all inferences from the complaint's factual allegations, that the plaintiff cannot prove any set of facts entitling him to relief. In re United Mine Workers of Am. Emp. Benefit Plans Litig., 854 F. Supp. 914, 915 (D.D.C. 1994).  Where the well-pleaded facts set forth in the complaint do not permit a court, drawing on its judicial experience and common sense, to infer more than the "mere possibility of misconduct," the complaint has not shown that the pleader is entitled to relief. Iqbal, ___ U.S. at ___, 129 S. Ct. at 1950.  If "the court finds that

[a] plaintiff[ ][has] failed to allege all the material elements of [his] cause of action," then the

Court may dismiss the complaint without prejudice, Taylor v. FDIC, 132 F.3d 753, 761 (D.C.

Cir. 1997), or with prejudice, provided that the Court "determines that the allegation of other

facts consistent with the challenged pleading could not possibly cure the deficiency," Firestone

v. Firestone, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (internal quotation marks and citations

omitted).

### III. Legal Analysis

Based on the positions taken by the parties, the issues presented for the Court's resolution

are multiple.  The Court must first determine whether it can exercise personal jurisdiction over

the Delphi Defendants in this case and, if so, whether the plaintiffs' Third Amended Complaint

should nonetheless be dismissed with respect to those defendants under the doctrine of forum

non conveniens.  The Court must then decide whether Counts I through VII of the plaintiffs'

Third Amended Complaint should be dismissed in whole or in part with respect to the AMS

Defendants under the doctrines of claim or issue preclusion.  Assuming it survives the AMS

Defendants' claim and issue preclusion arguments, the Court must then determine whether the

plaintiffs' RICO claim is properly pleaded.  If it is not, or if the Court concludes that the

plaintiffs' RICO claim is precluded by Judge Penn's prior rulings, then the Court must assess

whether it possesses subject-matter jurisdiction over the plaintiffs' remaining claims, all of

which arise under District of Columbia law.  Next, the Court must consider whether the breach

of contract, breach of fiduciary duty, and breach of the implied covenant of good faith and fair

dealing claims are duplicative of the plaintiffs' malpractice claim.  Finally, assuming that the

claim is still potentially viable following the Court's resolution of the issues delineated above,

the Court must determine whether a cause of action exists under District of Columbia law for

breach of the implied covenant of good faith and fair dealing.  Because the plaintiffs do not

contest the AMS Defendants' argument that the plaintiffs fail to allege facts sufficient to state a

claim for fraud or fraudulent concealment, the Court will treat that argument as conceded and

dismiss Counts VIII through X of the plaintiffs' Third Amended Complaint without further

analysis of that issue.[13]  See Buggs v. Powell, 293 F. Supp. 2d 135, 141 (D.D.C. 2003) (holding

that "when a plaintiff files an opposition to a dispositive motion and addresses only certain

arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to

address as conceded").

A.      The Delphi Defendants

1.      Personal jurisdiction

The Court must engage in a two-part inquiry to determine whether it may exercise

specific personal jurisdiction over non-resident defendants.[14]  First, the Court must determine

whether jurisdiction may be exercised under the District of Columbia's long-arm statute, D.C.

---

[13]  The defendants argue that the fraud-based claims (Counts VIII through X) must be dismissed because the Court, rather than Dr. Lans, was the target of the alleged fraud. AMS Defs.' Mem. at 14; AMS Defs.' Reply at 19.  The defendants explain that reliance by the plaintiff is required for a fraud claim (Count VIII), and that Dr. Lans does not claim any personal reliance upon the alleged misrepresentations. AMS Defs.' Mem. at 14-15.  In addition, the defendants claim that the allegedly concealed facts for the fraudulent concealment claims (Counts IX & X) were hidden from the Court, not Dr. Lans or Uniboard, that "it was AMS'[s] intention to deceive the Court," and that the plaintiffs do not allege that they relied on the purported misrepresentations. Id. at 15.  Furthermore, the AMS Defendants maintain that the plaintiffs fail to assert lack of actual or constructive notice of the alleged falsehoods because Dr. Lans fails to state that he was unaware of the content of AMS's representation to the Court. Id. at 15-16.

[14]  Under District of Columbia law, personal jurisdiction can be satisfied by demonstrating that the individual Delphi Defendants have sufficient contacts with the District of Columbia, see Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945), which may exist in two forms: (1) general contacts that are "continuous and systematic," such that the forum has jurisdiction over any matter involving the defendant, see Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 415-16 (1984); and (2) specific contacts that give rise to the actual claims against the defendant, see D.C. Code § 13-423 (2001).  It is clear, and the plaintiffs do not contend otherwise, that the Court does not have general jurisdiction over any of the Delphi Defendants.  See id. § 13-422.  Thus, if personal jurisdiction exists here at all, it must exist based on specific contacts with the District of Columbia.

Code section 13-423 (2001).[15]   Second, the Court must determine whether the exercise of

personal jurisdiction would satisfy the requirements of due process.   GTE New Media Servs. Inc.

v. BellSouth Corp., 199 F.3d 1343, 1347 (D.C. Cir. 2000) (citing United States v. Ferrara, 54

F.3d 825, 828 (D.C. Cir. 1995)).   The due process analysis turns on whether a defendant's

"minimum contacts" with the District of Columbia are such that "the maintenance of the suit

does not offend traditional notions of fair play and substantial justice."   Int'l Shoe Co. v.

Washington, 326 U.S. 310, 316 (1945) (internal quotation marks and citations omitted).   These

minimum contacts must arise from "some act by which the defendant purposefully avails

[himself] of the privilege of conducting activities within the forum State, thus invoking the

benefits and protections of its laws."   Asahi Metal Indus. Co. v. Super. Ct. of Cal., Solano

County, 480 U.S. 102, 109 (1987) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475

(1985)).   The defendant must have "purposefully directed his activities at residents of the forum,

and the litigation results from alleged injuries that arose out of or relate to those activities."

Burger King, 471 U.S. at 472-73 (internal citations and quotation marks omitted).   In other

words, courts must ensure that "the defendant's conduct and connection with the forum State are

---

[15]   Section 13-423(a) states in pertinent part:

> A District of Columbia court may exercise personal jurisdiction over a person,
> who acts directly or by an agent, as to a claim for relief arising from the person's
> – (1) transacting business in the District of Columbia; (2) contracting to supply
> services in the District of Columbia; (3) causing tortious injury in the District of
> Columbia by an act or omission in the District of Columbia; (4) causing tortious
> injury in the District of Columbia by an act or omission outside the District of
> Columbia if he regularly does or solicits business, engages in any other
> persistent course of conduct, or derives substantial revenue from goods used or
> consumed, or services rendered, in the District of Columbia; (5) having an
> interest in, using, or possessing real property in the District of Columbia; (6)
> contracting to insure or act as surety for or on any person, property, or risk,
> contract, obligation, or agreement located, executed, or to be performed within
> the District of Columbia at the time of contracting, unless the parties otherwise
> provide in writing; or (7) marital or parent and child relationship in the District
> of Columbia . . . .

D.C. Code § 13-423(a); see also id. § 13-421 (defining "person" to include a partnership).

such that he should reasonably anticipate being haled into court there." World-Wide

Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980).

      a.    Delphi[16]

      The Delphi Defendants assert that because they have not had minimum contacts with the

District of Columbia and it would therefore be unreasonable to assert jurisdiction over them, the

Court lacks personal jurisdiction over them as a constitutional matter.  Delphi Defs.' Mem. at 2,

8-20.  The Delphi Defendants argue that they do not have sufficient minimum contacts with the

District of Columbia to support personal jurisdiction over them because: (1) they "did not

conduct litigation-related activities in the District of Columbia," id. at 11-13; (2) the "single

visit" to the District of Columbia to meet with AMS and several of Dr. Lans's foreign lawyers

"does not constitute minimum contacts with the District of Columbia," id. at 13-14 (internal

quotation marks omitted); (3) none of the Delphi Defendants' other visits have any connection to

the plaintiffs' claims, id. at 14 n.7; and (4) the Delphi Defendants' "alleged inaction cannot

support the exercise of personal jurisdiction" because their alleged inaction only emphasizes

their lack of involvement in the litigation, id. at 16.  Specifically, the Delphi Defendants argue

that they never participated in litigation activities in the District, such as mediation or discovery,

did not sign any pleadings, and did not make an appearance in this Court.  Id. at 13.  Rather, they

allege, their only participation in the litigation was "assisting [Dr.] Lans and other Swedish

witnesses in responding to discovery and reviewing certain papers at the request of [Dr.] Lans's

---

[16]  The Court appreciates that the exercise of personal jurisdiction must be based on the individual actions of each
defendant.  Atlantigas, 290 F. Supp. 2d at 42.  However, because personal jurisdiction over Delphi, as a partnership,
is based on the contacts all of its partners had with the District of Columbia, Donatelli v. Nat'l Hockey League, 893
F.2d 459, 466-67 (1st Cir. 1990); see, e.g., Willis v. Semmes, Bowen & Semmes, 441 F. Supp. 1235, 1238-40 (E.D.
Va. 1977), the Court will address in this section the collective contacts of all the Delphi Defendants.  Thus, despite
the Court's collective references to the Delphi Defendants, this section's analysis concerns only whether personal
jurisdiction can be exercised over Delphi.  The Court will address whether personal jurisdiction can be exercised
over the individual Delphi defendants separately in section III.A.1.b, infra, of this opinion.

U.S. counsel," and those actions were performed in Sweden.  Id.  Moreover, the Delphi

Defendants argue that "the evidence in this case demonstrates that the decision to file suit in this

Court in [Dr.] Lans's name only was not made at the meeting in Washington, D.C.," id. at 14,

and that "Mr. Utterström and Mr. Lindström deny that . . . a final decision to do so was made at

that [meeting]," id.  As evidence of their position, the Delphi Defendants point to: (1) the Fee

Agreement which vests AMS with "sole and exclusive discretion" in deciding whether to pursue

litigation, id. at 15; Pls.' Delphi Opp'n, Ex. A, Tab 6 (Fee Agreement) at 3; (2) testimony from

Dr. Lans in one of the underlying patent litigation lawsuits, where he stated that "[AMS] had

complete control over the litigation involving the '986 Patent," Delphi Defs.' Mem. at 15 (citing

Motion of Håkan Lans and Uniboard Aktiebolag for Reconsideration of the Courts September 6,

2001 Order Concerning Attorneys' Fees ("Mot. for Recons."), Declaration of Håkan Lans ("Lans

Decl."), Lans v. Gateway 2000, Inc., Civil Action No. 97-2523 (JGP), Civil Action No. 97-2526

(JGP), Civil Action No. 99-3153 (JGP) (D.D.C. Jan. 14, 2002)); (3) the declaration of Dr. Lans

in Lans v. Gateway 2000, Inc., dated January 14, 2002, stating that "[AMS] decided who the

named plaintiff should be," id.; and (4) the first two versions of the complaint which did not

specifically allege that the Delphi Defendants participated in the decision, id.[17]

　　　　The plaintiffs argue, on the other hand, that the Delphi Defendants had sufficient contacts

with the District of Columbia because (1) "[t]he Delphi Defendants' communications with AMS

are contacts for the purposes of the Due Process Clause," Pls.' Delphi Opp'n at 7-9; see also id.

at 7-9, (2) the Delphi Defendants participated in the July 1997 meeting "to discuss the critical

issue of who would be named [the] plaintiff in litigation," id. at 9-11, and (3) "the actions of

AMS are attributable to Delphi because the Delphi Defendants and AMS acted as partners" or

---

[17]  The Delphi Defendants were not added as parties to this case until the Second Amended Complaint was filed.

alternatively "entered into a co-counsel relationship," id. at 11-13.  More specifically, the

plaintiffs assert that the Delphi Defendants "engaged in a persistent course of contacts with the

forum – by fax, phone, email and personal meetings, including at least three meetings in the

District of Columbia – all directed toward . . . persuading Dr. Lans to engage them as counsel for

activity in the District, and . . . representing Dr. Lans in activity in the District."  Id. at 6-7.  In

addition, the plaintiffs allege that the Delphi Defendants actively participated in the infringement

litigation, not only by meeting with AMS regarding the litigation, but also by reviewing the

notice of infringement letters, preparing responses to discovery requests, and drafting

declarations to the Court in relation to the infringement litigation.  Id. at 8.  Finally, in support of

their argument that AMS and the Delphi Defendants formed a partnership or, alternatively, a co-

counsel relationship, the plaintiffs point to the Fee Agreement which, the plaintiffs allege, states

that AMS and Delphi "jointly" represent Dr. Lans, jointly finance any litigation, are entitled to

33% of any fees collected under the agreement, and implies a separate agreement between

Delphi and AMS to "divide the profits."  Id. at 11.  The plaintiffs also point to the fee splitting

agreement between AMS, Delphi, and the '986 Partners, and Mastriani's testimony that "the

Delphi Defendants were authorized to speak on behalf of AMS in its negotiations with Dr.

Lans."  Id.  In addition, the plaintiffs contend that the "Delphi Defendants [p]urposely [d]irected

[t]heir [c]ontacts [t]oward [t]his [f]orum," id. at 14, and "Dr. Lans's and Uniboard's claims arise

out of the Delphi Defendants' contacts with" the District of Columbia, id. at 15.

In response, the Delphi Defendants deny that AMS and Delphi formed a partnership,

contending that (1) Delphi and AMS agreed to jointly represent Dr. Lans only in relation to the

"identification of potential infringers," and AMS had exclusive control over any litigation,

Delphi Defs.' Reply at 7, (2) the Fee Agreement does not suggest that AMS and Delphi would

jointly finance any litigation or that expenses would be shared by the firms, but rather, only

clarifies that Dr. Lans would not be responsible for expenses incurred by the firms and the firms

would not be responsible for expenses incurred by Dr. Lans, id. at 8, (3) the sharing of fees

obtained from enforcement of the patent does not constitute sharing of profits, but rather

constitutes the division of gross returns, id. at 8-9, and (4) even if the firms did share profits, an

agreement to share profits is not sufficient, by itself, to create a partnership, id. at 9-10.  The

Delphi Defendants also claim that AMS and Delphi did not create a co-counsel relationship,

stating that the case relied on by the plaintiffs is distinguishable because the nonresident lawyers

in that case were primarily responsible for the litigation underlying the plaintiffs' claims, the

plaintiffs were residents of the forum state, and the fee agreement was written according to the

forum state's law.  Id. at 10-11.

i.   The District of Columbia long-arm statute

The plaintiffs have not directed the Court to any proposed statutory bases for their

jurisdictional argument.  Nevertheless, the Court will assume that the plaintiffs are attempting to

assert jurisdiction under D.C. Code section 13-423(a)(1), see FC Inv. Grp. LC v. IFX Mkts.,

Ltd., 479 F. Supp. 2d 30, 38 (D.D.C. 2007) (assuming the statutory bases for plaintiffs'

jurisdictional argument where the plaintiffs did not provide such guidance to the court), the only

subsection of the District of Columbia long-arm statute arguably supporting jurisdiction based on

the facts as presented by the plaintiffs.[18]  For the following reasons, the Court finds that it may

---

[18]  The Court concludes that none of the remaining provisions of the District of Columbia long-arm statute appear to support the Court having jurisdiction over this action.  Subsection (a)(2) is inapplicable because this provision only applies "to a non-resident who injects itself into the District by agreeing to provide some service to [a] resident in the District," and because "[t]he mere existence of a contract between a non-resident and a resident is not a sufficient basis on which to claim jurisdiction over the non-resident in the District of Columbia."  COMSAT Corp. v. Finshipyards S.A.M., 900 F. Supp. 515, 524 (D.D.C. 1995).  And here, a non-resident and resident defendant agreed to provide services to non-resident plaintiffs.  Subsection (a)(3), while supporting jurisdiction over the plaintiffs' malpractice and RICO claims, fails to support jurisdiction over the remaining claims.  The tort-based

(continued . . .)

exercise jurisdiction in this case under subsection (a)(1) of the District of Columbia long-arm statute.

Subsection (a)(1)'s "transacting any business" clause has been interpreted to be "coextensive in reach with the personal jurisdiction allowed by the due process clause of the United States Constitution," Shoppers Food Warehouse v. Moreno, 746 A.2d 320, 329 (D.C. 2000), and thus to merge into a single inquiry, GTE, 199 F.3d at 1347 (citing Ferrara, 54 F.3d at 828).[19]  As a result of this congruence, in order to establish that this Court has specific

---

(. . . continued)
claims under which (a)(3) would be applicable are the malpractice, RICO, intentional infliction of emotional distress, and conversion claims. Section (a)(3) requires that both the alleged tortious injury and the act forming the basis of the claim must have occurred in the District, and the plaintiffs are alleging both economic and emotional injuries.  Emotional injury occurs where the plaintiff lives or works, Calder v. Jones, 465 U.S. 783, 785, 788-89 (1984); Masterson-Cook v. Criss Bros. Iron Works, Inc., 722 F. Supp. 810, 813 (D.D.C. 1989), and therefore subsection (a)(3) does not provide a basis for jurisdiction over the intentional infliction of emotional distress claim because any injury based on this claim occurred in Sweden.  See Compl. ¶¶ 15-16 (stating that the plaintiffs reside in Sweden).  Economic injury, on the other hand, occurs at "the location of the original event which caused the injury, not the location where the resultant damages are subsequently felt by the plaintiff."  Helmer v. Doletskaya, 393 F.3d 201, 208 (D.C. Cir. 2004) (quoting Mareno v. Rowe, 910 F.2d 1043, 1046 (2d Cir. 1990)).  Therefore, as to the malpractice claim, any injury occurred when the suit was dismissed in the District of Columbia.  See, e.g., Kowalski v. Doherty, Wallace, Pillsbury & Murphy, Attorneys at Law, 787 F.2d 7, 8 (1st Cir. 1986) (tortious injury in a legal malpractice action was the loss of the right to recover in a lawsuit, not the "effect" of the loss on the plaintiff).  Similarly, in regards to the RICO claim, the injury occurred when the court ordered the award of attorneys' fees against the plaintiffs, which occurred in the District of Columbia.  Any injury related to the conversion claim, however, occurred where the escrow account was located.  See Wenz v. Memery Crystal, 55 F.3d 1503, 1506-08 (10th Cir. 1995) (holding that, where a Colorado resident sued a London law firm for wrongfully withdrawing funds from his London trust account, the injury or loss occurred where the account was located because "the unauthorized disbursals occurred in London and were from a London account").  Because the plaintiffs bear the burden of establishing personal jurisdiction, and they have failed to delineate the location of the escrow account, the plaintiffs have not satisfied the requirements of subsection (a)(3) as to their conversion claim.  Furthermore, the alleged acts (or inactions) underlying the malpractice and RICO claims occurred in the District of Columbia, where the decision to file the first suit in Dr. Lans's name was made, and the failure to correct Mastriani's allegedly false statement to the Court occurred.  See Compl. ¶¶ 60, 92 (stating that the meeting to decide in whose name to file suit occurred in the District of Columbia, and that Mastriani filed the allegedly false statement in this Court).  Subsection (a)(4) is inapplicable because the defendants do not "regularly do[] or solicit[] business, engage[] in any other persistent course of conduct, or derive[] substantial revenue from . . . services rendered, in the District of Columbia."  D.C. Code § 13-423(a)(4).  Finally, subsections (a)(5) through (a)(7) have no applicability to the facts of this case.

[19]  The plaintiffs assert that the District of Columbia long-arm statute, in its entirety, is "coextensive with the limits of Due Process," Pls.' Delphi Opp'n at 5, and therefore the "statutory and constitutional analysis tend[s] to merge and become[s] essentially the same," id. at 6 (internal quotation marks omitted); they therefore contend that "nothing in the Federal Rules of Civil Procedure require[s Dr.] Lans to plead the statutory basis for personal jurisdiction," id. at 5.  The plaintiffs' argument misconstrues the reach of each paragraph of the long-arm statute.  While subsection (a)(1) has been interpreted to be co-extensive with the limits of due process, the same is not true of the other subsections of the long-arm statute.  See Crane v. Carr, 814 F.2d 758, 762 (D.C. Cir. 1987) ("The drafters

(continued . . .)

jurisdiction under section 13-423(a)(1), a plaintiff must demonstrate that (1) the defendant transacted business in the District of Columbia, (2) the cause of action arose from the business transacted in the District of Columbia, and (3) the "defendant had minimum contacts with the District of Columbia such that the Court's exercise of personal jurisdiction would not offend 'traditional notions of fair play and substantial justice.'"  DSMC, Inc. v. Convera Corp., 273 F. Supp. 2d 14, 20 (D.D.C. 2002) (quoting Int'l Shoe, 326 U.S. at 316); see also Jacobsen v. Oliver, 201 F. Supp. 2d 93, 104 (D.D.C. 2002); Formica v. Cascade Candle Co., 125 F. Supp. 2d 552, 553 (D.D.C. 2001).

The Court is persuaded that the plaintiffs have a statutory basis for jurisdiction being exercised by this Court under section 13-423(a)(1).  Delphi's regular communications into the District of Columbia in regard to Dr. Lans's representation, standing alone, do not constitute the transaction of business.  See IFX Mkts., 479 F. Supp. 2d at 39 (holding that the defendant's "regular" phone calls into the District of Columbia, standing alone, do not constitute "transacting business" in the District of Columbia).  However, when these communications are combined with the business meetings that were conducted in the District of Columbia, along with Delphi contracting with a District of Columbia law firm to assist with the representation of Dr. Lans and Uniboard, and that contract ultimately being performed in the District by filing the patent infringement lawsuit in this Court, Delphi clearly conducted business in the District of

---

(. . . continued)

of this provision apparently intended that the (a)(4) subsection would not occupy all of the constitutionally available space. . . .  This court has explicitly noted, moreover, that (a)(4) of the D.C. long-arm statute may indeed stop short of the outer limit of the constitutional space."); Moncrief v. Lexington Herald-Leader Co., 807 F.2d 217, 221 (D.C. Cir. 1986) ("Paragraph (a)(3) . . . is a precise and intentionally restricted tort section which stops short of the outer limits of due process . . . ." (internal quotation marks and citations omitted)); Mouzavires v. Baxter, 434 A.2d 988, 991 (D.C. 1981) (noting that "Congress intended to vest courts of the District with jurisdictional reach identical to that in effect in Maryland and substantially the same as that in effect in Virginia," and that Maryland and Virginia courts have interpreted several provisions under their long-arm statutes as having a much narrower scope than subsection (a)(1)).  However, because this Court has found that only subsection (a)(1) applies to the facts of this case, this overstatement on the part of the plaintiffs has no effect on the personal jurisdiction analysis in this case.

Columbia.  See Dooley v. United Techs. Corp., 803 F. Supp. 428, 435 (D.D.C. 1992) (holding

that "conducting business meetings in the District; sending and receiving mail, telefaxes, and

phone calls to and from the District[;] and holding out Washington, D.C.-based counsel as its

representative in business matters" constituted transacting business in the District); Exponential

Biotherapies, Inc. v. Houthoff Buruma N.V., 638 F. Supp. 2d 1, 7 (D.D.C. 2009) ("[N]egotiating

or performing business contracts has qualified as 'transacting business' for purposes of § 13-

423(a)(1) . . . .").

Moreover, a non-resident defendant transacts business within the District, under

subsection (a)(1), when his contractual activities have an effect in the District.  Helmer v.

Doletskaya, 290 F. Supp. 2d 61, 67 (D.D.C. 2003).  Here, the Delphi Defendants contracted with

AMS to provide counsel to the plaintiffs by pursuing potential patent infringers in the United

States, either by negotiating licenses with the potential infringers or by initiating legal action

against the potential infringers.  See Pls.' Delphi Opp'n, Ex. A, Tab 6 (Fee Agreement) at 2; id.,

Ex. A, Tab 12 (Mastriani Deposition Excerpts) at 77:4-77:12.  Although the Fee Agreement was

executed in Sweden, and did not specifically state where the contract would be performed, the

Delphi Defendants solicited a District of Columbia law firm to assist them in their representation

of the plaintiffs in the United States, and the performance of the contract resulted in litigation

being initiated in the District.  Assuming, as the Court must at this stage of the litigation, that the

Delphi Defendants participated in the discussion regarding whether to bring suit under Dr.

Lans's name only, N.Y. Zoological Soc'y, 894 F.2d at 455-56 (factual discrepancies, when

assessing a motion to dismiss on jurisdictional grounds, must be resolved in favor of the

plaintiff), Delphi transacted business within the District because the performance of the contract

resulted in litigation initiated in the District, and the claims asserted by the plaintiffs relate to that

litigation and the overall performance of the contract, see, e.g., Willis v. Semmes, Bowen & Semmes, 441 F. Supp. 1235, 1240 (E.D. Va. 1977) (holding that under Virginia's "contracting to supply services" provision of its long-arm statute, a non-resident attorney who contracted to act as the plaintiff's counsel and provide those services in Virginia through local counsel was subject to jurisdiction in Virginia even though "the contract was made outside the state and did not specifically require performance in Virginia" because "performance did actually occur within [Virginia]"); cf. Atlantigas, 290 F. Supp. 2d at 47 (concluding that this Court did not have personal jurisdiction over the defendant solely because the service contracts were with a District of Columbia company when the agreements were negotiated and executed wholly outside of the District and all events making up claim occurred outside of the District).

ii.   Due Process

Having established a basis for this Court exercising jurisdiction under the District of Columbia long-arm statute, the plaintiffs must next demonstrate that the claims underlying the litigation directly arise out of, or relate to, the defendants' forum activities, Burger King, 471 U.S. at 472-73, and that the defendants "purposefully availed [themselves] of the privilege of conducting activities within the forum," Asahi, 480 U.S. at 109.  For the following reasons, the Court agrees with the plaintiffs that the exercise of jurisdiction in this case comports with the requirements of due process.

Delphi notes that it has no offices, assets, or property in the District of Columbia, nor does it have any assets or offices in the United States. Delphi Defs.' Mem., Utterström Decl. ¶ 3. The plaintiffs respond that Delphi's contacts with the forum are nonetheless sufficient for the Court to exercise personal jurisdiction without offending the Constitution.  These contacts include: (1) initiating contact with Dr. Lans and then with AMS, a District of Columbia law firm,

40

regarding the pursuit of patent infringers in the United States, Compl. ¶¶ 32-33; (2) contracting

with a District of Columbia law firm to assist with the representation of Dr. Lans in the United

States and share fees associated with that representation, Compl. ¶¶ 40-45; (3) communications,

in the form of letters, facsimiles, e-mails, and memoranda, between AMS in the District of

Columbia and Delphi in Sweden regarding the Fee Agreement, licensing issues, and the patent

infringement suit;[20] (4) maintenance of a website representing that Lindström is a member of the

District of Columbia Bar, the Bars of the Supreme Court of the United States and California, and

that Lindström specializes in United States law, Compl. ¶ 63; (5) several meetings in the District

of Columbia attended by the Delphi Defendants, including the July 1997 meeting at AMS's

office, to discuss the status of the Lans patents or the '986 Patent litigation;[21] (6) failing to

prevent AMS from filing the lawsuit without preparing and filing documents to clarify

---

[20]  These communications include: (1) the December 10, 1995, memorandum from Utterström to AMS (transmitted by Lindström) regarding the color graphics patent, Pls.' Delphi Opp'n, Ex. A, Tab 2; (2) the December 13, 1995, letter from Mastriani to Lindström regarding the Lans color graphics patent and options available to Dr. Lans,  Pls.' Delphi Opp'n, Ex. A, Tab 3; (3) the December 18, 1996, letter from Utterström to Mastriani admitting that Delphi was not permitted under Swedish ethics rules to finance the expenses of a client, Compl. ¶ 47; (4) the January 22, 1997, communication from Mastriani to Utterström relating to an issue with the scope of the IBM license, and including portions of the IBM license for Utterström to review, which contained the language specifying that Uniboard was the licensor, id. ¶ 52; (5) the January 30, 1997, facsimile from Utterström to Mastriani stating that Dr. Lans indicated he was not willing to modify the Fee Agreement in any way that might affect his 67% share of the license fees, or have deducted the expenses for litigation from his license income prior to payment of fee and expenses to the attorneys, Pls.' Delphi Opp'n, Ex. A, Tab 10; (6) the February 3, 1997, agreement between AMS, Delphi, and the Montgomery, Alabama-based '986 Partners, whereby the '986 Partners agreed to advance up to $300,000 to fund the infringement litigation, id., Ex. A, Tab 8; (7) the April 9, 1997, correspondence between Schaumberg (a principal at AMS), Klaus (a German lawyer), and Lindström regarding Uniboard's rights under the IBM/Uniboard license, Compl. ¶ 56; (8) the April 17, 1997, communication from Utterström to Mastriani confirming that all licensing fees for the patent were to be paid to Uniboard, id. ¶ 57; (9) the August 7, 1997, letter from Utterström to Mastriani regarding the taxation of the licensing fees, id. ¶ 58; (10) the August 8, 1997, letter from Utterström to Mastriani regarding a taxation issue, id. ¶ 59; (11) the forwarding of the Micron-Diamond settlement agreement to AMS after it was reviewed and approved, id. ¶ 83; and (12) Mastriani's communication of his allegedly false statement to Delphi, id. ¶¶ 3-7.

[21]  Utterström made a total of four visits to the District of Columbia related to this case during the relevant time period – three in which he met with the AMS attorneys at their office to receive updates on the status of the Lans patent matters, including the July 1997 meeting, Delphi Defs.' Mem., Utterström Decl. ¶ 11, and a meeting with Compaq, at Dr. Lans's request, in December of 1998 at AMS's office, id., Utterström Decl. ¶ 12.  Lindström made only one visit to the District of Columbia related to the Lans United States patent matters – the July 1997 meeting. Id., Lindström Decl. ¶¶ 12-14.

ownership of the patent, Compl. ¶ 74; (7) assisting with litigation by submitting declarations, translating, drafting, reviewing, and commenting on interrogatory responses, and preparing affidavits filed in this Court, Delphi Defs.' Mem., Utterström Decl. ¶¶ 10, 16; id., Lindström Decl. ¶¶ 16-17; Pls.' Delphi Opp'n, Ex. A, Tab 11 (Evidentiary Hearing Transcript) at 91:15-92:11; (8) misleading the Court about the defendants' knowledge of Uniboard's interest in the patent prior to the filing of the lawsuit, Compl. ¶¶ 3-7, 95, 97, 148; and (9) failing to make sure the material filed in response to the motion for attorneys' fees was factually accurate and neglecting to inform Dr. Lans of the conflict of interest, id. ¶ 110.

It is clear that the claims in this case arise out of or relate to Delphi's activities in the District of Columbia.  In an attempt to adequately represent Dr. Lans in the United States matters, Delphi secured a co-counsel relationship with District of Columbia attorneys.  And the parties formed a relationship through the Fee Agreement, the performance of which resulted in litigation initiated in the District of Columbia, and the claims relate to that litigation and the overall performance of the contract.  These conclusions are based on several factors.  First, the failure to file suit in the name of the correct party in the underlying patent litigation is the centerpiece of plaintiffs' malpractice claim, and the Delphi Defendants' participation in the July 1997 meeting in the District of Columbia, when who to name as the plaintiff was discussed, is inextricably related to the purported failure to file suit in the name of the correct party.  Second, the plaintiffs claim that the defendants breached the Fee Agreement by refusing to further represent Dr. Lans in his appeals in courts located in the District of Columbia unless he paid the defendants additional money, and by converting funds owed under the Fee Agreement and the Escrow Agreement created to fund the United States project.  Therefore, it is apparent that the plaintiffs' claims arise from Delphi's business activities in the District of Columbia.

Whether Delphi purposely had minimum contacts with the District of Columbia, however, requires closer scrutiny.  Delphi's letters, facsimiles, e-mails, mailings, and other communications into and from the District of Columbia unquestionably qualify as contacts for purposes of the Court's jurisdiction analysis.  See Dooley, 803 F. Supp. at 435 (basing jurisdiction, in part, on sending and receiving mail, telefaxes, and phone calls to and from the District).  However, these communications alone are insufficient to establish personal jurisdiction.  Exponential Biotherapies, 638 F. Supp. 2d at 9 (holding that the defendant law firm's telephone calls, e-mails, facsimiles, and mailings, including invoices, to the plaintiff's District of Columbia office were insufficient for personal jurisdiction, because "such communications are incidental to nearly every business relationship" (citing Dove v. United States, No. 86-cv-65, 1987 WL 18739, at *3 (D.D.C. Oct. 9, 1987) ("[T]he mere delivery of documents . . . does not confer jurisdiction under 423(a)(1)."))).

The plaintiffs also allege several failures on the part of Delphi as constituting contacts with this forum, and such allegations can qualify as contacts for personal jurisdiction purposes.  See, e.g., Jacobsen, 201 F. Supp. 2d at 107 (failure to include children as parties in a suit).  Similarly, the failure to disclose material information can constitute purposeful direction of material omissions into a forum, Wein Air Alaska, Inc. v. Brandt, 195 F.3d 208, 213 (5th Cir. 1999), but this will be the case only where the failure to disclose the information is an "intrinsic part of communications with [the forum]," Porter v. Berall, 142 F. Supp. 2d 1145, 1148 (W.D. Mo. 2001), and "actually give rise to a cause of action," Wein, 195 F.3d at 213.  For example, where a failure to disclose is the basis of a claim against a lawyer, the lawyer's continual communication with the forum while failing to disclose a material fact would qualify as purposeful direction of material omissions into the forum.  Id.  However, Delphi's alleged failure

43

to prevent the AMS Defendants from filing the lawsuit without clarifying ownership of the '986

Patent, Compl. ¶ 74, failure to correct Mastriani's allegedly false statement to this Court, along

with material filed with this Court in support of the motion for attorneys' fees, Compl. ¶¶ 3-7,

95, 97, 110, 148, and failure to inform Dr. Lans of its conflict of interest, Compl. ¶ 110, were not

intrinsically connected to any communications with this forum that underlie any of the claims

made against Delphi.  In other words, Delphi made no affirmative communications related to

these alleged omissions on their part, and, therefore, these alleged "inactions," Delphi Def.'s

Mem. at 16, are not germane for jurisdictional purposes.

Delphi's website is similarly insufficient to subject Delphi to personal jurisdiction in the

District of Columbia.  While a defendant's advertising activity aimed at District residents can

subject it to the personal jurisdiction of the District courts, see, e.g., Shoppers Food Warehouse,

746 A.2d at 330-37, the maintenance of a website that is merely accessible to District residents is

insufficient to subject a defendant to personal jurisdiction here, Exponential Biotherapies, 638 F.

Supp. 2d at 4-5, 7, 9.  Admittedly, Delphi's website represented that Lindström is a member of

the District of Columbia Bar and that he specializes in United States law.  Pls.' Delphi Opp'n,

Ex. A, Tab 7 (Delphi website printout).  These representations were not, however, directed at

District of Columbia residents, and therefore, Delphi's website does not constitute purposeful

availment of the privilege of conducting business in the District.  See Exponential Biotherapies,

638 F. Supp. 2d at 4-5, 7, 9 (holding that a foreign law firm's maintenance of a website that

described the law firm's membership in the American Bar Association and touted its "many U.S.

based clients," but did not advertise specifically to District of Columbia residents, was

insufficient to subject the defendant to personal jurisdiction in the District, even if the defendant

intended to attract the business of United States residents generally).

The Delphi Defendants' participation in litigation-related activities alone also does not subject Delphi to personal jurisdiction in the District of Columbia.  Delphi cites to several decisions by courts in other jurisdictions where the courts declined to find minimum contacts based on a non-resident lawyer's participation in litigation-related activities in the forum state. Delphi Defs.' Mem. at 12.[22]  The relevant question, however, is not whether the activity was related to the underlying litigation, but rather whether such activity created a sufficient relationship between the defendants and the District under the Due Process Clause to permit the exercise of personal jurisdiction.[23]  The Delphi Defendants assisted with discovery through the

---

[22] The plaintiffs failed to address the defendants' argument on this point in their opposition, and did not direct the Court to any District of Columbia case where a court considered formal participation in litigation-related activities, such as discovery, depositions, settlement conferences, mediation, or arguing motions before a court, as contacts with the District for personal jurisdiction purposes.

[23] Compare, e.g., Trinity Indus., Inc. v. Myers & Assocs., Ltd., 41 F.3d 229, 231 (5th Cir. 1995) (holding that two attorney defendants purposefully availed themselves of the benefits of the forum where one attorney's contacts with the forum included appearing pro hac vice for the client in the Northern District of Texas, and the other attorney completed several patent applications and appeared in the Northern District of Texas litigation for eight months), Joye v. Heuer, No. 93-2004, 1995 WL 552028, at *3 (4th Cir. Sept. 19, 1995) (personal jurisdiction proper where one of the contacts with the forum was attending depositions in the South Carolina forum in regards to a California action), Kan. Tpk. Auth. v. Barr Bros. & Co., No. 89-2176-S, 1989 WL 117314, at *2 (D. Kan. Sept. 11, 1989) (finding personal jurisdiction where the defendant moved for and obtained admission pro hac vice, entered into a contract with a local law firm for services as local counsel, filed numerous pleadings and motions, appeared before and presented arguments to courts in the forum, sent correspondence and made telephone calls into the forum, and attended depositions and other discovery in the forum), Schleit v. Warren, 693 F. Supp. 416, 422 (E.D. Va. 1988) ("[A] lawyer who knowingly serves abusive process in a jurisdiction may expect to be haled into court where service was effectuated."), and Willis, 441 F. Supp. at 1238-40 (personal jurisdiction established where attorney's legal representation of client brought him into Virginia for a bankruptcy proceeding in which settlement agreements were signed and submitted to the Court, the settlement agreement being "the very embodiment and finalization of a course of legal malpractice and breach of contract" under plaintiff's theory of liability), with Rossi v. Wohl, 246 F. App'x 856, 858 (5th Cir. 2007) (agreeing with holding of district court that an attorney's contacts incidental to the representation of a client and contacts arising out of the representation are insufficient to establish minimum contacts), Sher v. Johnson, 911 F.2d 1357, 1360, 1362-63 (9th Cir. 1990) (finding no personal jurisdiction in California court over partners of Florida law firm in a malpractice action arising out of representation in Florida case where at most one of the partners made phone calls to and sent letters to California, and traveled to the state on several occasions to provide services to his client), Austad Co. v. Pennie & Edmonds, 823 F.2d 223, 226 (8th Cir. 1987) (refusing to exercise personal jurisdiction over a New York law firm representing a South Dakota corporation in Maryland litigation, where the contacts included a single three-day document and information gathering visit by an associate and law clerk from the firm because the defendants did not have an office in the forum, had never advertised or solicited business in the forum, did not actively seek out the in-forum plaintiff as a client, none of the law firm's attorneys resided in the forum or maintained a license to practice law there, and the actions giving rise to the lawsuit did not occur in the forum), Star Tech., Inc. v. Tultex Corp., 844 F. Supp. 295, 298 (N.D. Tex. 1993) (declining to exercise personal jurisdiction over a District of Columbia lawyer in Texas when his only connections

(continued . . .)

submission of declarations, the preparation of affidavits filed in this Court, and the translation,

drafting, reviewing, and commentary on interrogatory responses, along with also allegedly

reviewing and approving the Complaint and the Micron-Diamond settlement agreement and its

forwarding to AMS in the District.  Delphi Defs.' Mem., Utterström Decl. ¶¶ 10, 16; id.,

Lindström Decl. ¶¶ 16-17; Pls.' Delphi Opp'n, Ex. A, Tab 11 (Evidentiary Hearing Transcript) at

90:19-92:11.  The Court finds that these activities are alone insufficient to satisfy the due process

requirement of purposeful availment.

     In this case, however, there is more than just the communications sent into the forum and

participation in the insubstantial litigation-related activities discussed above.  Here, there were

also meetings regarding the representation attended by the Delphi Defendants in the District of

Columbia, including the July 1997 meeting when alleged malpractice occurred.  There is also an

underlying long-term contractual relationship, initiated by Delphi with Dr. Lans and a District of

Columbia law firm, which forms the basis of many of the plaintiffs' claims.  These meetings and

the contractual relationship, combined with Delphi's communications into the forum and

litigation-related activities, demonstrate that Delphi purposefully availed itself of the privilege of

conducting business in the District of Columbia.

     Regarding the Delphi Defendants visits to the District of Columbia, the defendants focus

solely on the July 1997 meeting at AMS's office because it is "[t]he centerpiece of the

---

(. . . continued)

with the forum in connection with the representation of his co-defendant included associating himself with a local
Texas law firm for the purpose of representing his client, having his name appear on pleadings, and making two trips
to Dallas for the purpose of participating in settlement discussions, mediation, discovery, and arguing a discovery
motion), Steinhilber v. Lamoree, 825 F. Supp. 1003, 1006 (S.D. Fla. 1992) (declining to exercise personal
jurisdiction over non-resident lawyers who attended, at the direction of a Missouri court, a settlement conference in
Florida, where the plaintiff resided), and Weiss v. Greenburg, Traurig, Askew, Hoffman, Lipoff, Quentel & Wolff,
P.A., 446 N.Y.S.2d 447, 448-49 (N.Y. App. Div. 1981) (refusing to exercise personal jurisdiction over a Florida law
firm sued by the plaintiff, a New York resident, based on a Florida foreclosure action because knowledge that the
plaintiff was a New York resident and travel by the firm's employees to New York to conduct or attend depositions
related to the Florida litigation were not sufficient alone to establish personal jurisdiction).

[p]laintiffs' allegations," Delphi Defs.' Mem. at 13, and argue that this single visit does not constitute minimum contacts.  Their position lacks merit for several reasons.  First, the Delphi Defendants have admitted attending several meetings in the District of Columbia to discuss the status of the Lans patents, Pls.' Delphi Opp'n at 4-5, or the '986 Patent litigation, Compl. ¶ 60. See Delphi Defs.' Mem., Utterström Decl. ¶¶ 11-15; id., Lindström Decl. ¶¶ 12-14. Furthermore, even if the July 1997 meeting was Delphi's only contact with the District, this contact alone is sufficient to constitute minimum contacts.  See Richter v. Analex Corp., 940 F. Supp. 353, 360 (D.D.C. 1996) (holding that personal jurisdiction existed over a nonresident where the evidence suggested that the defendant gave advice regarding the bonuses at issue in the case during a meeting in the District, even though the defendant disputed the allegation, because the Court had to resolve factual disputes in favor of the plaintiff in assessing that it had jurisdiction); Law Offices of Jerris Leonard, P.C. v. Mideast Sys., Ltd., 630 F. Supp. 1311, 1313 (D.D.C. 1986) (holding that the defendants' several trips to the District to consult with their attorneys (the plaintiffs) regarding the defendants' case, coupled with the fact that "much of the legal work [performed by the plaintiffs] was performed in the District," constituted substantial contact with the District); see also Freiman v. Lazur, 925 F. Supp. 14, 25-26 (D.D.C. 1996) (stating that while a single meeting in the District may be sufficient to satisfy minimum contacts, in that case, the single meeting in the District was neither "qualitatively significant" nor significant "in the scheme of the parties' dealings," as all of the contracts at issue were executed and performed outside of the District); Mitchell Energy Corp. v. Mary Helen Coal Co., 524 F. Supp. 558, 563-64 (D.D.C. 1981) (maintaining that a single meeting in the District may be sufficient to constitute "transacting business," but holding that under the particular circumstances of the case, the single meeting in the District in which the parties negotiated terms of a contract

was insignificant in the scheme of the parties' dealings because the final contract signed by the parties in Indianapolis differed substantially from the negotiated terms, and, therefore, the defendant's contacts were not sufficient to support jurisdiction under the long-arm statute or the Due Process Clause).

The Delphi Defendants attempt to distinguish <u>Richter</u>, noting that the Court there "felt obliged to resolve disputes of fact in the record in the plaintiff's favor" because discovery had not yet occurred, Delphi Defs.' Mem. at 14 (citing <u>Richter</u>, 940 F. Supp. at 360), and on the contention that there is no factual dispute in this case as to whether the decision to file suit in this Court in Dr. Lans's name only was made at the July 1997 meeting in the District.  <u>Id.</u>  These arguments fail for two reasons.  First, whether discovery has occurred is irrelevant to the Court's obligation in deciding a motion to dismiss to construe the facts alleged in the complaint in favor of the plaintiff unless such assertions are "directly contradicted by affidavit . . . or other evidence."  <u>Rong v. Liaoning Provincial Gov't</u>, 362 F. Supp. 2d 83, 90 (D.D.C. 2005) (internal quotation marks and citation omitted); <u>see, e.g.</u>, <u>Richter</u>, 940 F. Supp. at 360 (implying that the court had to resolve the factual dispute in favor of the plaintiff because "at [that] stage of the litigation" – before the completion of discovery – there was no evidence contradicting the plaintiff's factual assertion, other than the defendant's denial, and there was some evidence that partially supported the plaintiff's allegation).  Second, the evidence cited by the defendants as allegedly demonstrating that the decision to file suit was not made at that July 1997 meeting actually supports the fact that there <u>is</u> a factual dispute which must be resolved in favor of the plaintiffs.

There is both evidence contradicting the plaintiffs' factual assertions that a decision to file suit in Dr. Lans's name occurred at the July 1997 meeting and that Delphi participated in that

decision, and evidence supporting Dr. Lans's allegations.  Compare Delphi Defs.' Mem.,

Utterström Decl. ¶ 14 (claiming that the purpose of the meeting was to receive updates on the

status of patent licensing efforts in the United States, as well as in Germany and Italy), id.,

Lindström Decl. ¶ 12 (same but only as to Germany and Italy), id., Utterström Decl. ¶¶ 14-15

(confirming that there was a discussion regarding the potential transfer of ownership of the

patent, but claiming that no decision on this issue was made at the meeting, and the decision to

file suit in the United States, as well as in whose name to file, was not made at that meeting), id.,

Lindström Decl. ¶ 15 (same), and Mot. for Recons., Lans Decl. ¶ 14, Gateway, Civil Action No.

97-2523 (JGP), Civil Action No. 97-2526 (JGP), Civil Action No. 99-3153 (JGP) (indicating that

"[AMS] decided who the named plaintiff should be"), with Compl. ¶ 60 (alleging that a topic of

discussion at the meeting was whether the suit should be brought in Dr. Lans's name or in the

name of Uniboard, and that the Delphi Defendants participated in the discussion), Delphi Defs.'

Mem., Utterström Decl. ¶ 15 (admitting that the possibility of litigation may have been discussed

at the meeting), and Pls.' Delphi Opp'n, Ex. A, Tab 12 (Mastriani Deposition) at 152:4-21

(Mastriani's statement that a discussion about who to name as plaintiff in the various

jurisdictions took place at the meeting).  Based on the available evidence, the Court can only

conclude that there is a factual dispute concerning what was discussed and decided at the July

1997 meeting.  If the Court assumes that the Delphi Defendants took part in the critical decision

to file the suit in Dr. Lans's name only at the July 1997 meeting, then the Delphi Defendants'

"single visit" to the District of Columbia would contribute sufficient minimum contacts under

Richter.  Also, even if the ultimate decision to file suit in Dr. Lans's name only did not occur at

this meeting, but Delphi's contribution to the discussion at the meeting was significant "in the

scheme of the parties' dealings," Mitchell Energy, 524 F. Supp. at 564, such that the discussion

led directly to the ultimate decision, then their participation in the discussion would support this

Court exercising personal jurisdiction over Delphi.  See id. at 563-64 (recognizing that a single

negotiation session in the District upon which a contract at issue is based may be sufficient to

constitute "transacting business" in the District, but holding that under the particular

circumstances of the case, the single negotiation session was "insignificant in the scheme of the

parties' dealings" because the final contract signed by the parties in Indianapolis differed

substantially from the negotiated terms).  Therefore, the Court finds the Delphi Defendants'

"single visit" to the District of Columbia to constitute sufficient contacts with this forum to

satisfy the Due Process Clause.

Moreover, the Delphi Defendants contracted with a District of Columbia law firm to

assist with the representation of Dr. Lans and Uniboard.

> While negotiating or performing business contracts has qualified as
> 'transacting business' for purposes of § 13-423(a)(1), entering into
> a contract with an out-of-state party does not by itself . . . establish
> minimum contacts or constitute purposeful availment.  There must
> be a 'substantial connection' between the contract and the forum,
> which often exists where the contract is to be performed, in whole
> or in part, in D.C.

Exponential Biotherapies, 638 F. Supp. 2d at 7 (internal citations omitted).  The court must look

to the "prior negotiations and contemplated future consequences, along with the terms of the

contract and the parties' actual course of dealing" to determine whether Delphi "purposely

established minimum contacts" with the forum.  Burger King, 471 U.S. at 479; see Creighton

Ltd. v. Gov't of Qatar, 181 F.3d 118, 127-28 (D.C. Cir. 1999) (holding that the defendant did not

have minimum contacts with Tennessee or the United States solely by contracting with a United

States company because consideration of the prior negotiations, the contemplated future

consequences, the terms of the contract, and the parties course of dealing demonstrated that the

contract was offered, accepted, and performed in Qatar, the contract was made subject to the laws of Qatar, and the alleged breach occurred in Qatar).

Here, the Fee Agreement was negotiated and executed in Sweden.  Delphi Defs.' Mem., Utterström Decl. ¶ 16.  Therefore, the parties' "prior negotiations" do not support the exercise of jurisdiction over Delphi.  However, the "contemplated future consequences" of the contract and the parties' "actual course of dealing" support a finding of personal jurisdiction in this forum. By contracting with a District of Columbia law firm, Delphi had to appreciate that the work performed by the District firm would be performed in this forum.  See Law Offices of Jerris Leonard, 630 F. Supp. at 1313 (holding that defendants, New York clients of a District of Columbia law firm, "reasonably could have expected . . . that much of the legal work would have been performed in the District of Columbia" by seeking legal counsel from a District firm with expertise in government contracts law); Chase v. Pan-Pacific Broad., Inc., 617 F. Supp. 1414, 1422 (D.D.C. 1985) (initiation of business relationship with District of Columbia attorney considered a contact indicating purposeful availment).  Furthermore, the parties knew that the patent would not expire for at least two-and-a-half years after they entered into the agreement, Compl. ¶ 39 (indicating Mastriani's belief that the patent would expire in December 1998); Pls.' Delphi Opp'n, Ex. A, Tab 2 (Memo from Utterström, dated Dec. 10, 1995, indicating expiration of all Dr. Lans's color graphics patents between 2000 and 2002); id., Tab 6 (Fee Agreement) (dated July 23, 1996), and therefore entered into a long-term agreement with a District of Columbia law firm whereby AMS, in consultation with Delphi, would identify potential infringers in the United States, Pls.' Delphi Opp'n, Ex. A, Tab 6 (Fee Agreement) at 2, determine the strategy for obtaining licenses from these infringers, id.; Compl. ¶ 43, and potentially initiate legal action on behalf of the plaintiffs, Pls.' Delphi Opp'n, Ex. A, Tab 6 (Fee Agreement) at 2.

The work was then actually performed in the District, and formed the basis for the plaintiffs'

claims.  Having established such a long-term relationship, Delphi should have anticipated being

haled into court here.  See Trinity Indus., Inc. v. Myers & Assocs., Ltd., 41 F.3d 229, 231 (5th

Cir. 1995) (holding that the existence of a long-term attorney-client relationship, in which the

attorney regularly handled matters for the client, along with representation requiring regular mail

and telephone communications with the forum, and occasional physical meetings in the forum,

supported an inference that the defendants purposefully availed themselves of the privilege of

doing business in the forum).

   The Delphi Defendants argue that they did not contemplate representing the plaintiffs in

any litigation because AMS had exclusive control over litigation, but a fair reading of the Fee

Agreement only indicates that Delphi had no control over the decision to initiate litigation.  Pls.'

Delphi Opp'n, Ex. A, Tab 6 (Fee Agreement) at 2-3.  It indicates nothing concerning Delphi's

authority to make decisions or have input regarding any litigation after it has been initiated.  See

id. at 1-3.  Despite the fact that the Fee Agreement does not address Delphi's role following the

initiation of litigation, litigation in the United States was actually pursued, and the Delphi

Defendants actually assisted with that U.S. litigation by submitting declarations in support of

discovery motions, translating, drafting, reviewing and commenting on interrogatory responses,

preparing affidavits filed in this Court, and reviewing the complaint.  Delphi Defs.' Mem.,

Utterström Decl. ¶¶ 10, 16; id., Lindström Decl. ¶¶ 16-17; Pls.' Delphi Opp'n, Ex. A, Tab 11

(Evidentiary Hearing Transcript) at 90:19-92:11.  Finally, once litigation was initiated in the

District under Dr. Lans's name, and Delphi participated in that litigation, it clearly availed itself

of the privilege of doing business in this forum as a result of the decision to pursue litigation in

this jurisdiction.  See Mitrano v. Hawes, 377 F.3d 402, 407 (4th Cir. 2004) ("[E]ven assuming

[the defendant] was not involved in the initial selection of the forum, . . . [the defendant] knew

that the suit had been filed there. . . . Thus, [the defendant's] knowing continuation of the suit in

[the forum] demonstrates that his availment of [the forum's] legal protections was purposeful."

(citing Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 55 (1st Cir.

2002))); see also Chase, 617 F. Supp. at 1424 ("[R]atification may be implied from any act,

words, or course of conduct on the part of the principal which reasonably tends to show an

intention on his part to ratify the unauthorized acts or transactions of the alleged agent." (quoting

3 Am. Jur. 2d Agency § 161 (1963))); 3 Am. Jur. 2d Agency § 193 (2002) ("[R]atification may

be inferred by a principal's acquiescence in the results of an unauthorized act of an agent, and, in

this regard, it has also been said that ratification may be found to exist by implication from a

principal's failure to dissent within a reasonable time after learning what has been done . . . ."

(footnotes omitted)).

     In sum, Delphi deliberately reached out beyond Sweden and voluntarily negotiated and

entered into a contract with a District of Columbia law firm, on behalf of their Swedish client, in

order to obtain the benefits of associating with a District law firm in connection with Dr. Lans

receiving legal representation in the United States.  Further, Delphi engaged in a transaction

(contracting with the AMS Defendants to assist in representing the plaintiffs in the United States)

which had a substantial connection with the District and which Delphi must have known would

have consequences here.  In so doing, Delphi invoked the benefits and protections of the

District's laws.  Hanson v. Denckla, 357 U.S. 235, 253 (1958); see also, e.g., Chase, 617 F.

Supp. at 1422 (holding that initiation of a business relationship with a District of Columbia

attorney, making business decisions related to the legal matters, and taking part in telephone

conversations, correspondence, and two meetings in the District of Columbia to discuss the legal

matters with the District attorney demonstrated that the defendant "'purposefully directed his activities at residents' of the District of Columbia").

For the foregoing reasons, the Court concludes that the plaintiffs have stated sufficient facts to establish personal jurisdiction over Delphi.[24]

> b.   Defendants Utterström's and Lindström's Fiduciary Shield Defense

Defendants Lindström and Utterström, relying on the fiduciary shield doctrine,[25] argue that not only must personal jurisdiction be established as to each defendant individually, but personal jurisdiction over them as "employees, officers, or agents sued in their individual capacities must be based on their personal contacts with the forum and not on activities carried out" within the scope of employment.  Delphi Defs.' Mem. at 9 (emphasis added); see also Delphi Defs.' Reply at 5-7.  The plaintiffs counter that the fiduciary shield doctrine does not apply in the context of a legal malpractice case, and that an individual attorney's contacts with the forum, even in his capacity as an employee, officer, or agent of a law firm, are sufficient to establish personal jurisdiction over the individual attorney as well as the law firm.  Pls.' Delphi Opp'n at 6 n.10.

Notably, the defendants failed to acknowledge the exception to the fiduciary shield doctrine – that the doctrine is "inapplicable when the defendant is found to be 'more than an employee' of the corporation."  Nat'l Cmty. Reinvestment Coal. v. Novastar Fin., Inc., 631 F.

---

[24]  The plaintiffs also argue that even if the Delphi Defendants contacts were insufficient for personal jurisdiction, all contacts made by AMS with the District of Columbia are attributable to Delphi because they acted as partners, or at least co-counsel.  Pls.' Delphi Opp'n at 11.  Because the Court has determined that Delphi's contacts were sufficient to establish personal jurisdiction, the Court finds it unnecessary to address these arguments.

[25]  The fiduciary shield doctrine requires that "personal jurisdiction over the employees or officers of a corporation in their individual capacities . . . be based on their personal contacts with the forum and not their acts and contacts carried out solely in a corporate capacity."  Nat'l Cmty. Reinvestment Coal. v. Novastar Fin., Inc., 631 F. Supp. 2d 1, 5 (D.D.C. 2009) (quoting Wiggins v. Equifax, 853 F. Supp. 500, 503 (D.D.C. 1994)).  "The plaintiff therefore must demonstrate that the individual defendants are subject to personal jurisdiction 'apart from any jurisdiction that might exist over their corporate-entity employers.'"  Id. (quoting D'Onofrio v. SFX Sports Grp., Inc., 534 F. Supp. 2d 86, 90-91 (D.D.C. 2008)).

Supp. 2d 1, 5 (D.D.C. 2009); see, e.g., Covington & Burling v. Int'l Mktg. & Research, Inc., No.

Civ.A. 01-0004360, 2003 WL 21384825, at *6 (D.C. Super. Ct. Apr. 17, 2003) (concluding that,

where the two officer defendants were the "only corporate officers [of the corporation] and set

company policies and procedures," were "active in day-to-day operations of the company," and

had direct "involvement and supervision of all aspects of the company," the corporate officers

were "more than mere employees" and, therefore, "not insulated from [the C]ourt's

jurisdiction").  But see Kopff v. Battaglia, 425 F. Supp. 2d 76, 85 (D.D.C. 2006) (recognizing

Covington, but determining that the exception did not apply in that case because the chief

programmer of a blast-fax advertising firm, although an officer, did not have "any role in

directing or controlling company policy").[26]  In any case, there is no indication that the fiduciary

shield doctrine applies in the non-corporation context, as it has not been applied to law firm

attorneys in legal malpractice cases or to partnerships.[27]  See, e.g., Jacobsen, 201 F. Supp. 2d at

107 & n.11 (basing personal jurisdiction over partner of professional corporation law firm on

contacts made within the scope of employment, i.e., legal advice that was the basis for the

---

[26]  Other members of this Court have also held that because the "transacting business" provision of the long-arm statute extends to the full limits of the Due Process Clause, and the doctrine "confuses procedural and substantive questions and unreasonably immunizes from jurisdiction one who in fact acted in the forum state," the fiduciary shield is inapplicable to section 13-423(a)(1). Chase, 617 F. Supp. at 1423; see also Am. Directory Serv. Agency, Inc. v. Beam, 131 F.R.D. 15, 17 (D.D.C. 1990) (agreeing with Chase and finding that the fiduciary shield doctrine goes to the merits of the case, not the ability of the court to adjudicate the case); Katradis v. Dav-el of Washington, D.C., 702 F. Supp. 1, 1 (D.D.C. 1987)  (citing Chase for the proposition that an individual may be "transacting business" in the District of Columbia under D.C. Code § 13-423(a)(1) even if acting solely in a fiduciary capacity for a corporation).

[27]  Even if the fiduciary shield doctrine applied to law firms, Mr. Utterström would not be insulated from the Court's jurisdiction under the exception because he was the managing partner of Delphi, and in this capacity would inevitably have had a major role in all aspects of the firm's operations, including directing or controlling company policy, making him more than a mere employee.  Lindström, on the other hand, might be insulated from the Court's jurisdiction based on contacts within the scope of his employment because his position at Delphi was as "of counsel" and he therefore presumably had little or no control over company policy.  However, application of the fiduciary shield doctrine is not mandatory, and is within the sound discretion of the Court.  Bailey v. J & B Trucking Servs., Inc., 577 F. Supp. 2d 116, 119 (D.D.C. 2008).  Because the Court determines that the fiduciary shield doctrine does not apply in this case, it is unnecessary for the Court to determine whether Lindström would have been insulated from its jurisdiction under the doctrine.

plaintiffs' malpractice suit); <u>Richter</u>, 940 F. Supp. at 359-60 (finding personal jurisdiction over managing partner of accounting firm who was present at meeting where negligent advice was allegedly provided, without considering the applicability of the fiduciary shield doctrine). Therefore, the plaintiffs must establish personal jurisdiction over Utterström and Lindström based on each defendant's independent contacts with the forum, but these contacts may be contacts committed within the scope of their employment.

Utterström is a citizen and resident of Sweden, has never lived, worked, rented or owned property in the District of Columbia, and has no other assets in the United States. Delphi Defs.' Mem., Utterström Decl. ¶¶ 2, 4, 6. He has also made no appearances in any patent infringement cases in the United States. <u>Id.</u>, Utterström Decl. ¶ 9. Utterström was, however, the managing partner of Delphi during the time period relevant to this litigation. <u>Id.</u>, Utterström Decl. ¶ 3. During that period of time, Utterström sent several communications to AMS in the District related to Dr. Lans's representation. <u>See</u> Pls.' Delphi Opp'n Ex. A, Tab 2, 6 (Memorandum and Letter); Compl. ¶¶ 57-59.[28] He also visited the District on four occasions related to the representation, including three visits with AMS to receive updates on the status of the Lans patent matters, Delphi Defs.' Mem., Utterström Decl. ¶ 11, a meeting with Compaq at AMS's office, <u>id.</u>, Utterström Decl. ¶ 12, and the July 1997 meeting where a topic of discussion was whether the suit should be brought in Dr. Lans's name or in the name of Uniboard, <u>id.</u>, Utterström Decl. ¶ 14. Finally, Utterström assisted with the District of Columbia litigation by reviewing and commenting on interrogatory responses, and preparing affidavits filed in this Court. <u>Id.</u>, Utterström Decl. ¶¶ 10, 16.

---

[28] These communications consisted of the December 10, 1995, memorandum to AMS regarding the '986 patent, Pls.' Delphi Opp'n Ex. A, Tab 2, the April 17, 1997, communication to Mastriani confirming that all licensing fees for the patent were to be paid to Uniboard, Compl. ¶ 57, the August 7, 1997, letter to Mastriani regarding the taxation of the licensing fees, <u>id.</u> ¶ 58, and the August 8, 1997, letter to Mastriani regarding a taxation issue, <u>id.</u> ¶ 59.

Lindström, on the other hand, is a United States citizen, id., Lindström Decl. ¶ 2, and was an inactive member of the District of Columbia Bar prior to moving to Sweden, id., Lindström Decl. ¶ 8. He is, however, a resident of Sweden, id., Lindström Decl. ¶ 3, and has no assets in the District of Columbia, id., Lindström Decl. ¶ 9. He also made no appearance in any patent infringement cases filed on behalf of Dr. Lans in the United States, id., Lindström Decl. ¶ 11, and was employed as "of counsel" at Delphi during the relevant time period, id., Lindström Decl. ¶ 5. Lindström is, nevertheless, responsible for having initiated contact with AMS regarding the pursuit of patent infringers in the United States on Dr. Lans's behalf. Compl. ¶¶ 32-33. During that representation, Lindström made two visits to the District of Columbia to meet with AMS regarding the representation, including the July 1997 meeting. Delphi Defs.' Mem., Lindström Decl. ¶ 12. Finally, Lindström assisted with litigation by submitting declarations, translating, reviewing and commenting on interrogatory responses, and preparing affidavits filed in this Court. Id., Lindström Decl. ¶¶ 16-17.

For reasons similar to those discussed previously as to Delphi, the Court finds that Utterström transacted business in the District of Columbia under the long-arm statute, and had sufficient contacts purposefully directed at the District to satisfy due process. While his communications and litigation-related activities alone would be insufficient to confer personal jurisdiction over him, Utterström's four visits to the District of Columbia related to the representation of the plaintiffs, including his participation in the July 1997 meeting when alleged malpractice was committed, and contracting with a District of Columbia law firm to assist with the representation, are sufficient to qualify as minimum contacts. See Chase, 617 F. Supp. at 1422 (holding that initiation of a business relationship with a District of Columbia attorney, agreeing to fee agreement with the attorney, making business decisions related to the legal

matters, communications into the District through telephone conversations and written correspondence, and attending two meetings in the District to discuss the legal matters with the District attorney established that defendant "purposefully directed his activities at residents of the District of Columbia" (internal quotation marks omitted)).  Even though Utterström did not initiate contact with AMS, when he signed the agreement to represent Dr. Lans in the United States and consulted with a District of Columbia law firm concerning that representation, he reasonably could have expected that much of the work would be performed in the District. Moreover, the agreement to seek licenses from patent infringers throughout the duration of the patent – a patent Utterström knew would not expire for at least two-and-a-half years after he entered into the agreement, Pls.' Delphi Opp'n, Ex. A, Tab 2 (Memo from Utterström indicating expiration of all Dr. Lans's color graphics patents between 2000 and 2002) – created a long-term relationship with a District of Columbia law firm.  Utterström expected to gain the pecuniary benefits of being able to represent Dr. Lans against United States infringers, through the involvement of local counsel, by collecting a percentage of all licensing fees obtained in the United States matters, whether through negotiation or litigation.  Id., Ex. A, Tab 6 (Fee Agreement) at 3.  Therefore, once litigation was initiated – an action not outside the contemplation of the parties – Utterström's knowing continuation of the suit in the District demonstrated his purposeful availment of the benefits and protections of the laws of this forum, Mitrano v. Hawes, 377 F.3d 402, 407 (4th Cir. 2004), and he therefore should have anticipated being haled into court here.

The case for jurisdiction over Lindström is even more compelling.  Not only did Lindström make two visits to the District of Columbia related to the representation, including participation in the July 1997 meeting when alleged malpractice took place, and enter into a

long-term relationship with a District of Columbia law firm to assist with the plainitffs'

representation by signing the Fee Agreement, but he is also responsible for initially approaching

AMS regarding Dr. Lans's United States-based pursuits.  Compl. ¶¶ 32-33.  Therefore, for the

same reasons stated above, the exercise of personal jurisdiction over Lindström is proper.[29]

       c.    <u>Reasonableness</u>

Once a court has determined that a defendant has purposefully directed its activities at

residents of a forum, the burden shifts to the defendant "to present a compelling case that the

presence of some other considerations would render jurisdiction unreasonable."  <u>Jacobsen</u>, 201

F. Supp. 2d at 107-08 (quoting <u>Burger King</u>, 471 U.S. at 477) (internal quotation marks omitted).

In assessing whether the assertion of jurisdiction is reasonable, the court must consider "the

burden on the defendant, the interests of the forum State, . . . the plaintiff's interest in obtaining

relief . . . the interstate judicial system's interest in obtaining efficient resolution of

controversies[,] and the shared interest of the several States in furthering fundamental

substantive social policies."  <u>Asahi</u>, 480 U.S. at 113 (quoting <u>World-Wide Volkswagen</u>, 444 U.S.

at 292) (internal quotation marks omitted).

---

[29]  There is some discussion in the briefs concerning the impact of Lindström's membership in the District of Columbia Bar.  Because personal jurisdiction over Lindström is held to be proper without evaluation of this factor, the Court need not address it.  However, the Court notes that it has been widely held that membership in a state Bar does not have any impact on the jurisdictional analysis.  <u>Santos v. Sacks</u>, 697 F. Supp. 275, 281 (E.D. La. 1988) ("It is this Court's opinion that membership in the [state] Bar does not, of itself, establish the minimum contacts required by due process to confer personal jurisdiction over a nonresident defendant."); <u>see</u> <u>Dove v. United States</u>, No. 86-cv-65, 1987 WL 18739, at *1-*4 (D.D.C. Oct. 9, 1987) (District of Columbia Bar membership had no impact on whether court could exercise personal jurisdiction over two Virginia attorneys who performed legal services that had a subsequent impact in the District; jurisdiction therefore found lacking despite their Bar membership); <u>Ghanem v. Kay, D.P.M.</u>, 624 F. Supp. 23, 24-25 & n.6 (D.D.C. 1984) (finding persuasive the holding in <u>Lebkuecher v. Loquasto</u>, 389 A.2d 143, 145 (Pa. Super. 1978), that "it is the actual practice of a profession . . . and not the possession of the right to practice that brings a person within the jurisdiction of a . . . court" and thus holding that "where the physician has not aggressively sought patients in the forum and the plaintiff did not consult defendant as a result of forum activities by the defendant[], possession of a license . . . without practicing in the forum is not sufficient to meet the due process requirements" of long-arm jurisdiction); <u>see also</u> <u>Worthington v. Small</u>, 46 F. Supp. 2d 1126, 1127-30 (D. Kan. 1999) (finding no personal jurisdiction, despite the defendant attorney's license to practice law in Kansas, because his legal practice was centered in Missouri, the attorney did not solicit plaintiff's business in Kansas, and the contract at issue did not contemplate the performance of any services in Kansas).

The Delphi Defendants contend that even if there are sufficient minimum contacts with the District of Columbia, it would be unreasonable to assert jurisdiction over them for several reasons: (1) the burden on the defendants of having to appear in a suit in a foreign country would be significant, especially since they have no office or facilities in the United States, Delphi Defs.' Mem. at 17; (2) the District's interest in adjudicating the dispute is "minimal" because neither of the plaintiffs nor any of the Delphi Defendants is a resident of the District, id. at 17-18; (3) the plaintiffs' interest in obtaining convenient relief should be given little weight where the plaintiffs have not chosen their home forum and there is no indication that bringing suit in Sweden would subject the plaintiffs to "unreasonable inconvenience," id. at 18-19; (4) "any judgment rendered against the Delphi Defendants by this Court will not [be] enforceable in Sweden," and therefore permitting litigation to continue in the District of Columbia would be an inefficient use of judicial resources, id. at 19; and (5) whereas the District of Columbia has little interest in ensuring that the plaintiffs' claims are litigated here, "Sweden's interest in developing and enforcing the standards governing the provision of legal services by Swedish lawyers, in Sweden, to Swedish nationals, is undeniable," id. at 19-20.

In response, the plaintiffs assert that any burden imposed on the defendants is outweighed by their contacts with the forum because of the frequency with which the individual defendants visited the District of Columbia, Lindström's status as a former resident of McLean, Virginia, and his status as an inactive member of the District of Columbia Bar. Pls.' Delphi Opp'n at 16-17. Further, the plaintiffs contend that the District of Columbia has a substantial interest in regulating the conduct of attorneys who practice within its borders. Id. at 18. While the plaintiffs admit that the Delphi Defendants did not appear before the Court, the plaintiffs nevertheless claim that the defendants did participate in the infringement proceedings through

the drafting of affidavits and discovery responses and by giving advice regarding litigation and

negotiation strategy.  Id.  The plaintiffs claim that their interest in having their claims against the

Delphi Defendants heard in the District of Columbia is strong because their choice of forum

should be given deference, they likely would be unable to litigate their claims against AMS in

Sweden, and forcing the plaintiffs to litigate this matter against AMS in the District and against

the Delphi Defendants in Sweden "creates the possibility that parallel and contradictory

judgments will be rendered."  Id.  The plaintiffs also contend that any effort to litigate this matter

in a Swedish court would be a "duplicative, inefficient use of resources" because the Swedish

court "would have to re-create the events which have transpired in this Court over many years,"

and damages calculations in this case require the application of United States patent law, which

United States courts can "more efficiently" decide.  Id. at 19.  Lastly, the plaintiffs argue that

public policy should "discourage attorneys from actively participating in, and earning substantial

revenue from, litigation before it, but then denying the Court's authority to exercise jurisdiction

over those attorneys."  Id.  The Court finds that the Delphi Defendants have not presented a

compelling case that this Court's exercise of jurisdiction in this matter would be unreasonable.

     In evaluating the burden on the Delphi Defendants, the Court is mindful of the Supreme

Court's admonition that "[t]he unique burdens placed upon one who must defend oneself in a

foreign legal system should have significant weight in assessing the reasonableness of stretching

the long arm of personal jurisdiction over national borders."  Asahi, 480 U.S. at 114.  The burden

on the defendants in this case is therefore significant.  As the Delphi Defendants point out, they

have no offices or facilities in the District of Columbia or anywhere in the United States.  Delphi

Defs.' Mem., Utterström ¶ 3.  Nor do they have any assets in the United States or own or rent

any real or personal property in the District of Columbia.  Id., Utterstrom Decl. ¶ 3.  Not only

must the Delphi Defendants travel the great distance between Sweden and the District of

Columbia, but they also must defend themselves in a foreign nation's judicial system.  Although

the plaintiffs argue that the frequency with which Lindström and Utterström visited the District

of Columbia indicates that there would not be a significant burden on the defendants, 14 visits

over 10 years is hardly significant.  Id., Utterström Decl. ¶¶ 11-14; id., Lindström Decl. ¶¶ 12-14,

18.

Next, the Court must consider the interests of the District of Columbia in adjudicating the

dispute.  Where minimum contacts have been established, the serious burdens placed on an alien

defendant are often justified by the interests of the plaintiff and the forum.  See Asahi, 480 U.S.

at 114 ("[O]ften the interests of the plaintiff and the forum in the exercise of jurisdiction will

justify even the serious burdens placed on the alien defendant.").  Because the plaintiffs are not

District of Columbia residents, the District's interest in the dispute is considerably diminished.

See id.  The District's interest is not, however, completely eliminated in such circumstances.  For

example, the District of Columbia has an interest in "regulating the conduct of attorneys who

practice within its borders."  Jacobsen, 201 F. Supp. 2d at 99-100.  The claims in this case center

on alleged malpractice, assorted torts, breaches of various fiduciary duties, and breaches of

contract, all which relate to litigation pursued in the District of Columbia and legal

representation by attorneys in general.  Even though none of the Delphi Defendants ever entered

an appearance in Dr. Lans's cases filed in this Court, Delphi Defs.' Mem., Utterström Decl. ¶ 9;

id., Lindström Decl. ¶ 11, the District would have a significant interest in the conduct of the

Delphi Defendants if they participated in the infringement litigation-related activities, through

their drafting of affidavits and discovery responses, and their submission of declarations, and

their participation in strategy discussions, including, possibly the decision to file the first suit in

Dr. Lans's name only.  Construing these disputed facts in favor of the plaintiffs, the Court

concludes that the District of Columbia has a significant interest in exercising jurisdiction over

the Delphi Defendants.  Cf. Asahi, 480 U.S. at 114-15 (holding that the interests of the forum

were slight where (1) the only remaining claim had no connection to the forum, (2) the plaintiff

was not a resident of the forum, (3) the plaintiff had not demonstrated that it was more

convenient for it to litigate its claim against the alien defendant in California rather than Taiwan,

the plaintiff's home forum, and (4) while California did have an interest in "protecting its

consumers by ensuring that foreign manufacturers comply with the state's safety standards," the

dispute was not primarily about safety standards, but rather indemnification).

The defendants also argue that the plaintiffs' interest should be given little weight

because the plaintiffs have not chosen their home forum and there is no indication that bringing

suit in Sweden would subject the plaintiffs to "unreasonable inconvenience," Delphi Defs.'

Mem. at 18.  Defendants cite to Camelback Ski Corp. v. Behning, 539 A.2d 1107 (Md. 1988),

where the Court of Appeals of Maryland determined it did not have personal jurisdiction over a

Pennsylvania defendant in a suit brought by a Maryland plaintiff where the plaintiff could have

maintained the action in Pennsylvania "without suffering unreasonable inconvenience."

Camelback Ski Corp., 539 A.2d at 1113.  While this was indeed a factor considered by

Maryland's highest court in its fairness analysis, the court's conclusion was that the fairness

factors "would operate slightly in favor of the claim that Maryland should exercise jurisdiction,"

not that the court lacked jurisdiction based on these factors.  Id.  The Court noted that the

exercise of jurisdiction in Maryland would have been proper had the plaintiff in that case

established sufficient "minimum contacts" between the defendant and Maryland.  Id.  Therefore,

the fact that the plaintiffs in this case could have brought suit in Sweden without "unreasonable

inconvenience" has minimal significance.  On the other hand, the "possibility that parallel and contradictory judgments will be rendered," Pls.' Delphi Opp'n at 18-19, as a result of the plaintiffs' litigating this matter against AMS in the District and against Delphi in Sweden is a legitimate concern, and therefore has considerable weight.  As such, this factor operates in favor of jurisdiction being exercised by this Court.

As to the "efficient resolution of controversies" consideration, the Court is mindful that any judgment rendered against the Delphi Defendants in this Court may be unenforceable against them in Sweden because Swedish courts do not recognize United States judgments and the defendants currently have no assets in the United States.  See Eaton Corp. v. Maslym Holding Co., 929 F. Supp. 792, 799 (D.N.J. 1996) (noting the "utter inefficiency" that would result from adjudicating a controversy in which any judgment rendered by a United States court "would not be recognized nor enforceable" in the defendants' home country, and that "[t]here simply cannot be a less efficient use of judicial resources" than "spend[ing] countless hours on an effort that would have little or no meaningful effect on defendants in [their home country]"); see also Delphi Defs.' Mem. at 23-24.  The life of a judgment, however, is extensive.  During its existence, the defendants may at some point attain assets in the United States against which the plaintiffs can enforce any judgment it may obtain.  Or, the Delphi Defendants may acquire assets in a foreign country willing to recognize and enforce a United States judgment.  While the plaintiffs assume a risk by choosing to litigate here against the Delphi Defendants, the plaintiffs appear to be willing to assume such risk.  Therefore, this factor also weighs in favor of personal jurisdiction being exercised in the District of Columbia.

Finally, consideration of the shared interests of the "several States" factor requires this Court, in this case, to consider the "procedural and substantive policies of other nations whose

interests are affected by the assertion of jurisdiction" by a District of Columbia court – here,

Sweden.  Asahi, 480 U.S. at 115.  Sweden's interests and foreign relations policy are best served

by "a careful inquiry into the reasonableness of the assertion of jurisdiction . . . , and an

unwillingness to find the serious burdens on an alien defendant outweighed by minimal interests

on the part of the plaintiff or the forum State."  Id.  As previously noted, however, the District of

Columbia has a significant interest in regulating attorneys who engage in legal activity within its

borders, whether the attorneys are American or Swedish.  Sweden's interests, therefore, are

minimally impacted here, where the interests of the forum and of the plaintiff are significant.

On the record in this case the Court finds, on balance, that the reasonableness factors

weigh in favor of the Court exercising jurisdiction over all of the Delphi Defendants.

Accordingly, the Delphi Defendants' motion to dismiss for lack of personal jurisdiction is

denied.[30]

  2.  <u>Forum non conveniens</u>

The Delphi Defendants next assert that, even if this Court finds that it has personal

jurisdiction over them, this case should be dismissed on the basis of forum non conveniens.  As

previously noted, a motion to dismiss based on forum non conveniens requires that the defendant

demonstrate that (1) an adequate alternative forum exists, Piper Aircraft, 454 U.S. at 254; El

Fadl, 75 F.3d at 676-77, (2) "the balance of convenience tilts strongly in favor of trial in the

foreign forum," R. Maganlal, 942 F.2d at 167; El Fadl, 75 F.3d at 676-77, and (3) the "plaintiffs

can reinstate their suit in the alternative forum without undue inconvenience or prejudice," Pain,

637 F.2d at 784-85.  The Delphi Defendants argue that this case should be dismissed on the basis

---

[30]  The plaintiffs requested that the Court permit them to take jurisdictional discovery if the Court was inclined to dismiss their complaint for lack of personal jurisdiction. Pls.' Delphi Opp'n at 2 n.1.  Because the Court finds that the plaintiffs have established personal jurisdiction over all the defendants, the request for jurisdictional discovery is now moot.

of forum non conveniens because "Sweden offers the more convenient forum for the resolution of [the p]laintiffs' claims against the Delphi Defendants." Delphi Defs.' Mem. at 20. The Delphi Defendants first argue that Sweden is an adequate alternative forum because all of the Delphi Defendants are amenable to service of process in Sweden, id., and Sweden's legal system is well-developed, such that the plaintiffs would not be deprived of all remedies or treated unfairly in Sweden, id. at 21. Specifically, the defendants argue that "so long as Swedish law provides remedies for the type of conduct alleged in the Complaint – which it does – Swedish courts supply the requisite 'adequate alternative forum' to allow a forum non conveniens dismissal." Id. at 21 (emphasis omitted).

The plaintiffs argue, on the other hand, that the Delphi Defendants fail to meet their burden to demonstrate that Sweden is an adequate alternative forum because the Delphi Defendants "have not shown that Dr. Lans or Uniboard could reinstate their claims against AMS in Sweden without undue prejudice or burden." Pls.' Delphi Opp'n at 20. More specifically, the plaintiffs assert that the Delphi Defendants have offered only a conclusory statement that an alternative forum is adequate, which fails to satisfy the defendants' burden. Id. at 20-21. In addition, the plaintiffs point to the Swedish court's "dismiss[al of] an action by the Delphi Defendants seeking declaratory relief that they had no liability to Dr. Lans and Uniboard and awarded Dr. Lans his legal costs in defending the suit." Id. at 21.

In their reply, the Delphi Defendants dispute that they must demonstrate that AMS is amenable to suit in Sweden, contending that "[i]t is not a prerequisite . . . to a forum non conveniens dismissal that an identical lawsuit may be filed in the alternative forum." Delphi Defs.' Reply at 19.

The Delphi Defendants also contend that the balance of private and public interest factors

favor dismissal.  Delphi Defs.' Mem. at 22-27.  First, they argue that private interest factors favor dismissal for the following reasons: (1) the presumption in favor of the plaintiffs' choice of forum is entitled to little deference because "both [of] the [p]laintiffs are Swedish and have no strong connection to the District of Columbia," id. at 22; (2) the ease of access to evidence favors litigation in Sweden because Dr. Lans's, Uniboard's, and Delphi's documents are all located in Sweden, many of these documents are written in Swedish, and translation of documents is expensive and time-consuming, id. at 22-23; (3) many key witnesses reside in Sweden or other European countries, possibly beyond the subpoena power of this Court, and even if these witnesses did agree to testify, the cost and inconvenience of traveling thousands of miles to the United States favors dismissal, id. at 23; and (4) any judgment entered against the Delphi Defendants by this Court is unenforceable in Sweden, and therefore, the case may have to be re-litigated in Sweden, creating the potential for duplicative litigation and conflicting judgments, id. at 23-24.

Second, the Delphi Defendants assert that public interest factors also favor dismissal for the following reasons: (1) this dispute, described as between Swedish clients and their Swedish attorneys, does not present a localized controversy given that the "claims against the Delphi Defendants are based primarily on allegations of professional malpractice and violations of the Swedish rules of professional ethics," id. at 25; (2) Swedish law will need to be applied because "[t]he conduct complained of occurred in Sweden, the [p]laintiffs and the Delphi Defendants are domiciled in Sweden, the relationship between the parties [was] centered in Sweden, . . . the Fee Agreement was negotiated and executed by [the p]laintiffs and the Delphi Defendants in Sweden," and Swedish courts have a greater interest in the regulation of their lawyers, id. at 25 n.12; (3) even if United States law applies to some parts of the case, such as to one defendant,

application of multiple jurisdiction's laws would make the case "hopelessly complex and confusing," id. at 26; and (4) because the plaintiffs have requested a jury trial, application of different legal standards to different defendants would be confusing for a jury, there is a threat of prejudice to the parties as a result of the jurors' potential reluctance at reaching different results as to the different defendants, and District of Columbia residents should not be compelled to resolve a dispute between Swedish parties, id.

The plaintiffs retort that private and public interest factors weigh strongly against dismissal. Pls.' Delphi Opp'n at 21. Specifically, the plaintiffs contend that private interest factors weigh against dismissal because: (1) of the five persons and two law firms named as defendants in this suit, three individuals and the AMS law firm reside and have their principal place of business in the United States, id. at 21-22; (2) the underlying case that is the basis for this case was prosecuted in this Court, id. at 22; (3) most of the relevant witnesses and documents are located in the District of Columbia, id.; (4) most of the relevant correspondence between the parties, and all the correspondence between the defendants is likely to be in English, so the cost of providing translators and translation actually would be less in the District of Columbia than in Sweden, id.; (5) the defendants have failed to provide "uncontested expert testimony" indicating that a United States judgment would be unenforceable in Sweden as was presented in Blimpie Int'l, Inc. v. ICA Menyforetagen AB, No. 96 CIV. 3082 (RWS), 1997 WL 143907, at *7 (S.D.N.Y. Mar. 25, 1997), id.; (6) the defendants fail to show how a Swedish court would handle issues of patent law and the calculation of damages when United States patent law is implicated, id.; (7) it is inappropriate for the Delphi Defendants to argue that a United States judgment is unenforceable in Sweden because the Delphi Defendants would benefit from an unenforceable judgment, id.; (8) "[n]o matter where this case is litigated, there will be witnesses

located in different countries and documents written in different languages," id.; and (9) the case against AMS will still proceed in this Court, so dismissal of the Delphi Defendants would create duplicative testimony and the possibility of inconsistent rulings, id. at 23.

The plaintiffs also argue that public interest factors weigh against dismissal for the following reasons: (1) this dispute is not solely between Swedish clients and their Swedish attorneys – rather, it is a localized controversy because "[m]ost of the legal principles that the Delphi Defendants violated are grounded in D.C. law," and this Court has heard testimony and written opinions in the underlying litigation which deal with certain facts and issues relevant to the present case, id.; (2) District of Columbia law applies because the District, not Sweden, has the most significant relationship to the case on account of the filing of the underlying litigation in this Court and the critical 1997 conversation occurring in the District, the injury and conduct complained of occurred in the District, the relationship between the parties was centered here, where the potential patent infringers were being pursued, id. at 24; (3) the District of Columbia's interest in litigating a malpractice suit arising out of litigation carried out in the District is greater than Sweden's interest "aris[ing] solely because the Delphi Defendants are domiciled there," id. at 24-25; and (4) this case involves "substantial questions of U.S. patent law," such as the merits of the underlying litigation, in order to demonstrate that "the Delphi Defendants' negligence adversely affected [the plaintiffs'] ability to assert 'an otherwise meritorious claim or defense in the underlying action,'" id. at 25 (emphasis omitted).  For the following reasons, the Court agrees with the plaintiffs.

a.    <u>Adequacy of alternative forum</u>

In order to establish that an alternative forum is adequate, the defendant must first establish that an alternative forum is available where the plaintiff may bring his claims.

Normally, an alternative forum is considered available when the defendant is "amenable to process" in that forum. Piper Aircraft, 454 U.S. at 241. For the reasons that follow, the Court holds that the defendants have not met their burden of establishing that Sweden is truly an available alternative forum.

The defendants have failed to establish that Sweden is available as an alternative forum as to all defendants. The Delphi Defendants attempt to portray this case as one involving only Swedish parties, conspicuously ignoring the inclusion of AMS in this litigation. Delphi Defs.' Mem. at 25 ("This dispute – between Swedish clients and their Swedish lawyers . . . ."); Delphi Defs.' Reply at 19 ("[The] [p]laintiffs do not contest the declarations establishing that the Delphi Defendants are amenable to jurisdiction in Sweden. . . . [T]herefore[,] . . . Sweden is an adequate alternative forum" (emphasis added)). Moreover, when confronted with their failure to demonstrate that the claims against AMS could be reinstated in Sweden, the Delphi Defendants attempt to persuade the Court that they need not show that all parties are amenable to jurisdiction in Sweden, citing to BPA International, Inc. v. Kingdom of Sweden, 281 F. Supp. 2d 73 (D.D.C. 2003). The Delphi Defendants further state that "the courts have rejected the notion that forum non conveniens is an all-or-nothing doctrine or that an action or part of an action may be dismissed on forum non conveniens grounds only if all the issues can be resolved in a single alternative jurisdiction." Delphi Defs.' Reply at 19 (internal quotation marks and emphasis omitted). In support of this proposition, the defendants cite to dicta in a single Massachusetts Supreme Court case. Id. (quoting United Techs. Corp. v. Liberty Mutual Ins. Co., 555 N.E.2d 224, 225 (Mass. 1990). The Court finds the Delphi Defendants' argument unpersuasive.

This appears to present a dilemma of first impression in the District of Columbia.[31] However, there is wide-ranging consensus among the various Circuits that a dismissal based on forum non conveniens requires that the alternate forum have jurisdiction over all of the moving party's co-defendants.  Evolution Online Sys., Inc. v. Koninklijke PTT Nederland N.V., 145 F.3d 505, 510 (2d Cir. 1998); Raytheon, 142 F.3d at 1282; Lacey v. Cessna Aircraft Co., 932 F.2d 170, 180 (3d Cir. 1991); Watson v. Merrell Dow Pharm., 769 F.2d 354, 357 (6th Cir.1985); see also, e.g., In re Air Crash Disaster Near New Orleans, La. on July 9, 1982, 821 F.2d 1147, 1168-69 (5th Cir. 1987) (holding that the case was properly held in the United States because "no other forum could entertain the plaintiffs' actions against all of the defendants" even though the moving defendant assured the court that it would pay "any judgment rendered against it" in the alternate forum, because "it" did not refer to the other defendant and the "[p]laintiffs sought recovery from Pan American [Airlines] and the United States, not one or the other;" therefore, "Pan American's conditional promises simply fail[ed] to make all defendants available to [the] plaintiffs in a Uruguayan forum"); Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 243 F. Supp. 2d 1073, 1095 (C.D. Cal. 2003) (denying the defendant's motion to dismiss based on forum non conveniens because the defendant "made no showing that its non-Australian co-Defendants [were] amenable to suit in Australia or Vanuatu" (internal citations omitted)).  In addition, several courts have based their grant of a dismissal for forum non conveniens on the co-defendants' voluntary submission to jurisdiction in the alternate forum.  See Dole Food Co. v.

---

[31]  The Court is unaware of any other case in the District of Columbia that has addressed this specific issue, but another member of this Court has conducted a forum non conveniens analysis in a case with multiple defendants, and where only some of the defendants were moving for dismissal.  In BPA International, 281 F. Supp. 2d 73 (D.D.C. 2003), the court concluded that Sweden was an adequate alternative forum based, in part, on the fact that "each of the defendants are subject to the jurisdiction of the appropriate Swedish courts." Id. at 85.  However, the Court never stated that jurisdiction over all of the defendants was required – the Court only made a conclusion based, in part, on this uncontested fact.  See id.  Therefore, this issue seemingly remains one of first impression in the District of Columbia.

Watts, 303 F.3d 1104, 1116 (9th Cir. 2002) (holding that Rotterdam was not an available

alternate forum since defendants failed to prove that any single alternative forum had subject-

matter and personal jurisdiction over all parties and issues); Jota v. Texaco, Inc., 157 F.3d 153,

159 (2d Cir. 1998) (holding that dismissal for forum non conveniens was not appropriate absent

the defendant's willingness to submit to the jurisdiction of the foreign court); In re Air Crash

Near Peixoto De Azeveda, Brazil, on September 29, 2006, 574 F. Supp. 2d 272, 282-83

(E.D.N.Y. 2008) (stating that where all defendants except two have signed declarations

consenting to jurisdiction in Brazil, the defendants must still demonstrate that a Brazilian court

has jurisdiction over the two non-consenting defendants); Stromberg v. Marriot Int'l, Inc., 474 F.

Supp. 2d 57, 61 (D.D.C. 2007) (noting that one factor in finding that Mexico was an available

alternate forum was that the non-Mexican co-defendant had stipulated to submit to service of

process there); Indymac Mortgage Holdings, Inc. v. Reyad, 167 F. Supp. 2d 222, 248 n.33 (D.

Conn. 2001) (holding that dismissal on the basis of forum non conveniens was not available

since "it is not clear that [the co-defendant] would be subject to personal jurisdiction in

California, and thus that state cannot be considered an adequate alternative forum, absent some

agreement [by the co-defendant] to submit to jurisdiction there").  Finally, the Delphi Defendants

use of BPA International to support their position that they only need to demonstrate that the

Delphi Defendants are amendable to process in Sweden is misguided.  BPA International held

that the defendants met their burden of demonstrating that Sweden was an adequate alternative

forum by providing uncontested affidavits showing that the plaintiffs' claims could be brought in

Sweden and that Sweden had jurisdiction over all of the defendants.  See BPA Int'l, 281 F. Supp.

2d at 85 ("Telia's general counsel avers that BPA International could assert its claims in the

courts of Sweden and that each of the defendants are subject to the jurisdiction of the appropriate

Swedish courts." (emphasis added and internal quotation marks omitted)).  Therefore, absent a

showing by the Delphi Defendants that a Swedish court would also have jurisdiction over AMS,

or consent by AMS to submit to the jurisdiction of a Swedish court, dismissal on the basis of

forum non conveniens is not appropriate.

Furthermore, even if the defendants established that Sweden will be able to exert

jurisdiction over AMS or if AMS consented to such jurisdiction, the Delphi Defendants have

nonetheless failed to provide sufficient evidence demonstrating that Sweden is an adequate

forum for resolution of the disputes in this case.  Several courts have agreed that Sweden offers a

"well-developed legal system" with "many important procedural safeguards such as the right to

present evidence and call witnesses, and the right to appeal." Carlenstolpe v. Merck & Co., 638

F. Supp. 901, 905 (S.D.N.Y. 1986); see also Blimpie Int'l, 1997 WL 143907, at *5.  However,

this acknowledgement alone is insufficient to demonstrate that Sweden provides an adequate

forum in this case.  A forum is considered inadequate "where the remedy offered by the other

forum is clearly unsatisfactory," such as where the subject matter of the dispute may not be

litigated in the alternative forum.  Piper Aircraft, 454 U.S. at 254 n.22.  Nonetheless, the

alternate forum does not need to have identical causes of action or identical remedies to be

deemed adequate.  Norex Petroleum Ltd. v. Access Industries, Inc., 416 F.3d 146, 158 (2d Cir.

2005); see also Termorio S.A. E.S.P. v. Electrificadora Del Atlantico S.A. E.S.P., 421 F. Supp.

2d 87, 103 (D.D.C. 2006).  As such, in civil RICO actions, for example, it is sufficient that the

"foreign jurisdiction[] provide alternative legal actions . . . [that] address the wrongdoing

encompassed by civil RICO."  Norex Petroleum, 416 F.3d at 158.  Nor is a court "to place undue

weight on the possibility of a change in substantive law" or on the existence of "different

adjudicative procedures or general allegations of corruption in the judicial system."  Termorio,

421 F. Supp. 2d at 103; accord El-Fadl, 75 F.3d at 678.

The defendants correctly state that "so long as Swedish law provides remedies for the type of conduct alleged in the Complaint[,] . . . Swedish courts supply the requisite 'adequate alternative forum' to allow a forum non conveniens dismissal." Delphi Defs.' Mem. at 21 (emphasis omitted). However, the Delphi Defendants have failed to demonstrate what causes of action or remedies would actually be available in Sweden; instead, merely providing an unsubstantiated claim that "Swedish law [does] provide[] remedies for the type of conduct alleged in the Complaint." Id. This proffer is inadequate to satisfy their burden of proof. See Baris v. Sulpicio Lines, Inc., 932 F.2d 1540, 1550 n.14 (5th Cir. 1991) ("[W]e require a defendant to put forth unequivocal, substantiated evidence presented by affidavit testimony in order for the district court to satisfy the standard enunciated in Gulf Oil Corp. v. Gilbert." (internal citation omitted)); see also Raytheon, 142 F.3d at 1282 & n.11 (expressing skepticism that the defendants demonstrated Panama was an adequate forum because the defendants offered only an unsworn declaration of a Panamanian attorney stating "with no substantiation or citation of Panamanian legal authority, that the Panamanian court would take jurisdiction of the case and that it is familiar with [the type of case at issue] and is experienced in dealing with English-speaking witnesses"); El-Fadl, 75 F.3d at 677 (noting that reversal of a dismissal based on forum non conveniens is appropriate even when the defendant provides an affidavit, but "the affidavit through which [the defendant] attempted to meet its burden contain[ed] substantial gaps" such that "the record before the court [was] so 'fragmentary' that 'it [was] impossible to make a sound determination' of whether an adequate alternative forum exist[ed]" (internal citations omitted)); Lacey, 862 F.2d at 45 (noting that the defendants' "failure to provide any record support for their contentions precluded the district court from scrutinizing the substance of the dispute between

the parties" and that the defendants had therefore failed to carry their burden).

For the foregoing reasons, the Court holds that the Delphi Defendants have failed to establish that Sweden is an adequate alternative forum for the resolution of the plaintiffs' claims.

> b.   Private interests

Even if Sweden was an adequate alternative for forum non conveniens purposes, the defendants would still have to prove that the balance of private and public interest factors weigh strongly in favor of dismissal.  The "private interest factors" are those private interests of the litigants, including: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process for compelling the attendance of unwilling witnesses, and the cost of attaining attendance of willing witnesses; (3) the enforceability of a judgment; and (4) "all other practical problems that make trial of a case easy, expeditious[,] and inexpensive." Gulf Oil, 330 U.S. at 508.  For the following reasons, the Court finds that the private interest factors weigh against dismissal.

To be sure, the plaintiffs have chosen a forum that is not their home forum.  While there is a strong presumption in favor of a plaintiff's initial choice of forum, id., this presumption is not irrefutable, and the presumption is weakened "when the forum is not [the] plaintiff's home forum and most of the relevant events occurred elsewhere," Demery v. Montgomery Cnty., 602 F. Supp. 2d 206, 210 (D.D.C. 2009) (quoting Hunter v. Johanns, 517 F. Supp. 2d 340, 344 (D.D.C. 2007)).  Here, the plaintiffs reside or have their principal place of business in Sweden, but nonetheless chose the District of Columbia as the forum for the litigation of this case. However, the District of Columbia is not a forum without meaningful ties to the controversy, as the majority of the relevant events occurred in the District, some of the events having occurred in this very Court.  Indeed, the District of Columbia is the location into which the Delphi

Defendants deliberately reached to conduct business, and a prior member of this Court handled the underlying litigation which forms the factual basis for many of the plaintiffs' claims. Accordingly, the plaintiffs' choice of forum is entitled to deference.

Furthermore, an evaluation of the ease of access to sources of proof reveals that the Delphi Defendants have failed to meet their burden as to this factor.[32]  The cost, time, and effort involved in translating documents is a relevant factor to this analysis.  However, the parties dispute both where the majority of relevant documents are located and in what language they are written. Delphi Defs.' Mem. at 22-23 (alleging that they are in Sweden, and written in Swedish); Pls.' Delphi Opp'n at 22 (alleging that they are in the District of Columbia, and written in English).  The Delphi Defendants contend that Dr. Lans's, Uniboard's, and their own documents concerning this litigation are located in Sweden, Delphi Defs.' Mem. at 22-23, and therefore the majority of documents are in Sweden.  The plaintiffs counter, however, that because five of the seven individual defendants reside in the United States, AMS has its principal place of business in the District of Columbia, and the underlying litigation was in this Court, the majority of the relevant documents and witnesses are, therefore, located in the District of Columbia. Pls.' Delphi Opp'n at 22.  No matter where this case is litigated, it seems inevitable that many of the relevant documents will be in the other jurisdiction.  However, due to modern technology, the physical location of the documents is less important in determining the convenience of the parties because many if not all of these documents can presumably be made available electronically.

Thayer/Patricof Educ. Funding, L.L.C. v. Pryor Res., Inc., 196 F. Supp. 2d 21, 29, 36 (D.D.C.

---

[32]  The plaintiffs' claims will likely require, at a minimum: (1) evidence related to the Fee Agreement's negotiation, formation, and performance, including evidence related to the fee-splitting aspect of the agreement; (2) evidence concerning negligent representation in regard to the Micron-Diamond settlement and license agreement, due diligence investigation of patent ownership, and the conduct of the infringement litigation; (3) evidence regarding the defendants' knowledge of Uniboard's interest in the patent; (4) evidence relating to the Escrow Agreement; and (5) evidence as to the amount of damages suffered by the plaintiffs.

2002) (stating that in the context of a motion for a transfer of forum, "the location of documents, given modern technology, is less important in determining the convenience of the parties").  In addition, the use of either forum will result in some documents being in a foreign language.  However, because the AMS attorneys did not speak Swedish, the Delphi Defendants appear to have communicated with AMS only in English, as evidenced by the Fee Agreement which states: "as [AMS] in Washington, D.C. is also a part of the understanding as a result of which I keep myself to English."  Pls.' Delphi Opp'n, Ex. A, Tab 6 (Fee Agreement) (fax cover page).  Thus, any communications involving AMS or the individual AMS lawyers are presumably in English.  Furthermore, any documents submitted to this Court for its consideration would have to be in English.  Therefore, it seems logical to assume that many, if not the majority, of the documents related to liability on the various counts will be in English, while most of the documents related to damages will probably be in Swedish.  Based on these assumptions, the Court finds that the ease of access to evidence probably favors this case being litigated in the District of Columbia.  But at a minimum, the Court finds that this factor favors neither this forum nor Sweden.  In any event, it is the defendants' burden to prove otherwise.  In re Air Crash Disaster Near New Orleans, La., 821 F.2d at 1164.  And here, the defendants fail to specifically identify, or provide any affidavits that explain any evidentiary problems they would encounter if the trial or other proceedings related to this case were conducted in the District of Columbia.  They merely state that "many of the documents" are located in Sweden and written in Swedish.  Delphi Defs.' Mem. at 23.  Because the defendants bear the burden of persuasion, In re Air Crash Disaster Near New Orleans, La., 821 F.2d at 1164, and they have not offered sufficient evidence to counter the plaintiffs' contentions, this factor weighs slightly against dismissal.

Next, the court must consider the availability of compulsory process for attendance of

unwilling witnesses and the cost of obtaining the presence of willing witnesses.  It appears that this factor is in approximate equipoise as between the United States and Sweden.  The use of either forum will result in certain crucial witnesses being beyond the reach of that particular forum's compulsory process.  In addition to the parties in this case, other non-party witnesses, such as the parties' accountants and the lawyers responsible for the German and Italian patent infringement suits, are likely to also be important to a trial of this matter.  Uniboard's and Delphi's accountants are presumably Swedish residents, and therefore their presence could be compelled in Sweden, and AMS's accountants are presumably United States residents, and therefore their presence could be compelled in the District of Columbia.[33]  Neither forum would be able to compel the attendance at trial of the German or Italian lawyers because they are not residents of the United States or Sweden.  However, the defendants have not demonstrated that these witnesses would actually be unwilling to testify in the District, nor have they pointed to any evidentiary problems they would face if litigation continued in the District of Columbia. See FC Inv. Grp. LC v. Lichtenstein, 441 F. Supp. 2d 3, 14 (D.D.C. 2006) ("When analyzing the convenience of parties and witnesses, a defendant must show that witnesses would be unwilling to testify in the District of Columbia.  Otherwise, it is assumed that the witnesses will voluntarily appear . . . ." (internal citations omitted)); Piper Aircraft, 454 U.S. at 258 (finding that the defendants had met their burden by submitting affidavits describing generally who they would call as witnesses and the evidentiary problems they would face if trial were held in the United States).  Furthermore, no matter which forum is used, half of the witnesses may have to travel long distances to testify.  For example, if the case is litigated in Sweden, all three of the AMS defendants plus any of the German or Italian lawyers that agree to testify will have to travel to

---

[33]  This might require that a federal court in another jurisdiction compel the witnesses' appearances, but nonetheless, their presence can be compelled.

Sweden.  On the other hand, if the case continues in the District, Dr. Lans, the two Delphi

attorneys, and any of the German or Italian lawyers that agree to testify will have to travel to the

United States.  However, due to modern technology this Court has the capacity to have their

testimony presented to it or a jury through close-circuit technology, provided this technology is

also available at the situs of the witnesses.  In the final analysis, the cost of obtaining the

attendance of willing witnesses is, therefore, in near equipoise.

Another practical consideration in this case concerns the enforceability of any judgment

the plaintiffs might obtain.  The Delphi Defendants, citing Blimpie, 1997 WL 143907, at *7, and

a United States Department of State circular on the enforcement of foreign judgments, contend

that any judgment rendered in this Court is unenforceable in Sweden because there is no bilateral

or multilateral agreement providing for Sweden's recognition and enforcement of United States

judgments.  Delphi Defs.' Mem. at 23-24.  The plaintiffs, however, point out that the defendants

have failed to provide expert testimony supporting their contention, as was done in Blimpie.

Pls.' Delphi Opp'n at 22.  They also argue that the unenforceability of a judgment in Sweden is

"not an argument for Delphi to make since [Delphi] would . . . benefit[] if the judgment were not

directly enforceable."  Id.  In asserting that the unenforceability of a United States judgment

would only benefit Delphi, the plaintiffs fail to take into consideration the significant expense

and burdens the Delphi Defendants would first have to endure by defending this lawsuit in

Washington D.C.  Second, Blimpie does not say that expert testimony establishing the

unenforceability of a United States judgment in a foreign country is required.  See Blimpie, 1997

WL 143907, at *7.  Rather, the defendants need only provide sufficient proof of unenforceability

to satisfy their burden.  The defendants in Blimpie met that burden by providing an expert

affidavit stating that the judgment would be unenforceable due to the nonexistence of a bilateral

or multilateral agreement.  Id.  Here, the defendants' use of Blimpie and a Department of State

circular is insufficient proof to satisfy their burden.  The court in Blimpie quoted what the expert

said in his affidavit about the unenforceability of any United States judgment in Sweden.  Id.

The defendants here seemingly want this Court to use the text of the affidavit in Blimpie as proof

of the unenforceability of any judgment that would be rendered in this case in Sweden.  See

Delphi Defs.' Mem. at 23-24 (basing its factual assertion that "[t]here is no bilateral or

multilateral agreement providing for the recognition and enforcement of American judgments in

Sweden" on Blimpie, 1997 WL 143907, at *7, because the court in Blimpie concluded that the

uncontested expert testimony in that case demonstrated that a United States judgment would be

unenforceable in Sweden).  However, the Court simply cannot rely on a thirteen year old

affidavit as proof of the current situation regarding the enforceability of a judgment in this case

in Sweden.  In addition, the Department of State circular referenced by the defendants clearly

states that

> THE INFORMATION IN THIS CIRCULAR IS PROVIDED FOR
> GENERAL INFORMATION ONLY.  THE DEPARTMENT OF
> STATE MAKES NO WARRANTY REGARDING THE
> ACCURACY OF THIS INFORMATION.  WHILE SOME OF
> THE INFORMATION IS ABOUT LEGAL ISSUES, IT IS NOT
> LEGAL ADVICE.  QUESTIONS INVOLVING
> INTERPRETATION OF SPECIFIC FOREIGN LAWS SHOULD
> BE ADDRESSED TO FOREIGN ATTORNEYS.

U.S. Department of State, Enforcement of Judgments,

http://travel.state.gov/law/info/judicial/judicial_691.html. (emphasis added).[34]  The Court,

therefore, cannot use this circular as reliable "proof" of the unenforceability in Sweden of any

---

[34]  The Delphi Defendants actually cited to a different web address for this source.  See Delphi Defs.' Mem. at 24
(citing U.S. Department of State, Enforcement of Judgments,
http://travel.state.gov/law/info/judicial/judicial_667.html.).  That web address is no longer active.  The court,
therefore, bases its statements on the currently available web address for the same source.  U.S. Department of State,
Enforcement of Judgments, http://travel.state.gov/law/info/judicial/judicial_691.html.

judgment that might be entered in the Court.  Furthermore, this Court would be able to enforce

its own judgment if the Delphi Defendants have any assets in the United States when a judgment

is entered or at some point thereafter.  Although they claim that they have no assets in the United

States at this time, Delphi Defs.' Mem., Utterström Decl. ¶¶ 3-4, 6 (Utterström and Delphi have

no assets in the United States); see also id., Lindström Decl. ¶ 9 (Lindström has no assets in the

District of Columbia),[35] this is not proof that they never will.  On this record, the Delphi

Defendants have once again provided insufficient proof to meet their burden, and the Court

determines that this factor is, like the last one, in equipoise.[36]

      Finally, the Court must consider "all other practical problems that make trial of a case

easy, expeditious and inexpensive."  Gulf Oil, 330 U.S. at 508.  The Delphi Defendants argue

that because of the unenforceability of any United States judgment in Sweden, litigating this case

in the U.S. will require that the case be re-litigated in Sweden, creating the potential for

duplicative litigation and conflicting judgments.  Delphi Defs.' Mem. at 24.  The plaintiffs,

however, counter that litigating this case in Sweden will have this same result because the case

against AMS will still proceed in this Court.  Pls.' Delphi Opp'n at 23.  Judicial economy and the

avoidance of inconsistent judgments are the most significant factors relevant to this analysis.

Byerson v. Equifax, 467 F. Supp. 2d 627, 635 (E.D. Va. 2006).  Therefore, "[t]here is a strong

policy favoring the litigation of related claims in the same tribunal."  Columbia Pictures Indus. v.

Fung, 447 F. Supp. 2d 306, 309 (S.D.N.Y. 2006) (quoting Wyndham Assoc. v. Bintliff, 398 F.2d

---

[35]  The Court notes that Lindström does not indicate whether he owns any assets in any United States jurisdiction
other than the District of Columbia.  See generally Delphi Defs.' Mem., Lindström Decl.  This only further
strengthens the Court's conclusion that the Delphi Defendants have failed to provide sufficient proof that a judgment
in this case would be unenforceable.

[36]  The plaintiffs also argue that the Delphi Defendants failed to show "how a Swedish court would handle issues of
U.S. patent law and the calculation of damages when U.S. patent law is implicated."  Pls.' Delphi Opp'n at 22.  The
Court deems this argument more relevant to the public interests analysis than to the enforceability of judgments
factor.  The Court will therefore address this argument in its balance of the public interests.

614, 619 (2nd Cir. 1968)).  The evidence and witnesses material to the plaintiffs' liability claims against the Delphi Defendants will undoubtedly be the same as those necessary to prove the claims against the AMS Defendants.  While it is true that there is a possibility that this case will have to be re-litigated in Sweden if the Court permits the case against the Delphi Defendants to be pursued here, the Nacka District Court in Sweden noted that litigation in the United States would assist the Swedish courts by "remov[ing] the uncertainty about the status of the legal relationship" between the plaintiffs and the Delphi Defendants.  Pls.' Delphi Opp'n, Ex. B at 7. If, however, the Court dismisses the claims against the Delphi Defendants, the plaintiffs would have to litigate two virtually identical cases involving the same facts, witnesses, and evidence, in two different jurisdictions on different sides of the globe.  Not only would this approach significantly prejudice the plaintiffs, but litigation of all the issues against all of the defendants in this Court would conserve the most judicial resources and possibly avoid duplicative litigation. This factor therefore weighs against dismissal.

Accordingly, the Court finds that the balance of private interest factors weigh against dismissing the plaintiffs' claims against the Delphi Defendants.

c.   Public interests

The relevant "public interest factors" include: (1) the interest in avoiding administrative difficulties caused by foreign litigation congesting local court dockets; (2) the interest in avoiding the unfair imposition of jury duty on citizens of a forum having little relation to the case; (3) the "local interest in having localized controversies decided at home;" and (4) the interest in avoiding unnecessary problems with the conflict of law, or the application of foreign laws.  Gulf Oil, 330 U.S. at 508-09.  The Court holds that the public interest factors also weigh against dismissal.

The first relevant factor in the public interest analysis is whether it is appropriate to impose jury duty upon District of Columbia citizens considering the nature of the dispute. The Delphi Defendants argue that this is a dispute between Swedish parties with only a "tangential relationship" to the District, and therefore District of Columbia residents should not be compelled to resolve this dispute between foreign parties. Delphi Defs.' Mem. at 25-26. Moreover, they contend that Sweden has the strongest interest in litigating a dispute based primarily on allegations of professional malpractice and violations of the Swedish rules of professional ethics. Id. at 25 & n.12. It cannot be disputed that Sweden has a greater interest in providing redress for the injuries allegedly sustained by the plaintiffs, as Dr. Lans is a Swedish citizen and Uniboard is a Swedish corporation. See Miller v. Toyota Motor Corp., 620 F. Supp. 2d 109, 119 (D.D.C. 2009). However, the analysis does not end here. While it is true that Sweden also has an interest in regulating the conduct of Swedish lawyers, this is not a case comprised solely of Swedish parties, nor are all of the attorney defendants members of the Swedish legal establishment, as the AMS Defendants are District of Columbia attorneys. Moreover, one of the Delphi attorneys – Lindström – was an inactive member of the District of Columbia Bar prior to moving to Sweden, and may have still had such status during the relevant time period.[37] Lindström Decl. ¶ 8. The District of Columbia would, therefore, have a greater interest in regulating the conduct of these District of Columbia attorneys. Furthermore, the District of Columbia "has a compelling and overriding interest in regulating the conduct of [any lawyers] who practice within its borders," Jacobsen, 201 F. Supp. 2d at 99-100 (emphasis added), regardless of whether they are licensed to practice in the District of Columbia. The

---

[37] As previously stated, the parties do not state whether Lindström continued to be a member of the District of Columbia Bar, even if only in inactive status, after moving to Sweden. Because the moving party urging a forum non conveniens dismissal bears the burden of persuasion, the Court will assume that Lindström was still a member of the District of Columbia Bar, in some status, after moving to Sweden.

underlying patent infringement suits were filed in this Court, and the plaintiffs' current claims

arose out of the defendants' activities within the District of Columbia that occurred during the

course of those underlying cases. See id. at 105, 108 (stating that the plaintiffs' claims arose out

of the defendants' "series of activities within the District of Columbia relating to [the underlying

litigation]," and that "the District maintain[ed] an interest in adjudicating this case, because it

relate[d] to an underlying action" brought in the District). Even if none of the Delphi Defendants

are District of Columbia lawyers, the District has a compelling interest in regulating them if their

involvement in a lawsuit in this Court amounted to providing legal services. In addition, "the

[majority of the] parties and material events that make up the claims' factual predicate," Milanes

v. Holder, 264 F.R.D. 1, 6 (D.D.C. 2009) (quoting Montgomery v. STG Int'l, Inc., 532 F. Supp.

2d 29, 34 (D.D.C. 2008)), have a greater connection to the District of Columbia. To be sure,

there are some tenuous connections to Sweden in this case. For example, the Fee Agreement

was negotiated and signed in Sweden and the Delphi Defendants allegedly conducted all of their

litigation-related activities from Sweden. Delphi, of course, is a Swedish entity, and the Delphi

Defendants and the plaintiffs are Swedish citizens. Any interest that Sweden may have in this

litigation ends there, however. The dispute concerns claims related to the underlying litigation

initiated in this Court, and involves issues related to United States patent law and events that

occurred in the District of Columbia. See Pls.' Delphi Opp'n at 23-25. And the primary

malpractice claim relates to what occurred at the July 1997 meeting that was held in the District

of Columbia. See id. at 24. Moreover, even though the Fee Agreement was negotiated and

signed in Sweden, those events lack importance here because the contract claims in this case are

not based on the contract's negotiation or formation, but rather on its performance, which

occurred in the District of Columbia. See Ott v. Kaiser-Georgetown Community Health Plan,

Inc., 689 F. Supp. 9, 12-13 (D.D.C. 1988) (stating that, in a case involving a claim of medical

malpractice in Maryland, despite "the District's and Maryland's interests in overseeing the

conduct of a business it has permitted to incorporate and licensed, respectively, these factors lack

significance here because this case has no connection with the fact of Kaiser's incorporation or

licensing;" rather, the case was based on Kaiser's conduct, and the alleged misconduct occurred

in Maryland, not the District of Columbia).  Therefore, the District of Columbia is the forum

more closely related to the litigation, and it would be appropriate to impose jury duty on District

of Columbia citizens in this matter.

Furthermore, this case does not present a "localized" Swedish controversy, in which there

is a significant Swedish local interest.  In fact, this dispute represents more than just a localized

dispute of any jurisdiction, so the preference for deciding localized controversies in a local forum

is inapplicable.  For example, an adjudication of rights in this case would be enforced and have

an effect on the economy in both the District of Columbia – if judgment is entered against the

AMS Defendants – and in Sweden – if judgment is entered against the Delphi Defendants.  See

Blimpie, 1997 WL 143907, at *11.  Moreover, even if this controversy can be said to be

localized, which the Court finds it is not, its localization would be in the District of Columbia.

As discussed above, the Delphi Defendants conducted business across national borders by

contacting and negotiating with AMS, a law firm located in the District of Columbia, to permit

Delphi to continue its involvement in the plaintiffs' representation in the United States.  And the

underlying litigation forming the basis of many of the plaintiffs' claims occurred as a result of

litigation in this Court.

Also relevant to the public interest analysis is the law that would govern this case.  "It is

preferable that a case be tried by the court most familiar with the law to be applied."  Blimpie,

1997 WL 143907, at *9.  While "the Court need not definitively resolve the choice of law issue at this point, the likelihood that foreign law will apply weighs against retention of the action." Ioannides v. Marika Maritime Corp., 928 F. Supp. 374, 379 (S.D.N.Y. 1996).  However, showing that another jurisdiction's law will apply is not alone sufficient to refuse retention of a case if the court will not have any difficulty applying foreign law.  See Lichtenstein, 441 F. Supp. 2d at 14 (explaining that the defendant must also show that the court will have difficulty applying another jurisdiction's law).[38]  Where a true conflict exists between the law of the two competing jurisdictions, a court has applied a combination of the "governmental interest" analysis for tort actions, and the "significant relationship" test for contract disputes.  Century Int'l Arms, Ltd. v. Fed. State Unitary Enter. State Corp. 'Rosvoorouzhenie', 172 F. Supp. 2d 79, 89 (D.D.C. 2001); Virtual Def. & Dev. Int'l, Inc. v. Republic of Moldova, 133 F. Supp. 2d 9, 15 (D.D.C. 2001). [39]

Under the governmental interest analysis, the "court must apply the law of the jurisdiction which has a more substantial interest in the case."  Century Int'l Arms, 172 F. Supp. 2d at 89.  In determining which jurisdiction has the greatest interest, courts have considered (1) the place where the injury occurred, (2) the place where the conduct occurred, (3) the domicile, residence, nationality, and place of business of the parties, and (4) the place where the relationship between the parties is centered.  Reed v. Islamic Republic of Iran, 439 F. Supp. 2d 53, 64 (D.D.C. 2006); see also Restatement (Second) of Conflict of Laws § 145 (1971).  The

---

[38]  The Delphi Defendants have failed to demonstrate how, if Swedish law applied, this Court would have difficulty applying the law of Sweden.  However, for purposes of this analysis, the Court assumes that it would have some level of difficulty applying Swedish law.

[39]  Where this approach has been employed, as a threshold inquiry the Court must determine that a true conflict exists between the laws of the competing jurisdictions.  See GEICO v. Fetisoff, 958 F.2d 1137, 1141 (D.C. Cir. 1992).  Because the parties have not discussed how the law of Sweden compares to the law of the District of Columbia, the court will assume arguendo that there is a true conflict.

Delphi Defendants argue that Swedish law must be applied to the tort claims because "[t]he conduct complained of occurred in Sweden, the [p]laintiffs and the Delphi Defendants are domiciled in Sweden, the relationship between the parties [was] centered in Sweden," and Swedish courts have a "greater interest in the regulation of their lawyers."[40]  Delphi Defs.' Mem. at n.12.  The Court disagrees.  Not only are the Delphi Defendants' allegations regarding the location of the conduct and the center of the parties' relationship conclusory, they are also incorrect.  First, certain conduct allegedly causing the injury occurred in the District, namely, knowingly filing Mastriani's allegedly false statement with the Court, Compl. ¶¶ 6, 112-113, 117, 148, while other tortious conduct purportedly occurred in Sweden.  Second, in regard to claims being advanced in this case, the relationship between the parties was centered in the District where the underlying litigation was initiated, where the parties met to discuss pursuit of potential patent infringers and possible initiation of the underlying patent infringement suits in the District, and where the allegedly false judicial statement was filed.  Delphi Defs.' Mem., Utterström Decl. ¶¶ 14-15; id., Lindström Decl. ¶ 12; Pls.' Delphi Opp'n, Ex. A, Tab 12 (Mastriani Deposition) at 152:4-21.  Moreover, "while [Sweden] admittedly has an interest in regulating the conduct of its attorneys, the District has a compelling and overriding interest in regulating the conduct of attorneys who practice within its borders."  Jacobsen, 201 F. Supp. 2d at 99-100; see, e.g., Crossland Savings FSB v. Rockwood Insurance Co., 692 F. Supp. 1510, 1512 (S.D.N.Y. 1988) (holding that interest of New York in regulating conduct within its borders outweighed interest of Texas in regulating professionals licensed to practice in Texas).  Even though the plaintiffs and the Delphi Defendants are, indeed, domiciled in Sweden, the Court

---

[40]  Neither the Delphi Defendants nor the plaintiffs advance a point of view on the place where any injury occurred, and the Court acknowledges that the injury, depending on the specific cause of action, may have occurred in either Sweden or the District.  Therefore, this factor has no impact on the Court's analysis and the Court will not discuss it further.

concludes that the balance of factors indicate that the District of Columbia has the greater interest in regard to the tort disputes.[41]

Next, in determining the jurisdiction with the most "significant relationship" to a contract dispute, courts have considered five factors: "(1) the place of contracting; (2) the place of negotiation; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties." Virtual Def. & Dev. Int'l, 133 F. Supp. 2d at 16; see also Restatement (Second) of Conflict of Laws § 188.  Here, the Delphi Defendants contend that Swedish law must be applied because "the Fee Agreement was negotiated and executed by [the p]laintiffs and the Delphi Defendants in Sweden," Delphi Defs.' Mem. at n.12.  While this is true, in the choice-of-law context, "the place of contracting standing alone is typically viewed as rather insignificant, . . . whereas the place of negotiation and performance . . . should generally control." Helmer v. Doletskaya, 393 F.3d 201, 207 (D.C. Cir. 2004) (internal quotation marks omitted).  Even though the Fee Agreement was negotiated and signed in Sweden, the plaintiffs' breach of contract claims focus primarily on breaches in the performance of the contract, and performance of the contract primarily occurred in the District, where litigation was initiated and Delphi allegedly participated in the principal conversation regarding who to name as the plaintiff in the underlying suit. Compl. ¶ 60; Utterström Decl. ¶ 14; Pls.' Delphi Opp'n, Ex. A, Tab 12 (Mastriani Deposition) at 152:4-21.  Therefore, the District of Columbia has the most significant relationship to the contract disputes.

Finally, even if Swedish law applied to some aspects of this case and United States law to other parts, the Delphi Defendant's argument that the application of several legal standards to the

---

[41]  Even if the balance of factors appeared to indicate that Sweden had the greater interest, the Delphi Defendants' conclusory allegations fail to satisfy their burden of proof.

issues or parties in the case would make the case "hopelessly complex and confusing," Delphi

Defs.' Mem. at 26, is unavailing.  The Delphi Defendants offer no basis for concluding that these

same problems would not be present if the case was litigated in Sweden.  Therefore, the Court

concludes that the balance of public interest factors weighs against dismissing the Delphi

Defendants.

        For the foregoing reasons, the Court denies the Delphi Defendants' motion to dismiss on

the basis of forum non conveniens.

B.      The AMS Defendants

        1.      Preclusive effects of Judge Penn's prior decisions[42]

        Claim preclusion prohibits "the parties to a suit and their privies from relitigating in a

separate proceeding any ground for relief which they already have had an opportunity to

litigate[,] even if they chose not to exploit that opportunity and regardless of the soundness of the

earlier judgment."  Kissi v. EMC Mortg. Corp., 627 F. Supp. 2d 27, 32 (D.D.C. 2009) (Walton,

J.) (quoting Hardison v. Alexander, 655 F.2d 1281, 1288 (D.C. Cir. 1981) (internal quotation

marks omitted)).  In order for the plaintiffs' claims to be barred by the doctrine of claim

preclusion, (1) there must have been a final judgment on the merits, (2) the judgment must have

been made by a court of competent jurisdiction, (3) the present claim must be the same as a

claim that was raised or that could have been raised in the first proceeding, and (4) the parties

must be identical in both suits.  Does I through III v. District of Columbia, 238 F. Supp. 2d 212,

217 (D.D.C. 2002) (citing Am. Forest Res. Council v. Shea, 172 F. Supp. 2d 24, 29 (D.D.C.

2001)); see also Jacobsen, 201 F. Supp. 2d at 102-03 (citing Allen v. McCurry, 449 U.S. 90, 94

---

[42]  "[T]he preclusive effect of federal court litigation is a question of federal law."  Athridge v. Aetna Cas. & Sur.
Co., 351 F.3d 1166, 1171 (D.C. Cir. 2003) (citing 17 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper,
Federal Practice and Procedure § 4226, at n.10 (2d ed. 1988)).  Therefore, federal law controls the application of
claim and issue preclusion in this case.

(1980)).  "[T]here is an identity of the causes of action when the cases are based on the 'same

nucleus of facts' because 'it is the facts surrounding the transaction or occurrence which operate

to constitute the cause of action, not the legal theory on which a litigant relies.'" Capitol Hill

Group v. Pillsbury Winthrop Shaw Pittman, LLP, 574 F. Supp. 2d 143, 149 (D.D.C. 2008)

(quoting Page v. United States, 729 F.2d 818, 820 (D.C. Cir. 1984)).  Additionally, although the

requirement of a full and fair opportunity to litigate is most often discussed in the context of

issue preclusion, "the invocation of [claim preclusion] . . . is subject to the same limitation."

Kremer v. Chem. Constr. Corp., 456 U.S. 461, 481 n.22 (1982).  If the requirements for claim

preclusion are met, a final judgment on the merits precludes the "parties and those in privity with

them, [from re-litigating] not only [those] matter[s] which [were] offered and received to sustain

or defeat the claim or demand, but as to any other admissible matter which might have been

offered for that purpose."  Travelers Indem. Co. v. Bailey, ___ U.S. ___, ___, 129 S. Ct. 2195,

2205 (2009) (quoting Cromwell v. Sac County, 94 U.S. 351, 352 (1876)) (footnote and internal

quotation marks omitted).  To prevail, the defendant bears the burden of proving all the elements

of claim preclusion.  See Paley v. Estate of Ogus, 20 F. Supp. 2d 83, 87 (D.D.C. 1998) (placing

burden on the defendant).

     In contrast, issue preclusion bars only the relitigation of specific issues actually

adjudicated in prior proceedings.  Athridge v. Aetna Cas. and Sur. Co., 604 F.3d 625, 634 (D.C.

Cir. 2010).  Issue preclusion requires: (1) that the party against whom preclusion is asserted have

been a party to the prior case, see United States v. Mendoza, 464 U.S. 154, 158 (1984);[43] (2) the

---

[43] "The assertion of non-mutual defensive collateral estoppel[]," as well as offensive collateral estoppel, is permitted by District of Columbia law.  Bryson v. Gere, 268 F. Supp. 2d 46, 57 (D.D.C. 2003)  (permitting defensive use of collateral estoppel against the plaintiff in the prior action) (citing Jackson v. District of Columbia, 412 A.2d 948, 952-53 (D.C. 1980)); Jack Faucett Assocs., Inc. v. Am. Tel. and Tel. Co., 744 F.2d 118, 124-25 (D.C. Cir. 1984) (permitting offensive use of collateral estoppel against the defendant in the prior action).

issue presently raised must have been actually litigated in the prior case, <u>Athridge</u>, 604 F.3d at

634; (2) the issue must have been "actually decided" by a final judgment of a court of competent

jurisdiction, <u>Yamaha Corp. v. United States</u>, 961 F.2d 245, 254 (D.C. Cir. 1992); (3)

determination of the issue must have been "essential to the judgment," <u>Athridge</u>, 604 F.3d at

634; and (4) "preclusion in the second case must not work a basic unfairness to the party bound

by the first determination[, such as] . . . when the losing party clearly lacked any incentive to

litigate the point in the first trial," <u>Yamaha Corp.</u>, 961 F.2d at 254.  The prior judgment is the

foundation for issue preclusion; in other words, the judgment, "not the court's opinion

explicating the judgment" is what matters.  <u>Id.</u>  Furthermore, any "issue necessary to [that]

judgment" is barred from re-litigation.  <u>Id.</u>  Moreover, issue preclusion works to bar re-litigation

of the entire issue decided, "not just the particular arguments raised in support of it in the first

case."  <u>Id.</u>  Finally, like claim preclusion, the moving party bears the burden of proving all the

elements of issue preclusion.  <u>Athridge v. Aetna Cas. and Sur. Co.</u>, 351 F.3d 1166, 1171 (D.C.

Cir. 2003).

     The AMS Defendants assert that the plaintiffs are precluded from pursuing Counts I

through X of the plaintiffs' Third Amended Complaint.[44]  AMS Defs.' Mem. at 16-30, AMS

Defs.' Reply at 8-14.  The defendants base their issue and claim preclusion arguments on <u>Lans I</u>

(granting summary judgment against Dr. Lans for lack of standing), <u>Lans II</u> (denying

reconsideration of the ruling in <u>Lans I</u> based on newly discovered evidence), <u>Lans III</u> (granting

attorneys' fees against Dr. Lans), <u>Lans IV</u> (denying motion for reconsideration of attorneys' fees

---

[44]  The AMS Defendants argue that the fraud-based claims (Counts VIII through X) are barred by both issue and claim preclusion.  However, because the Court is dismissing the fraud and fraudulent concealment claims as a result of the plaintiffs' concession that they failed to allege facts sufficient to state a claim for either of these claims, the Court will not discuss these preclusion arguments.  Furthermore, the plaintiffs' arguments regarding the allegedly duplicative nature of Counts II through VI will be discussed in section III.B.2.b, <u>infra</u>.  Therefore, this section will only examine whether the plaintiffs' RICO and malpractice claims (Counts I and VII) are precluded under the doctrines of issue or claim preclusion.

award), Lans V (referral to the United States Attorney), and the October 3, 2005 Memorandum

Order (denying request for Court to take judicial notice concerning ownership of the '986

Patent).[45]   AMS Defs.' Mem. at 16; AMS Defs.' Reply at 10-11.

> a.   Claim preclusion

Two preliminary matters are beyond dispute: a court of competent jurisdiction presided

over the underlying proceedings, and each of the relevant proceedings was resolved by a final

judgment on the merits. See, e.g., Lans I (granting summary judgment against Dr. Lans due to a

lack of standing); Lans IV (denying motion for reconsideration of attorneys' fees); Lans V

(denying the plaintiffs' request to refer Mastriani to the United States Attorney's office for

perjury); Lans v. Gateway 2000, Inc., Civil Action No. 97-2523 (JGP), Civil Action No. 97-2526

(JGP), Civil Action No. 99-3153 (JGP), Mem. Order (D.D.C. Oct. 3, 2005) (denying Plaintiffs'

Request That The Court Take Judicial Notice that the '986 Patent is registered to Dr. Lans).

Therefore, the only issues that remain as to whether the claims being challenged on claim

preclusion grounds are barred from consideration in this case are whether the parties in the suits

are identical and whether the claims that the plaintiff now advances were among those claims on

which the Court rendered a final judgment upon the merits.

> i.   The legal malpractice claim

The AMS Defendants argue that claim preclusion bars the plaintiffs' legal malpractice

claim.  AMS Defs.' Mem. at 23-25.  They assert that (1) the denial of the motion for

reconsideration was a final judgment on the merits, id. at 23; (2) the plaintiffs argued the

standard of care issue, based on the same facts as those stipulated in the Complaint, in their

motion for reconsideration, id.; and (3) the plaintiffs cannot use breach of the standard of care as

---

[45]  The AMS Defendants state that they base their issue preclusion arguments on Lans IV and Lans V alone, but also cite to Lans I, Lans II, and Lans III as support for their position.  See, e.g., AMS Defs.' Mem. at 19-20.

the proximate cause of their injuries because AMS's breach of the standard of care has already

been argued and decided, id. at 23-24.

The plaintiffs contend that claim preclusion does not apply to any of their claims because

(1) "Dr. Lans and Uniboard never asserted any claim against AMS [in the patent infringement

proceedings], let alone the identical cause of action," Pls.' AMS Opp'n at 7; (2) the AMS

Defendants were not parties to the patent infringement proceedings, and were only permitted to

intervene "to a limited extent," id.; and (3) "[c]laim preclusion cannot apply to any claim that

arises after the original pleading filed in the earlier litigation," and the plaintiffs' "claims arose

from AMS's conduct during the litigation," id. at 8.  In addition, the plaintiffs argue that breach

of the standard of care and proximate cause are only elements of the claim for malpractice, not

claims themselves.  Id. at 7.

The AMS Defendants reply that a malpractice claim was asserted against them in the

prior proceedings because (1) the "[m]otion for [r]econsideration sought to hold AMS solely

liable for a sanctions award" and the plaintiffs "explicitly accused the AMS Defendants of gross

negligence and perjury" in that proceeding, AMS Defs.' Reply at 8; (2) as intervenors in the

motion for reconsideration, the AMS Defendants were parties to the underlying case for purposes

of collateral estoppel and res judicata,[46] id.; and (3) the plaintiffs' malpractice claim arose before

the Court's rulings on the motion for reconsideration and the request for the referral to the United

States Attorney, id. at 10-11.  The AMS Defendants, therefore, argue that the issues for which

they seek preclusion should be given collateral effect.[47]  Id. at 8.  For the following reasons, the

---

[46]  The plaintiffs argue that the AMS Defendants were not parties to the underlying proceedings for claim preclusion purposes, not issue preclusion (i.e., collateral estoppel).  See Pls.' AMS Opp'n at 7.

[47]  The AMS Defendants focus on the doctrine of collateral estoppel (issue preclusion) in this argument, but the plaintiffs' argument is that claim preclusion does not apply.  Also, Lawlor v. Nat'l Screen Serv. Corp., 349 U.S. 322,

(continued . . .)

Court agrees with the plaintiffs.

The plaintiffs misconstrue the basic principles of claim preclusion by arguing that the only final judgment that can serve as the basis for res judicata is the patent infringement action. See, e.g., Grausz v. Englander, 321 F.3d 467, 473 (4th Cir. 2003) (holding that Chapter 11 debtor's legal malpractice claim against law firm and attorney fee application proceedings arose out of the same "core of operative facts," supporting attorney's res judicata defense in legal malpractice claim brought by debtor, where both actions necessarily included an inquiry into the quality of legal services provided); Police Ass'n of New Orleans v. City of New Orleans, 951 F. Supp. 622, 626 (E.D. La. 1997) (permitting a claim preclusion defense based on a prior attorneys' fees award, but denying motion because there was no identity of cause of action). The defendants may, however, establish claim preclusion if they can demonstrate that the current malpractice claim is based on the same facts as did any final judgment, including the opinions that resolved the motions for reconsideration and referral to the United States Attorney, both which concerned AMS's knowledge of the Uniboard assignment of the '986 Patent.[48]

The malpractice claim is based on the nature and quality of legal services provided to the plaintiffs in connection with the patent litigation. The motion for reconsideration and the Lans V opinion did not include an examination of the quality of professional services rendered by AMS, but rather considered AMS's knowledge of the Uniboard assignment and Dr. Lans's credibility. In Lans III, the Court merely determined that AMS's behavior did not rise to the level of

---

(. . . continued)

328 (1955), and the other cases cited by the parties address the claim preclusion requirement that the cause of action being pursued in the present case be the same as the claim that was pursued in the prior case.

[48] The AMS Defendants never make an argument for preclusion based on Lans V (application for referral to the United States Attorney for Mastriani's alleged perjury), except to simply state that it, along with other opinions, "conclusively established that Mastriani did not commit perjury . . . [and t]he Court's determination of th[is] key fact[] eviscerates the factual basis of [the p]laintiffs' suit." AMS Defs.' Mem. at 16. The Court, nevertheless, will consider the potential for preclusion based on Lans V.

recklessness, a standard more onerous than mere negligence.  Lans III, slip op. at 7, 14.  The

Court in Lans IV upheld this determination upon consideration of whether AMS knew of the

Uniboard assignment.  See Lans IV, slip op. at 10 (upholding Lans III decision).  Furthermore,

the Court purposely did not address many issues related to the malpractice claim, see id. at 10

n.10, and even noted that Dr. Lans's allegations "cast suspicion on whether AMS acted within

the appropriate standard of care," id. at 8.  Moreover, the judicial notice opinion merely assesses

whether Dr. Lans is the registered owner of the '986 Patent, a decision that did not require any

inquiry into the quality of legal services provided by AMS.  See Lans v. Gateway 2000, Inc.,

Civil Action No. 97-2523 (JGP), Civil Action No. 97-2526 (JGP), Civil Action No. 99-3153

(JGP), Mem. Order at 1 (D.D.C. Oct. 3, 2005).  As such, the malpractice action is not founded on

the same "nucleus of facts" as Lans IV, Lans V, or the October 3, 2005 opinions.  Accordingly,

the Court concludes that the AMS Defendants have failed to establish all of the elements for

claim preclusion of the malpractice claim.[49]

### ii.    The RICO claim

AMS also contends that claim preclusion bars the plaintiffs' claim of perjury because the

Lans I, Lans III, and Lans IV opinions constituted final judgments, the plaintiffs in this action are

the same as the plaintiffs in the actions that were the subject of those opinions, "the issue of

Mastriani's perjury was already raised in the previous proceeding[s]," AMS Defs.' Mem. at 20,

and the "RICO claim arises from the same facts decided by the Court in the previous actions," id.

at 21.  The plaintiffs, on the other hand, again argue that claim preclusion does not apply to any

of their claims (including their RICO claim) because no claim was asserted against AMS in the

patent infringement proceedings, Pls.' AMS Opp'n at 7, the AMS Defendants were not parties to

---

[49]  Because the AMS Defendants have failed to establish identity of cause of action, the Court need not address
whether there was identity of parties.

the patent infringement proceedings, id., and "[c]laim preclusion cannot apply to any claim that arises after the original pleading filed in the earlier litigation," id. at 8.

The AMS Defendants again reply that a claim was asserted against them in the prior proceedings because (1) the "[m]otion for [r]econsideration sought to hold AMS solely liable for a sanctions award" and the plaintiffs "explicitly accused the AMS Defendants of gross negligence and perjury" in that proceeding, AMS Defs.' Reply at 8; (2) as intervenors in the motion for reconsideration, the AMS Defendants were parties to the underlying case for purposes of collateral estoppel and res judicata,[50] id.; and (3) the plaintiffs' claims arose before the Court's rulings on the motion for reconsideration and Application for Referral to the United States Attorney, id. at 10-11.  For the following reasons, the Court agrees with the defendants.

The "core of operative facts" surrounding the RICO action is the alleged obstruction of justice and mail or wire fraud resulting from the submission of Mastriani's allegedly false statement to the Court with the "intent to impede the administration of justice."  Pls.' AMS Opp'n at 16-18; see Compl. ¶¶ 92-93, 147.  Therefore, the facts underlying both the RICO action, the motion for reconsideration, and the application for referral to the United States Attorney are the same.  All three matters relate to the AMS Defendants' knowledge of the Uniboard transfer of the '986 Patent.  An obstruction of justice claim, as well as a perjury claim, requires the making of a knowingly false statement.  The motion for reconsideration, and the referral to the United States Attorney for perjury, necessarily included an inquiry into the AMS Defendant's knowledge of the '986 Patent transfer.  See Lans I, 84 F. Supp. 2d at 114 (quoting Mastriani's declaration as stating: "I and other counsel to [Dr.] Lans have been repeatedly informed by [Dr.] Lans that no assignment had ever taken place with respect to the ['986 ] patent

---

[50] Again, the plaintiffs argue that the AMS Defendants were not parties to the underlying proceedings for claim preclusion purposes, not issue preclusion (i.e., collateral estoppel). See supra note 45.

. . . "). Without knowledge of the transfer, Mastriani's statement is not false. By denying the motion for reconsideration and the application for referral to the United States Attorney, the Court effectively found that the AMS Defendants had no knowledge of the assignment. The Court, therefore, concludes that Lans IV, Lans V, and the RICO matters all arise out of the same cause of action.

Likewise, there is an identity of parties in all three matters. In order for there to be identity of parties, a claim between the same parties must have been previously litigated. See Bd. of Managers of 195 Hudson St. Condo. v. Jeffrey M. Brown Assocs., Inc., 652 F. Supp. 2d 463, 472 (S.D.N.Y. 2009) (quoting City of New York v. Welsbach Elec. Corp., 878 N.E.2d 966, 968 (N.Y. 2007) ("One linchpin of res judicata is an identity of parties actually litigating successive actions against each other: the doctrine applies only when a claim between the parties has been previously brought to a final conclusion." (internal quotation marks omitted))). However, "[a] defendant not named in a prior suit may establish an 'identity of parties' and thus invoke res judicata by demonstrating that it is in privity with a party named in the prior suit." Evans v. Chase Manhattan Mortg. Corp., No. Civ. A. 04-2185 RMC, 2006 WL 785399, at *7 (D.D.C. Mar. 27, 2006) (emphasis omitted) (citing Apotex, Inc. v. FDA, 393 F.3d 210, 217 (D.C. Cir. 2004)).

The AMS Defendants argue that as intervenors on the motions for reconsideration of the fee award, they were parties to the underlying proceedings.[51] Generally, intervenors in a suit are parties for res judicata purposes. Watergate West, Inc. v. Barclays Bank, S.A., 759 A.2d 169,

---

[51]   The AMS Defendants were permitted to intervene solely in regard to the "motion of [Dr.] Lans and Uniboard for reconsideration . . . [,] the renewed motion to hold counsel jointly and severally liable filed . . . by Gateway 2000, Inc. in Lans v. Gateway 2000, Inc., Civil Action No. 97-2523 . . . [,] and . . . the motion opposing the plaintiffs' motion for reconsideration and requesting modification of the Court's first attorneys fees decision filed . . . by Dell in Lans v. Dell, Civil Action No. 97-2526, and Uniboard Aktiebolag v. Acer America, Civil Action No. 99-3153." Lans v. Gateway 2000, Inc., Civil Action No. 97-2523 (JGP), Civil Action No. 97-2526 (JGP), Civil Action No. 99-3153 (JGP), Mem. Order at 10 (D.D.C. Apr. 13, 2004).

179 (D.C. 2000) ("Generally, an intervenor who actively participates in the litigation is subject to res judicata just as an initially named party." (emphasis omitted)); see In re N.M. Natural Gas Antitrust Litig., MDL No. 403, 1982 WL 1827, at *21 n.24 (D.N.M. Jan. 26, 1982) (judgment had res judicata effect as to intervenors in contract interpretation suit); Police Ass'n of New Orleans, 951 F. Supp. at 626 (following successful § 1983 suit, attorney who intervened as a plaintiff to recover attorneys' fees was a party to the action). In order for intervenors to be considered parties to a suit, however, they must have actively participated in the litigation, either at the trial or appellate court level. Id. at 179 n.23 (fact that intervenors did not join litigation until after the trial court judgment had no effect on res judicata because intervenors actively participated in the appeal). Here, the AMS Defendants actively participated in the motion for reconsideration of the fee award by submitting a brief, and participating in depositions and at an evidentiary hearing. See generally Lans v. Gateway 2000, Inc., Civil Action No. 97-2523 (JGP), Civil Action No. 97-2526 (JGP), Civil Action No. 99-3153 (JGP), Order (D.D.C. Dec. 23, 2004) (ordering deposition of Dr. Lans and Mastriani, and an evidentiary hearing to address the motion for reconsideration); Intervenor's Memorandum of Points and Authorities in Opposition to Lans'/Uniboard's Motion for Reconsideration and the Motions of Gateway and Dell to Hold Counsel Jointly and Severally Liable, Gateway, Civil Action No. 97-2523 (JGP), Civil Action No. 97-2526 (JGP), Civil Action No. 99-3153 (JGP) (May 17, 2004). Therefore, the AMS Defendants, as intervenors in the motion for reconsideration, were parties to the action. As such, there is identity of parties between the plaintiffs' RICO claim and the motion for reconsideration.

For the foregoing reasons, the plaintiffs' RICO claim is precluded by the Lans IV decision.

b.      Issue preclusion

The parties do not dispute that the plaintiffs – the parties against whom the application of

collateral estoppel is alleged to apply – were parties in the underlying proceedings, or that all of

the relevant proceedings were resolved by final judgments of a court of competent jurisdiction.[52]

Therefore, the remaining issues to be resolved are: (1) whether the issues now raised are identical

to the issues raised in the prior proceedings, (2) whether the issues were actually decided, (3)

whether determination of the relevant issues was essential to the judgment, and (4) whether it

would be unfair to preclude litigation of the issues in this case.

i.      The malpractice claim

Under District of Columbia law, a claim for legal malpractice requires that the plaintiffs

establish "that the parties entered into an attorney-client relationship, what the applicable

standard of care is, that the standard of care has been violated by the defendant-lawyer, and that

there was a causal relationship, or proximate cause, between the violation and the harm

complained of" – in this case, the award of a judgment in some amount against the plaintiffs.

Smith v. Haden, 872 F. Supp. 1040, 1044 (D.D.C. 1994); see also Mills v. Cooter, 647 A.2d

1118, 1123 (D.C. 1994).  The AMS Defendants argue that issue preclusion bars reconsideration

---

[52]  Although the plaintiffs argue that "[t]he factual issues asserted by AMS were never decided by a final judgment," the plaintiffs' argument confuses the requirement of what constitutes a final judgment with the doctrine's requirement that the issue must have been actually and necessarily decided.  Pls.' AMS Opp'n at 8-9.  Thus, the Court will consider these arguments in analyzing the "actually and necessarily decided" element of issue preclusion. Furthermore, the Court concludes that all of the relevant opinions were decided by final judgments.  Lans I (granting summary judgment), Lans II (denying reconsideration of Lans I), Lans V (denying application to refer Mastriani to the United States Attorney), Uniboard Aktiebolag v. Acer Am. Corp., and the Federal Circuit Appeal of Uniboard, are all final judgments on the merits.  In addition, the opinions concerning attorneys' fees (Lans III and Lans IV) were final judgments as soon as the amount of the award was designated on September 30, 2005.  See In re Romanus, No. 05-83933, 2006 WL 1891851, at *2 (Bankr. C.D. Ill. June 23, 2006) (attorneys' fee judgment is not final for purposes of res judicata until the award amount is set); see also Lans v. Gateway 2000, Inc., Civil Action No. 97-2523 (JGP), Civil Action No. 97-2526 (JGP), Civil Action No. 99-3153 (JGP), Order (D.D.C. Sept. 30, 2005) (awarding Gateway "$836,220.84 in attorneys' fees minus a 10 percent reduction, $35,661.72 in expenses, plus pre-judgment and post-judgment interest . . . [plus] $174,802.98 in fees minus a 10 percent reduction, $9,266.21 in expenses, and post-judgment interest.").

of whether their actions or inactions were the proximate cause of the plaintiffs' injuries.  In

particular, the AMS Defendants argue that the plaintiffs raised the issue of their breach of the

standard of care in the plaintiffs' motion for reconsideration, <u>see</u> Mot. for Recons. at 10-11

(stating that "[f]or Mr. Mastriani and his firm to file patent litigation on behalf of [Dr.] Lans,

knowing of the IBM license agreement and being familiar with its terms, without obtaining the

documentary evidence of Uniboard's right to grant the license to IBM, was below the standard of

care," and "[g]iven Mr. Mastriani's knowledge of the confusion regarding ownership of the Lans

patent, he and his firm acted beneath the standard of care in failing to prepare and file the

necessary clarifying documents"), and the Court twice concluded that AMS's behavior was not

unreasonable, <u>see</u> <u>Lans III</u>, slip op. at 14 (stating that "the Court [was] unable to conclude that

[AMS's] conduct was vexatious and unreasonable"); <u>Lans IV</u>, slip op. at 5 (repeating Judge

Penn's conclusion that "there was no evidence that AMS engaged in 'vexatious and

unreasonable conduct'").  AMS Defs.' Mem. at 22-23; AMS Defs.' Reply at 18.

      The defendants further allege that the plaintiffs' contributory negligence bars their

malpractice claim.  AMS Defs.' Mem. at 25; AMS Defs.' Reply at 14-18.  The defendants

contend that Judge Penn "found facts establishing that [Dr.] Lans was contributorily negligent

for the failure of [the p]laintiffs' litigation" and that the current claims arise "from the same

nucleus of facts that were established by the Court in the Orders associated with the denial of

reconsideration."  AMS Defs.' Mem. at 25-26; <u>see also</u> AMS Defs.' Reply at 17.  Furthermore,

the AMS Defendants state that the Court "concluded on several occasions that [the p]laintiffs

were responsible for the fate of their case."  AMS Defs.' Mem. at 26; <u>see also</u> AMS Defs.' Reply

at 17 (stating that Judge Penn held that Dr. "'Lans only has himself to blame' for the

predicament in which the [p]laintiffs now find themselves," <u>see</u> <u>Lans III</u>, slip op. at 11, and

"[t]he Court cannot escape the conclusion that [Dr.] Lans chose to conceal all information about the assignment, possibly even from his attorneys, until confronted with irrefutable evidence that the assignment had occurred," Lans I, 84 F. Supp. 2d at 122).

The plaintiffs, on the other hand, contend that issue preclusion does not bar their malpractice claims because the Court "took care not to decide the very issues that AMS claims the Court decided," including questions related to "AMS's failure to . . . advise Dr. Lans of its conflict of interest . . . [,] advise Dr. Lans of AMS's financing arrangements with third parties[,] . . . [investigate ownership of the patent, and] explain American patent law to Dr. Lans." Pls.' AMS Opp'n at 8-9 (citing Lans IV, slip op. at 10 n.10); see id. at 25 ("[T]he Court specifically refused to rule on any issue related to the malpractice action."). In addition, the plaintiffs argue that the Court's statement that AMS did not exhibit "'vexatious and unreasonable conduct' . . . referred to AMS's conduct toward the infringement defendants – . . . not toward Dr. Lans or Uniboard," id. at 25, and relates only to "AMS's conduct under 28 U.S.C. § 1927, and whether AMS unnecessarily multiplied the proceedings," not to whether AMS satisfied the standard of care owed to its clients, id. at 9-10. Finally, the plaintiffs argue that the defendants have failed to prove that a client owes a duty to its attorney or that Dr. Lans and Uniboard breached any such duty for contributory negligence to apply. Id. at 24.

The AMS Defendants' Reply denies that the Court's avoidance of findings on certain issues bars the applicability of collateral estoppel. AMS Defs.' Reply at 9. The AMS Defendants argue that the gravamen of their collateral estoppel arguments are not affected by the Court's limitation on findings related to the standard of care. Specifically, the defendants allege that, in any event, the plaintiffs have failed to demonstrate proximate cause because "the Court determined that [Dr.] Lans did not tell AMS of the assignment and Mastriani did not lie." Id.

(citing <u>Lans IV</u>, slip op. at 8).  Moreover, the AMS Defendants state that a court's pronouncements as to the effect of its decisions are merely dictum, and therefore do not "deprive that decision from having collateral effects."  <u>Id.</u> at 10.  Finally, the AMS Defendants state that a ruling on a motion for reconsideration is a final judgment.  <u>Id.</u>  For the following reasons, the Court agrees with the plaintiffs.

First, the issue of whether AMS was the cause of the plaintiffs' injuries was raised in <u>Lans IV</u>.  In the plaintiffs' motion for reconsideration, the plaintiffs' allege that filing a patent litigation on behalf of Dr. Lans, "knowing of the IBM license agreement and being familiar with its terms, without obtaining the documentary evidence of Uniboard's right to grant the license to IBM, was below the standard of care," and that "[g]iven Mr. Mastriani's knowledge of the confusion regarding ownership of the Lans patent, he and his firm acted beneath the standard of care in failing to prepare and file the necessary clarifying documents."  Mot. for Recons. at 10-11.

Second, the defendants allege that by stating that it was "unable to conclude that [AMS's] conduct was vexatious and unreasonable," <u>Lans III</u>, slip op. at 14; <u>see also</u> <u>Lans IV</u>, slip op. at 10 (denying reconsideration of <u>Lans III</u> decision), the Court found that AMS "did not violate the reasonableness standard in representing [Dr.] Lans," AMS Defs.' Mem. at 22.   However, this conclusion by the Court did not relate to AMS's behavior as related to Dr. Lans, but rather was a conclusion that AMS did not "so multipl[y] the proceedings . . . unreasonably and vexatiously" to warrant sanctions under 28 U.S.C. § 1927.[53]  <u>Lans III</u>, slip op. at 7.  The Court explained that

---

[53]  The full text of 28 U.S.C. § 1927 provides:

> [a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy

(continued . . .)

this standard required that the attorney's behavior be "at least 'reckless' to be sanctionable" – a standard much greater than the mere negligence required for malpractice. Id. at 7. Moreover, the Court in Lans III noted that it found the "firm's conduct . . . troubling . . . in several regards," including the failure to properly investigate ownership of the patent before initiating litigation or even after the issue of an assignment was raised by the defendants in the case. Id. at 13. Finally, the Court in Lans IV specifically stated that it was making no determination on certain issues related to the malpractice claim, including their "failure to exercise the proper standard of care." Lans IV, slip op. at 10 n.10.

The defendants, nonetheless, contend that the plaintiffs cannot establish proximate cause because the Court found that Dr. "Lans did not tell AMS of the assignment and Mastriani did not lie." AMS Defs.' Reply at 9. Accordingly, the defendants attempt to frame the entire malpractice claim on AMS's actual knowledge of the Uniboard assignment, and solely based on the sanctions award. See AMS Defs.' Mem. at 21-22 ("In the present case, the standard of care is the duty . . . in discovering the true facts supporting a complaint. Under Federal Rule of Civil Procedure 11, an attorney must make a reasonable inquiry as to the factual and legal matters of the complaint so that the claims are not frivolous."); AMS Defs.' Reply at 9 (stating that the plaintiffs "cannot establish that AMS proximately caused [the p]laintiffs' injury because the Court determined that [Dr.] Lans did not tell AMS of the assignment and Mastriani did not lie"). However, the reach of the malpractice claim is much broader than the sanctions award, and includes the loss of the underlying patent infringement suit as a result of AMS's alleged

---

(. . . continued)

> personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927 (2006).

malpractice in failing to properly investigate ownership of the patent before filing suit.  See

Compl. ¶¶ 2, 11, 61, 75-78, 83-84, 122-125 (describing the various allegations of malpractice,

including the failure to properly investigate and clarify the ownership of the patent before giving

notice to potential infringers, before filing suit, or once the issue was raised in litigation; giving

notice of infringement and initiating litigation, in the name of the wrong party, or at least in the

name of both Dr. Lans and Uniboard; the award of attorneys' fees; negligently drafting and

advising Dr. Lans to sign the Micron-Diamond settlement and license agreements; and refusing

to represent the plaintiffs, without an explanation of their conflict of interest).  And the alleged

false statement to the Court is not a basis for the malpractice claim; rather, it is a basis for the

RICO claim.  Therefore, the Court did not actually decide the question of proximate cause.

Because the defendants have failed to establish that the issue of proximate cause was actually

decided, an assessment of whether determination of this issue was essential to the judgment is

not necessary.  Hence, the Court concludes that the malpractice claim is not barred by an earlier

finding by Judge Penn that proximate cause is lacking.

Finally, the District of Columbia recognizes contributory negligence as a defense to

negligence claims, including legal malpractice claims.  See In re Belmar, 319 B.R. 748, 756-57

(Bankr. D.D.C. 2004) (finding that a genuine issue of fact remained in a legal malpractice action

as to whether an attorney's failure to file a timely opposition was excused by the plaintiff clients'

contributory negligence); Breezevale Ltd. v. Dickinson, 759 A.2d 627, 634-35 (D.C. 2000)

(considering the potential contributory negligence of a client in a legal malpractice case), aff'd,

783 A.2d 573, 574-75 (D.C. 2001).  To assert a defense of contributory negligence, the

defendant "must establish by a preponderance of the evidence, that the plaintiff failed to exercise

reasonable care, and that this failure was a substantial factor in causing the alleged damage or

injury." Messengale v. Pitts, 737 A.2d 1029, 1031 (D.C. 1999) (internal citations omitted).

The defendants assert that "[m]any courts have . . . held that a client is contributorily negligent in a malpractice action where the client misrepresented important facts." AMS Defs.' Mem. at 25. It must be noted, however, that none of the cases cited by the defendants apply the doctrine of contributory negligence. See Hanlin v. Mitchelson, 623 F. Supp. 452, 457 (S.D.N.Y. 1985) (stating that a client's misrepresentation of important facts should be considered as part of the malpractice claim, and dismissing case, in part due to the client's misrepresentation); Mo-Kan Teamsters Pension Fund v. Creason, 669 F. Supp. 1532, 1543 (D. Kan. 1987) (applying comparative negligence); Burns v. Valene, 214 N.W.2d 686, 690 (Minn. 1974) (denying fraud claim of attorney against client for client's withholding of information from attorney because attorney "close[d] his eyes to the realities of the situation . . . [where there was] obvious uncertainty"). Furthermore, a client's misrepresentation of facts or fraud is not prima facie evidence of contributory negligence. See, e.g., Breezevale, 759 A.2d at 634-35 (finding that client's forging of documents did not play a substantial part in damaging the lawsuit), aff'd, 783 A.2d 573, 574-75 (D.C. 2001) (finding no contributory negligence despite forgery by client affecting settlement).

In any event, the Court has previously determined that the plaintiffs' failed to exercise reasonable care. In Lans III, for example, the Court stated that Dr. "Lans has only himself to blame for the situation in which he finds himself," and that "[i]f he had been more thorough with his recordkeeping and more forthcoming with his attorneys, then perhaps he would be pursuing his infringement claim today." Lans III, slip op. at 11. In addition, in Lans I the Court stated that it could not "escape the conclusion that [Dr.] Lans chose to conceal all information about the assignment, possibly even from his attorneys, until confronted with irrefutable evidence that the

assignment had occurred.  Therefore, the Court cannot hold that [Dr.] Lans's failure to join or sue in the name of Uniboard was an honest and understandable mistake." Lans I, at 122.

Despite these findings, the Court has never determined whether these failures were a substantial factor in the outcome of the lawsuit.  The Court in Breezevale framed the "substantial factor" component of the contributory negligence defense in the context of that case as "whether, if [the law firm] had exercised due care, [testimony from an employee of the client regarding alleged fraud of the client] would have substantially affected [the client's] lawsuit."  759 A.2d at 634-35.  The Breezevale Court specifically noted that it was not "whether the employee's allegations [of the client's fraud] were a substantial factor in [the defendant's] decision to make a particular settlement offer."[54]  Id.  Likewise, here the question is whether, if the AMS Defendants had exercised due care, the plaintiffs' failure to notify them of the Uniboard assignment would have substantially affected the plaintiffs' lawsuit.  The Court has not addressed this question in any of its prior opinions.   As such, the Court has never determined that the plaintiffs were contributorily negligent.  An assessment of the remaining elements of issue preclusion is, therefore, not necessary.

For the reasons set forth above, the Court holds that the malpractice claim is not barred by issue preclusion, either as to proximate cause or contributory negligence.

ii.   The RICO claim

As to the RICO Count of the complaint, the AMS Defendants argue that issue preclusion

---

[54] Breezevale concerned malpractice in an underlying case in which Breezevale sued Firestone for breach of contract and fraud related to an exclusive distributorship agreement.  Breezevale, 759 A.2d at 631.  Firestone initially offered to settle the case for $3,500,000, but Breezevale rejected the offer.  Id.  On the eve of the deposition of a Breezevale employee, the employee informed Breezevale's attorneys that she planned to testify that she had forged documents produced to Firestone, including documents pertaining to the contracts at issue, and that this was done at the direction of a Breezevale executive.  Id.  The attorneys decided to go forward with the deposition, even after Breezevale instructed the attorneys to "delay the deposition until [the attorneys] could investigate the allegations."  Id.  Firestone began drafting a motion to dismiss based upon the fraud, and therefore, at the advice of counsel Breezevale settled for $100,000.  Id.

bars the plaintiffs "from raising the perjury" of Mastriani as the "racketeering activity" for RICO because the issue was contested in a pre-hearing brief in Lans v. Gateway 2000 and has already been actually and necessarily decided.  AMS Defs.' Mem. at 18, 20.  Specifically, the defendants point to: (1) the "conclusive opinion" of Judge Penn indicating that Dr. "Lans chose to conceal all information about the assignment, possibly even from his attorneys," Lans I, 84 F. Supp. at 122, and that "even when confronted with [the] defendant's repeated discovery requests surrounding any assignment, [Dr.] Lans neglected to inform even his attorneys that an assignment had taken place," id. at 114; (2) the Lans III opinion which stated – in response to AMS's argument that it had no knowledge of the assignment to Uniboard and did not act in bad faith to warrant attorneys' fees – that despite the Court's concerns over AMS's conduct, the Court "[was] unable to conclude that [AMS's] conduct was vexatious and unreasonable," and therefore the firm was not liable for attorneys' fees, Lans III, slip op. at 14; and (3) the Lans IV opinion in which the Court repeated that Dr. Lans "should have been more 'thorough with his record keeping and more forthcoming with his attorneys,'" Lans IV, slip op. at 5 (quoting Lans III, slip op. at 11), and further stated that "[d]uring an evidentiary hearing . . . [Dr.] Lans admitted that he did not tell AMS that he had signed an agreement transferring his ownership rights," Lans IV, slip op. at 8.  AMS Defs.' Mem. at 19.  Moreover, they assert that "whether or not the AMS Defendants were actual parties is immaterial" because "[i]nvocation of the [issue] preclusion doctrine is not restricted to those litigants who were parties to the first litigation or their privies."[55]  AMS Defs.' Reply at 8.

    The plaintiffs, on the other hand, contend that any "opinions prior to the [M]otion for

---

[55]  The AMS Defendants are correct that collateral estoppel does not require identity of parties, but as previously noted, the plaintiffs' argument was based on claim preclusion.  See supra note 45. Consequently, the Court will only consider the defendants' arguments regarding intervenors as parties in the context of claim preclusion.

[R]econsideration . . . cannot bar any issues in this proceeding because . . . no party ever questioned AMS's conduct toward Dr. Lans and Uniboard" until that time, Pls.' AMS Opp'n at 9, and even if those opinions had preclusive effect, AMS wrongly depicts the Court's holdings, id. For the following reasons, the Court agrees with the defendants.

For the same reasons that claim preclusion bars the RICO claim, issue preclusion bars the plaintiffs from re-litigating Mastriani's knowledge of the Uniboard assignment as the underlying basis for the plaintiffs' RICO claim. As previously noted, the RICO claim arises out of the plaintiffs' allegation that Dr. Lans told AMS about the Uniboard assignment. See Compl. ¶¶ 50-59, 92-93, 147. The Complaint alleges that "[t]he AMS Persons caused AMS to file Mastriani's false statement in the Lans Lawsuit . . . in violation of the obstruction of justice statute," and that "[t]he AMS Persons caused Mastriani's material false testimony . . . to be sent by mail and wire to numerous persons, in violation of the mail and wire fraud statutes." Id. ¶ 147. The motion for reconsideration and application for referral to the United States Attorney also address the issue of the AMS Defendants' knowledge of the Uniboard assignment. See Lans IV, slip op. at 6 ("The main issue before the Court concerns [Dr.] Lans' credibility. . . . [Dr.] Lans argues that AMS knew about the assignment of the . . . [p]atent to Uniboard."); Lans V, Mem. Order at 1 ("[The p]laintiffs' application alleges that . . . Mastriani . . . committed perjury in his sworn statements to the Court . . . . These statements bear on Mastriani's knowledge of the Uniboard assignment . . . ."). Furthermore, the Court "actually decided" this issue in each of the opinions. See Lans IV, slip op. at 8 (stating "[w]hile all of [the] plaintiffs' claims cast suspicion on whether AMS acted within the appropriate standard of care in determining ownership of the patent, these claims are not determinative as to whether [Dr.] Lans told AMS about the assignment," and "[d]uring an evidentiary hearing . . . [Dr.] Lans admitted that he did not tell AMS that he had signed an

agreement transferring his ownership rights"); Lans V, Mem. Order at 2 ("[The p]laintiffs have

not proffered evidence in their application that unequivocally proves that the statements in

Mastriani's affidavit are false.").  Finally, the motions for reconsideration and referral to the

United States Attorney for perjury necessarily included an inquiry into the AMS Defendant's

knowledge of the assignment.  See Lans IV, slip op. at 6 ("The main issue before the Court

concerns [Dr.] Lans' credibility. . . . [Dr.] Lans argues that AMS knew about the assignment of

the . . . [p]atent to Uniboard."); Lans V, Mem. Order at 1-2 ("[The p]laintiffs' application alleges

that [Mastriani] committed perjury in his sworn statements to the Court . . . .  These statements

bear on Mastriani's knowledge of the Uniboard assignment . . . .  The perjury statute only

criminalizes 'the giving of testimony which is known to be false.'" (internal citations omitted)).

By denying the motion for reconsideration and the application for referral to the United States

Attorney, the Court effectively found that the AMS Defendants had no knowledge of the

assignment.  Cf. Yamaha Corp., 961 F.2d at 256 (concluding that Yamaha-America's claim that

it had independent right under section 526 of the Tariff Act "was actually and necessarily

rejected by the Ninth Circuit" because the "Court of Appeals must necessarily, albeit implicitly,

have rejected Yamaha-America's explicit argument that it had private rights under section 526"

in order to reach its conclusion that the district court "correctly granted summary judgment in

favor of ABC on Yamaha's claims under the Tariff Act").  The Court, therefore, concludes that

Lans IV and Lans V bar the plaintiffs from using Mastriani's alleged knowledge of the Uniboard

assignment as "racketeering activity" that supports their RICO claim.[56]

---

[56]  Because the Court has determined that the plaintiffs' claim is barred by claim preclusion and that issue preclusion bars Mastriani's alleged knowledge of the Uniboard assignment as the racketeering activity, the Court will not assess whether the plaintiffs have sufficiently alleged a valid RICO claim.

iii.     <u>Full and fair opportunity to litigate</u>

The plaintiffs assert that, even if relevant factual issues arose in the prior proceedings, Dr. Lans and Uniboard "did not have a full and fair opportunity to litigate those issues" because (1) AMS refused to produce relevant documents, Pls.' AMS Opp'n at 10-12, and (2) the plaintiffs were represented by attorneys with a conflict of interest who acted in their own self-interest by filing Mastriani's allegedly false statement with the Court, "revealing [confidential] client communications and waiving privilege, . . . [and] exposing its client to . . . sanctions or attorneys fees," <u>id.</u> at 12-13.  As to their document discovery arguments, the plaintiffs specifically contend that AMS "withheld broad categories of relevant documents such as attorneys' notes, time records, internal correspondence, and internal legal memoranda," which they contend were relevant to whether Dr. Lans put Mastriani on notice of the Uniboard transfer, claimed that they had no document discovery obligations as a result of the motion for reconsideration, and alleged that these documents would be produced in this malpractice action.  <u>Id.</u> at 11-12.  In addition, the plaintiffs allege that the conflict of interest created by AMS's representation of the plaintiffs in the Motion for Attorneys' Fees matter resulted in AMS "act[ing] in its own interest to the detriment of its client" by filing the allegedly false Mastriani declaration, which placed the blame on Dr. Lans and Uniboard.  <u>Id.</u> at 13.

The AMS Defendants counter these fairness arguments, stating that the plaintiffs (1) were afforded full due process, (2) had access to some documents and discovery, and (3) were represented by new counsel on the motion for reconsideration and application for referral to the United States Attorney.  AMS Defs.' Reply at 11-14.  They allege that the plaintiffs were afforded due process because they were given the opportunity to fully brief their arguments related to the underlying motions, including briefing their arguments prior to and after the

evidentiary hearing, depose Mastriani, submit evidence, present oral testimony and cross-examine Mastriani, and they were given a day for oral arguments and two days for an evidentiary hearing. Id. at 12. In addition, they allege that collateral estoppel is not being used offensively by the plaintiff, the prior proceedings were not "severely defective," and Dr. Lans did not "lack any incentive in the first action" to litigate the issue, pointing to the plaintiffs' two requests for reconsideration. AMS Defs.' Mem. at 20 (citing Yamaha Corp., 961 F.2d at 254). They further claim that the plaintiffs had adequate discovery because they had access to some documents and discovery, including the deposition of Mastriani and access to "all communications between themselves and the AMS Defendants" and to all records from the underlying case prior to October 16, 2001. AMS Defs.' Reply at 12. The fact that the plaintiffs were not afforded "unlimited discovery," they argue, does not negate the fact that they had a "full and fair opportunity to litigate." Id. The AMS Defendants also maintain that in order to claim deprivation of a full and fair opportunity to litigate based on inadequate discovery the plaintiffs had to "identify the undiscovered essential fact that could have led to a different result," which they state the plaintiffs failed to do. Id. at 13. Lastly, the AMS Defendants assert that the Lans IV and Lans V decisions are the only two opinions on which the AMS Defendants rely for collateral estoppel, and those opinions were based solely on proceedings where the plaintiffs were represented by new counsel. Id. Consequently, the defendants argue that the plaintiffs were not prejudiced by any alleged conflict of interest. Id. For the following reasons, the Court agrees with the defendants.

The plaintiffs have the burden of establishing the absence of a full and fair opportunity to litigate the issues in the prior proceedings. Hickerson v. City of New York, 997 F. Supp. 418, 423 (S.D. N.Y. 1998). A full and fair opportunity requires procedural due process. Smith v.

District of Columbia, 629 F. Supp. 2d 53, 57-58 (D.D.C. 2009).  The Lans IV and Lans V

proceedings satisfied the procedural requirements of due process. The Court permitted several

briefs to be submitted, held oral argument on the motion for reconsideration, permitted the

depositions of Mastriani and Dr. Lans to be taken, and conducted an evidentiary hearing.  Pls.'

AMS Opp'n at 5.  Also, the plaintiffs were represented by independent counsel throughout those

proceedings.  See Compl. ¶ 1 (stating that the plaintiffs were represented by AMS until October

16, 2001).  Moreover, the Court in Lans IV issued a detailed opinion acknowledging each of the

plaintiffs' claims and upholding the prior rulings, giving full effect to the earlier proceedings.

Although the plaintiffs argue that they were not afforded full discovery, by no means did this

deprive the plaintiff of a "full and fair opportunity" to litigate the claim.  "[T]he 'full and fair

opportunity' requirement does not entitle a party to unlimited discovery."  Hickerson, 997 F.

Supp. at 424 (full and fair opportunity to litigate satisfied where the plaintiffs were represented

by counsel, they were permitted some discovery, permitted to take one deposition, had an

opportunity to argue procedural complaints, and the court addressed discovery demands); Porter

v. Shah, 606 F.3d 809, 814 (D.C. Cir. 2010) (stating that the plaintiff had received a full and fair

opportunity to litigate where he was not afforded discovery or an evidentiary hearing, but was

permitted to, and did, submit extensive documentary evidence).  But see Compagnie Des

Bauxites de Guinee v. L'Union Atlantique S.A. D'Assurances, 723 F.2d 357, 361 (3d Cir. 1983)

(finding that the issue of in personam jurisdiction was not fully litigated in the prior proceedings

because discovery had been terminated before relevant information could be acquired).  Finally,

the plaintiffs did not lack any incentive to fully litigate the issue in the underlying matters. See

Shell Petroleum, Inc. v. United States, 319 F.3d 1334, 1339 (Fed. Cir. 2003).  Accordingly, the

Court rejects the plaintiffs' argument that they were denied a "full and fair opportunity to

litigate" their claims in the prior proceedings.

      2.    <u>The Claims arising under District of Columbia law</u>

        a.    <u>Subject-matter jurisdiction</u>

No federal claims remain in this case.  Therefore, this Court no longer has federal

subject-matter jurisdiction under 28 U.S.C. § 1331.  However, original federal question

jurisdiction under 28 U.S.C. § 1338 is extended to cases involving state law malpractice claims

that require resolution of a substantial question of federal patent law such as infringement,

validity, enforceability, or scope of a patent.  <u>See</u> 28 U.S.C. § 1338(a) ("The district courts shall

have original jurisdiction of any civil action arising under any Act of Congress relating to patents

. . . ."); <u>Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.</u>, 545 U.S. 308, 314 (2005)

(stating that the test for "arising under" jurisdiction involves determining whether "a state-law

claim necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal

forum may entertain without disturbing any congressionally approved balance of federal and

state judicial responsibilities"); <u>Air Measurement Techs., Inc. v. Akin, Gump, Strauss, Hauer &

Feld, L.L.P.</u>, 504 F.3d 1262, 1271-73 (Fed. Cir. 2007) (holding that in case involving state-law

legal malpractice claim arising out of underlying patent prosecution and earlier patent litigation,

the patent infringement aspect of the malpractice claim favored the exercise of federal

jurisdiction because "patent infringement [was] disputed," and it was a "necessary element of the

malpractice case," "[t]here [was] a strong federal interest in [adjudicating such] claims in federal

court because patents are issued by a federal agency," and that justified "resort to the experience,

solicitude, and hope of uniformity that a federal forum offers on federal issues"); <u>Immunocept,

L.L.C. v. Fulbright & Jaworski, L.L.P.</u>, 504 F.3d 1281, 1284-86 (Fed. Cir. 2007) (holding that, in

addition to patent validity and patent infringement, patent claim scope is a substantial question of

patent law, and therefore "serves as the basis of § 1338 jurisdiction" over a legal malpractice

claim based on a claim drafting error that narrowed the scope of the patent because, as the only

basis for negligence, the "claim drafting error [was] a necessary element of the malpractice cause

of action" and was disputed).  Given the need to litigate the issue of patent infringement and

resulting damages as part of the malpractice claim in this case, this Court will maintain subject-

matter jurisdiction over the malpractice claim.  See Jacobsen, 451 F. Supp. 2d at 187 ("In an

attorney malpractice action, courts must effectively undertake a 'trial within a trial' or 'case

within a case' in order to determine the likely outcome in the underlying action.").  As to the

remaining state-law claims, the only basis for federal subject-matter jurisdiction is supplemental

jurisdiction under 28 U.S.C. § 1367.  Because supplemental jurisdiction extends to all claims

related to a claim over which a federal court has original jurisdiction, 28 U.S.C. § 1367(a), and

this Court has original jurisdiction over the malpractice claim under § 1338, this Court will also

maintain subject-matter jurisdiction over all of the remaining state-law claims in this case.

> b.     Allegedly duplicative claims (Counts II through VI)

The defendants argue that the claims for breach of contract, breach of fiduciary duty, and

breach of the implied covenant of good faith and fair dealing must fail because these causes of

action are essentially "restatements of the failed malpractice claim," AMS Defs.' Mem. at 27

(quoting Macktal v. Garde, 111 F. Supp. 2d 18, 22 (D.D.C. 2000)), "arise out of the same facts

as the negligence claims," id. (quoting Asuncion v. Columbia Hosp. for Women, 514 A.2d 1187,

1191 (D.C. 1986)), and "require essentially the same standard of care," id.  AMS then reiterates

its allegation that the Court found facts that establish the contributory negligence of the

plaintiffs, and therefore, the malpractice claim fails.  Id.  As a result, the AMS Defendants argue

that Counts II through VI, allegedly arising from the same facts as the malpractice claims, must

also fail.  Id. at 27-28.

The plaintiffs, however, contend that the claims for breach of contract, breach of fiduciary duty, and breach of the covenant of good faith and fair dealing are based on different legal theories and facts than the malpractice claim, and therefore, are valid.  Pls.' AMS Opp'n at 26.  Specifically, the plaintiffs allege that the: (1) malpractice claim arises from AMS's purported "negligence in handling the infringement action" and, therefore, on "allegations regarding AMS's failure to meet the standard of care in investigating or clarifying ownership of the '986 Patent," id.; (2) the claims for breach of contract and breach of the implied covenant of good faith and fair dealing are based on AMS's purported failure to perform under the contingency fee agreement by "refus[ing] to appeal [the plaintiffs'] cases [or file an ITC action] unless Dr. Lans paid AMS substantial sums of money . . . to finance [the] litigation," id.; and (3) the claim for breach of fiduciary duty is centered on AMS's alleged "wrongful[] transferr[ing] of money out of [the plaintiffs'] client trust account and . . . withh[olding of] funds belonging to Dr. Lans and Uniboard," id. at 27.  As such, the plaintiffs posit that the contract-based claims do not arise from the same facts as the malpractice claim.  Id. at 26.

"[I]f a plaintiff is unable to prove his professional negligence claim, contract and tort claims which are essentially restatements of the failed malpractice claim must also fail." Macktal v. Garde, 111 F. Supp. 2d 18, 23 (D.D.C. 2000); cf. Asuncion, 514 A.2d at 1191 ("Although contract and tort claims arising out of the same incident theoretically have different requirements of proof and assessments of damages, . . . we have noted that, in professional malpractice cases, alleged negligence and breach of contract are typically premised on the same duty of care and, as a consequence, should typically lead to the same legal result." (internal citations omitted)).  However, where the actions are based upon "independent legal theories

which require the proof of different facts," even if both theories arise from one factual scenario, "the dismissal of one action [does] not disturb the legal underpinnings of the second count." Boynton v. Lopez, 473 A.2d 375, 377 (D.C. 1984). This is one such case.

First, the malpractice claim in this case centers on the alleged failure to investigate and clarify ownership of the patent. See Compl. ¶¶ 2, 11, 61, 75-78, 83-84 (failing to adequately investigate and clarify the ownership of the patent before giving notice to potential infringers, before filing suit, or once the issue was raised in litigation; failing to actually give notice of infringement to potential infringers in the name of Uniboard; initiating suit in the name of the wrong party, or at least in the name of both Dr. Lans and Uniboard; drafting and advising Dr. Lans to sign the Micron-Diamond settlement and license agreements that had the effect of giving a release and immunity from suit to all companies that purchased otherwise infringing components from Micron-Diamond, including companies that had received a notice of infringement letter).

Second, the plaintiffs are not alleging that "AMS had a duty to represent them free of charge in matters outside of the parameters of the contingency fee agreement," as the defendants allege, AMS Defs.' Reply at 18-19; rather, the plaintiffs' breach of contract claim alleges that representation in regard to the petition for a writ of certiorari and the filing of an ITC complaint were included in the Fee Agreement, see Pls.' AMS Opp'n at 26, and therefore refusing to represent Dr. Lans in these matters constituted a breach of the Fee Agreement, Compl. ¶¶ 122-125 (stating that AMS's refusal to represent Dr. Lans on appeals absent another payment of fees breached the fee agreement). In addition, the Complaint alleges that the defendants breached the Fee Agreement by converting funds owed to them under the terms of the Fee Agreement. Id. ¶ 130. Similarly, the breach of the implied covenant of good faith claim is based on these same

facts.  See id. ¶¶122-130.  The breach of contract and breach of the covenant of good faith claims

will, therefore, require proof of different facts than the malpractice claim.  Thus, a failed

malpractice claim will not necessarily preclude recovery on either of these claims.

Third, the breach of fiduciary duty claim centers primarily on violations of the District of

Columbia Code of Professional Conduct ("D.C.P.C.") and the Swedish Bar's Canon of Ethics.

For example, the fiduciary duty claims include: entering into the fee-splitting agreement in

violation of Swedish ethics rules, Compl. ¶ 47; concealing information regarding the division of

fees between AMS and Delphi, id. ¶ 46 (alleged violation of rule 1.5(e) of the D.C.P.C.);

revealing confidential client communications to the Court and others, id. ¶¶ 92-93; failing to

inform the plaintiffs that there was a conflict of interest at the summary judgment stage of the

underlying litigation, at the sanctions hearing, and in relation to the settlement agreement with

Gateway, id. ¶¶ 93, 110-111, 121; refusing to further represent the plaintiffs in litigation

concerning the patent or in challenging the sanctions order unless the plaintiffs paid additional

money, id. ¶¶ 120, 123-25 (purportedly violating Rule 1.16 of the D.C.P.C.); refusing to pay the

plaintiffs funds allegedly owed under the Fee Agreement from settlement agreements with

infringers, and converting those funds from the Client Trust Account holding such settlement

amounts, id. ¶¶ 126-132 (alleged violation of Rue 1.15 of the D.C.P.C.); failing promptly and

completely to provide the plaintiffs with all papers upon termination of the attorney-client

relationship, id. ¶¶ 135-139; failing properly to account for funds held in trust, id. ¶¶ 126-136;

and interfering with and refusing to cooperate with successor counsel, id. ¶¶ 135-139.  Thus, the

fiduciary duty claims also do not arise out of the same facts as the malpractice claim.  Therefore,

a failed malpractice claim will not necessarily preclude recovery on a claim for breach of

fiduciary duty.

For all of the reasons set forth above, the Court finds that the plaintiffs' breach of contract, breach of fiduciary duty, and breach of the covenant of good faith and fair dealing claims are not duplicative of the malpractice claims.

      c.     <u>Covenant of good faith and fair dealing (Counts III & V)</u>

Finally, the AMS Defendants assert that, while an independent cause of action for breach of the covenant of good faith and fair dealing exists in the context of employer-employee disputes, it does not exist in the District of Columbia for claims based on an attorney's representation of a client.  AMS Defs.' Mem. at 12-13.  The defendants cite to <u>Jacobsen</u>, where the Court dismissed the plaintiff's claim for breach of the implied covenant of good faith and fair dealing because it was identical to the plaintiff's claim for professional malpractice and because "there is no independent cause of action for an implied covenant of good faith and fair dealing with respect to an attorney's representation of a client."  <u>Jacobsen v. Oliver</u>, 201 F. Supp. 2d 93, 98 n.2 (D.D.C. 2002).  The plaintiffs, on the other hand, simply allege that the District of Columbia recognizes a cause of action for breach of the implied covenant.  Pls.' AMS Opp'n at 26 (citing <u>Willens v. 2720 Wisconsin Ave. Co-op Ass'n</u>, 844 A.2d 1126, 1135 (D.C. 2004)). The Court does not find the defendants' arguments persuasive.

First, the Court in <u>Jacobsen</u> dismissed the implied covenant count because it was identical to another claim for relief.  <u>Jacobsen</u>, 201 F. Supp. 2d at 98 n.2; <u>see also</u> <u>Northview Motors, Inc.</u> <u>v. Chrysler Motors Corp.</u>, 227 F.3d 78, 91-92 (3d Cir. 2000) (cited by <u>Jacobsen</u>, 201 F. Supp. 2d at 98 n.2, for support, and stating that "a party is not entitled to maintain an implied duty of good faith claim where the allegations of bad faith are identical to a claim for relief under an established cause of action"  (internal quotation marks and citation omitted)); <u>cf.</u> <u>Macktal</u>, 111 F. Supp. 2d at 23; <u>Asuncion</u>, 514 A.2d at 1191.  Second, while the <u>Jacobsen</u> Court ruled that

implied covenant claims are unavailable where they are based on an attorney's malpractice, the Court did not address whether the same result is warranted when a former client asserts a breach of contract claim against an attorney.  Jacobsen, 201 F. Supp. 2d at 98 n.2 (stating that an independent cause of action for implied covenant of good faith and fair dealing did not exist "with respect to an attorney's representation of a client" (emphasis added)).

In this case, the plaintiffs' implied covenant claims are founded upon their contract with the AMS Defendants, not on AMS's representation or any alleged malpractice.  Therefore, the general rule that "in every contract there is an implied covenant . . . of good faith and fair dealing" applies.  Willens v. 2720 Wisconsin Ave. Coop. Ass'n, Inc., 844 A.2d 1126, 1135 (D.C. 2004) (internal quotation marks and citations omitted).  No cases addressing legal malpractice have carved out an exception for such cases, and therefore, just like other contracts, contracts with attorneys are subject to an implied covenant of good faith and fair dealing.

Accordingly, the plaintiffs' claim for breach of the implied covenant of good faith and fair dealing survives the AMS Defendant's motion to dismiss.

## IV. Conclusion

For the foregoing reasons, the Court finds that the plaintiffs have made a sufficient showing that personal jurisdiction can properly be exercised over the Delphi Defendants based on specific jurisdiction. Thus, the Court denies the Delphi Defendant's motion to dismiss the complaint for lack of personal jurisdiction, in its entirety.  Further, for the reasons set forth above, the Court must also deny the Delphi Defendants motion to dismiss based on forum non conveniens.

Additionally, for the foregoing reasons, the Court denies the AMS Defendants' motion for judgment on the pleadings as to the plaintiffs' malpractice claim based on either issue or

claim preclusion, and grants the motion as to the plaintiffs' RICO claim based on both claim and issue preclusion.  Despite its dismissal of the RICO claim, the Court finds that it has original jurisdiction over the malpractice claim under 28 U.S.C. § 1338, and supplemental jurisdiction over the remaining state-law claims under 28 U.S.C. § 1367.  Furthermore, because the plaintiffs failed to contest the AMS Defendants' argument that they did not allege sufficient facts to state a claim for fraud or fraudulent concealment, the Court grants the motion as to these claims based on the plaintiffs' concession of the argument.  Moreover, the Court denies the AMS Defendants' motion for judgment on the pleadings as to the breach of contract, breach of fiduciary duty, and breach of the covenant of good faith and fair dealing claims as duplicative of the malpractice claim.  Finally, the Court holds that an independent cause of action for breach of the implied covenant of good faith and fair dealing is available in this case, where the claim is based on a breach of contract, rather than an attorney's malpractice.  Therefore, the Court denies the AMS Defendants' motion for judgment on the pleadings as to the plaintiffs' claim for breach of the implied covenant of good faith and fair dealing. [57]

      **SO ORDERED** this 23rd day of May, 2011.


                           REGGIE B. WALTON
                           United States District Judge

---

[57]  The Court will contemporaneously issue an order consistent with this Memorandum Opinion.